

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JB/AB:CMP
F. #2009R02328

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 18, 2010

<u>VIA ECF AND HAND DELIVERY</u>

The Honorable John Gleeson
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:  <u>United States v. Gaetano Napoli, et al.</u>
            <u>Criminal Docket No. 10-0150 (JG)</u>

Dear Judge Gleeson:

      The government respectfully moves to disqualify Joseph R. Corozzo, Esq. and his law firm from representing defendant Gaetano Napoli, Sr. in the above-captioned case based on a conflict of interest. Among other charges, the defendant Gaetano Napoli, Sr., is charged with engaging in the obstruction of justice relating to Witness #2, charged as Counts Eight and Nine in the indictment. Mr. Corozzo is the subject of the investigation into these exact charges in light of representations made by Napoli, Sr. to Witness #2 relating to Napoli, Sr.'s and Gaetano Napoli, Jr.'s efforts to tamper with Witness #2. Accordingly, Mr. Corozzo is burdened by a *per se* conflict of interest and should be disqualified. In addition, Mr. Corozzo is a witness to events that will be the subject of trial testimony, providing a further ground for his disqualification.

I.    <u>Factual Background</u>

      On March 4, 2010, a Grand Jury in this District returned a nine-count indictment charging defendants Gaetano Napoli, also known as "Gaetano Napoli, Sr." and "Thomas Napoli," Thomas Napoli, also known as "Thomas Napoli, Jr.," and Gaetano Napoli Jr., also known as "Guy." Listed in the chart below is a summary of the criminal counts included in this indictment:

| Counts | Description | Defendants |
|---|---|---|
| 1 | False Statements in Bankruptcy - Bankruptcy Petition | Gaetano Napoli, Sr. |
| 2 | False Statements in Bankruptcy - Section 341(a) Meeting | Gaetano Napoli, Sr. |
| 3 | Concealment of Assets in Bankruptcy | Gaetano Napoli, Sr., Thomas Napoli, Gaetano Napoli, Jr. |
| 4 | Conspiracy to Conceal Assets in Bankruptcy | Gaetano Napoli, Sr., Thomas Napoli, Gaetano Napoli, Jr. |
| 5 | Extortionate Collection of Credit - John Doe | Gaetano Napoli, Sr. |
| 6 | Obstruction of Justice - Witness #1 | Gaetano Napoli, Sr. |
| 7 | Obstruction of Justice - Grand Jury Proceeding | Gaetano Napoli, Sr. |
| 8 | Obstruction of Justice - Witness #2 | Gaetano Napoli, Sr., Gaetano Napoli, Jr. |
| 9 | Conspiracy to Obstruct Justice - Witness #2 | Gaetano Napoli, Sr., Gaetano Napoli, Jr. |

The defendants were arrested on March 10, 2010; Thomas Napoli was arrested in the Eastern District of New York and Gaetano Napoli, Sr. and Gaetano Napoli, Jr. were arrested in the Eastern District of North Carolina and have consented to being removed in custody to this District.[1] Relevant to this motion, Gaetano Napoli, Sr. is charged with obstructing Witness #2 in Counts 8 and 9 of the Indictment.

By way of background, as charged in Count One, Napoli knowingly made false statements in Napoli & Sons Meat, Inc.'s ("Napoli & Sons") 2009 bankruptcy petition, which he signed under penalty of perjury, by denying that his business, Napoli & Sons, had any assets whatsoever. Furthermore, as charged in Count Two, he took an oath to tell the truth during a meeting with the

---

[1] For additional background, the government respectfully refers to its detention memorandum filed on March 10, 2010 (attached as Exhibit A).

2

Bankruptcy Trustee pursuant to Section 341(a) of the Bankruptcy Code but nonetheless deliberately misrepresented Napoli & Sons' assets. For example, when asked if the debtor had equipment, Napoli responded, "Yeah. They're leased actually. All the equipments are leased." In fact, far from "leasing" the equipment, Napoli sold some of it for approximately $100,000 not long after the 341(a) meeting and rented additional equipment to a third party. Napoli and his sons were intercepted arranging a moving truck to transport the Napoli & Sons equipment, such as a 500 lb meat grinder, fork lifts and other industrial-sized meat-packing equipment, to the buyer, and agents conducting surveillance also photographed and videotaped the movers in action. Additionally, in the bankruptcy petition, Napoli denied having any accounts receivable; consequently, he and Gaetano Napoli, Jr. instructed customers to write checks in the name "G&T Meatpackers" instead of Napoli & Sons to conceal these accounts receivable and payments from the Bankruptcy Court.

During the investigation of this case, Witness #2 agreed to cooperate with the government and, as part of that agreement, agreed to consensually record conversations with the defendants. During a consensually recorded meeting with Gaetano Napoli, Sr. ("SR") and Gaetano Napoli, Jr. ("JR") on October 12, 2009, both Gaetano Napoli, Sr. and Gaetano Napoli, Jr. advised Witness #2 not to talk to law enforcement if law enforcement approached him about the bankruptcy investigation and coached him how to respond if law enforcement approached him - conduct that is, in part, the subject of Counts 8 and 9 of the Indictment. In relevant part, the Napolis instructed Witness #2 that,

> SR: I advise that you say nothing. Listen, either you give me time, I'll have my lawyer get in touch with you or do I get in touch with my lawyer. (UI)
>
> UM: Oh.
>
> SR: Do not, do not, and I repeat a hundred times. Let's not try to be lawyers for our friends. Okay?
>
> W#2: I understand that.
>
> SR: That's it. That's what he [referring to Mr. Corozzo] told me. In other words.

* * * * * *

3

SR: The Trustee . . . (UI) . . . We did not list . . . we have . . . (UI) and you don't know nothing about it. (UI) forget about it. Let him [referring to Mr. Corozzo] speak to [the bankruptcy attorney representing Napoli & Sons Meat, Inc.] (UI) they're fired. Don't even speak to nobody. Don't talk to nobody.

        \*    \*    \*    \*    \*    \*

JR: (UI) I don't have nothing to say, I'm waitin' for a lawyer.

SR: That's it.

UM: Like you hit me with a (UI)

JR: I don't have nothing to say. I'm waiting for my lawyer.

SR: That's it. (UI)

JR: I don't have nothing to say. Wait. Call my lawyer.

SR: That's it. (UI) That's it. That's it. We can't deny we knew each other but we're not gonna tell them what they ask. . . . You understand? So make sure . . . I hope I don't have to worry about you.

JR: There's nothing (UI) trying to be . . . a lawyer (UI)

W#2: I'm not trying to be a lawyer, Tom. (UI) can't do (UI) a lawyer (UI) that is a lawyer and (UI)  The lawyer is supposed to be good. I'm . . . I'm . . . (UI)

SR: You know (UI) speak to my lawyer. You understand? I don't even remember. I don't know (UI) get my lawyer. Speak to my lawyer. (UI) that's it. (UI)

        \*    \*    \*    \*    \*    \*    \*

>SR: He [referring to Mr. Corozzo] told me, speak to the lawyer. Maybe there might be something. Huh?

>\* \* \* \* \* \* \*

>SR: Do not call nobody! I just told you. I'll repeat again. Do not call nobody. He [referring to Mr. Corozzo] would take care. I told him, you wanna (UI) No. I will take care. Do you want so and so present there? No. I will take care. That's it. When the time comes and he wants me and it's you (UI) you do not . . . do not volunteer to nobody nothing. That's the case (UI) Anybody call, what's up? Good-bye? Tell Tommy.

>\* \* \* \* \* \* \*

>SR: Do not speak to them. One fuckin' word out of the way and we're all shit-fucked.[2]

On October 19, 2009, Witness #2 met with Gaetano Napoli, Sr., Mr. Corozzo and Napoli & Sons' bankruptcy attorney among others.[3] During this conversation, Napoli acknowledged that some of the assets used by Napoli & Sons and concealed in the bankruptcy proceeding were purchased by checks from a Napoli & Sons bank account – evidence that is relevant to establishing that Napoli & Sons in fact owned the assets concealed during the bankruptcy proceeding and that Napoli, Sr., therefore, made false statements during that proceeding to the contrary (i.e., regarding the ownership of the Napoli & Sons equipment). In addition, during this conversation, Napoli, Sr. again advised Witness #2, "If anybody comes around, you don't know nothing. Give them the name of a lawyer. My lawyer gets in touch. One word out of the way can fuck it up." Napoli, Sr. continued, "Don't answer no questions. Don't try to be an attorney."

---

[2] The quotations cited herein are based on draft transcripts subject to revision.

[3] Because Witness #2 is not in a joint defense agreement with Napoli, there is no viable claim that the conversation was privileged, a fact acknowledged by Mr. Corozzo during the discussion: "If I'm representing Tom [referring to Napoli, Sr.] and you're here unrepresented, then they [referring to law enforcement] can ask you about what's being said."

5

In addition, Napoli, Sr. is also charged in Count 5 with using extortionate means to collect an extension of credit. As part of its proof, the government anticipates it will offer evidence of Napoli, Sr.'s membership in the Gambino crime family to establish the background of this charge, including the reason why Napoli, Sr. was involved with the debt and why a reasonable person would believe a threat of violence existed. In light of Mr. Corozzo's alleged personal involvement in the Gambino family's activities that arguably implicate him in criminal conduct, which is described in detail in the attached exhibit, Mr. Corozzo suffers a further conflict of interest also requiring his disqualification. See <u>United States v. Agate, et al.</u>, 08-CR-076 (JBW), Memorandum Of Law In Support Of Government's Motion To Disqualify Joseph Corozzo, Jr., Esq., And The Law Firm Of Rubenstein & Corozzo, P.C., at 3-22 (E.D.N.Y. Mar. 20, 2008)(attached as Exhibit B).[4]

II. <u>Legal Standard</u>

A defendant's right to effective assistance of counsel includes the right to be represented by an attorney who is free

---

[4] On March 27, 2008, following a hearing, the Honorable Jack B. Weinstein, United States District Judge, disqualified Mr. Corozzo from representing his father, Gambino family consigliere Joseph Corozzo, after hearing the testimony of only one government witness on the ground that Mr. Corozzo had previously represented that witness, who was scheduled to testify against Mr. Corozzo's client. In making his ruling, Judge Weinstein did not address the other grounds advanced by the government in support of its motion to disqualify Mr. Corozzo. However, after a different witness testified at the trial of a co-defendant that Mr. Corozzo had advised him and his co-defendants to lie that, "if we told the Judge that we were on drugs or alcohol and asked him to recommend we went into the federal drug program, if we got into the program and successfully completed it, they would take a year off our sentence and give us a six-month Halfway House", <u>United States v. Carneglia</u>, 08-CR-76 (JBW), at 1609-1614 (E.D.N.Y. Feb. 9, 2009), Judge Weinstein directed that "The clerk of the court will furnish those pages of the transcript containing the testimony of the witness with respect to what an attorney admitted in the State of New York allegedly told him with respect to drug addiction and the effect on his prison sentence. Bring it to the attention of the United States Attorney with a request that it be brought to the attention of the Committee on Ethics of the Bar Association." <u>Id</u>. at 1613-14. (attached as Exhibit C).

6

from conflicts of interest. E.g., Wood v. Georgia, 450 U.S. 261, 271 (1981); United States v. Perez, 325 F.3d 115, 125 (2d Cir. 2003). "While the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988). A criminal defendant thus "does not have the absolute right to counsel of her own choosing." United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993).

When a court has been informed of the possibility of a defense counsel's conflict of interest, it has a threshold obligation to "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994).

The Second Circuit groups conflicts of interest into three categories. United States v. Williams, 372 F.3d 96, 102 (2d Cir. 2004). "The first category describes those conflicts that are so severe that they are deemed *per se* violations of the Sixth Amendment. Such violations are unwaivable and [on appeal] do not require a showing that the defendant was prejudiced by his representation." Id. *Per se* conflicts of interest occur "only where trial counsel is not authorized to practice law and where trial counsel is implicated in 'the same or closely related criminal conduct' for which the defendant is on trial." Id. at 103 (quoting United States v. Fulton, 5 F.3d 605, 611 (2d Cir. 1993)).

For the *per se* conflict of interest rule to apply, the Court need not find that defense counsel actually engaged in crimes closely related to those with which the defendant is charged. Id. at 611. Rather, allegations from a single witness regarding defense counsel's involvement in the events constituting criminal activity require disqualification "where there is a reasonable probability that a witness's allegations are true." Id. Further, "when a government witness alleges that he has direct knowledge of criminal conduct by defense counsel, for purposes of constitutional analysis, we must treat such allegations as though they are credible." Id. at 612. An attorney facing such allegations can avoid disqualification only where a district court finds following a hearing that it can "definitively rule out the possibility that the allegations are true." Id. at 613. As such, in Fulton, the Second Circuit

7

reversed a conviction obtained after the district court advised the defendant that a lone cooperating witness alleged that his attorney engaged in criminal conduct related to the conduct with which the defendant was charged and the defendant waived the conflict.[5]

The other two categories of conflicts address actual and potential conflicts of interest. "An attorney has an actual . . . conflict of interest when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action." Perez, 325 F.3d at 152. A potential conflict of interest exists where "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." Id.

If a court determines that an attorney suffers from an actual or potential conflict of such a serious nature that no rational defendant would knowingly and intelligently desire that

---

[5] In United States v. Rondon, 204 F.3d 376, 379-80 (2d Cir. 2000), a defendant appealing his trial conviction argued that he was the victim of a *per se* conflict of interest despite his prior knowledge that his attorney had been disbarred and his attorney's admission to represent him at trial *nunc pro tunc*. In setting forth the *per se* rule, the Rondon court stated that it applied only in instances where the alleged conflict was unknown to the defendant at the time of the representation, suggesting that a knowing waiver might be possible. Id. In Williams, while explicitly acknowledging that "we do not reach the issue of . . . a *per se* conflict of interest," the Second Circuit nevertheless attempted to square Rondon with Fulton's holding that a defendant's knowing waiver of his attorney's conflict of interest could not stand where the attorney engaged in conducted related to the crimes charged. 372 F.3d at 105. In this effort, while noting that the district court in Fulton advised the defendant of his attorney's conduct and the defendant subsequently waived of any resulting conflict, the Williams court stated that it was "unclear" whether the Fulton defendant knew of his attorney's criminal conduct and that "[t]hus we consider it unresolved in this Circuit whether the *per se* conflict rules are applicable where the defendant is aware of the facts underlying what would otherwise be a *per se* conflict." Id. The Second Circuit has thus expressly left this question open, and it is thus possible that the conflict will be found to be *per se* even if the defendant is aware of the relevant facts.

attorney's representation, the court *must* disqualify that attorney. E.g., United States v. Lussier, 71 F.3d 456, 461-62 (2d Cir. 1995); see also Levy, 25 F.3d at 153; Jones, 381 F.3d at 120; United States v. Schwarz, 283 F.3d 76, 95 (2d Cir. 2002). Further, in cases where, as here, numerous conflicts have been raised, "each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and his client." United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994); see also Levy, 25 F.3d at 157. In evaluating an actual or potential conflict of interest, actions of any member of a law firm are imputed to every member of the firm. E.g., United States v. Jiang, 140 F.3d 124, 127 (2d Cir. 1998).

Notwithstanding a defendant's willingness to waive his attorney's conflict of interest, courts retain "substantial latitude" in refusing such waivers. See Wheat, 486 U.S. at 163. This is so because "'[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" Locasio, 6 F.3d at 931 (quoting Wheat, 486 U.S. at 160); see also United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004) ("[D]isqualification . . . implicates not only the accused's right to counsel, but also the interests of the judiciary in preserving the integrity of its processes, and the government's interest in a fair trial and a just verdict."). *Per se* conflicts of interest, however, "are unwaivable." Williams, 372 F.3d at 102; Fulton, 5 F.3d at 613 ("Where a government witness implicates defense counsel in a related crime, the resultant conflict so permeates the defense that no meaningful waiver can be obtained."). Moreover, *per se* conflicts of interest are not only unwaivable, but are of such a serious nature that if allowed to persist through trial and conviction, on appeal they result in "automatic reversal without a showing of prejudice." Williams, 372 F.3d at 103 (internal quotations omitted).

Moreover, a defendant's Sixth Amendment right to counsel is not the only interest at issue when a conflict arises. In determining how to resolve conflict issues, the trial court also has an independent duty to preserve the integrity of the judicial process and to ensure that "criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 159. "The question of [attorney] disqualification therefore implicates not only the Sixth Amendment right to the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in

9

ensuring a just verdict and a fair trial." Locascio, 6 F.3d at 931. Accordingly, a court should decline to permit a defendant to be represented by the counsel of his choice if that representation would undermine the integrity of the judicial process. Wheat, 486 U.S. at 159. Both the Supreme Court and the Second Circuit have upheld a trial court's decision not to allow a waiver of a conflict of interest. See Wheat, 486 U.S. at 159; United States v. Rogers, 9 F.3d 1025, 1030-32 (2d Cir. 1993); United States v. Locascio, 6 F.3d 924, 931-35 (2d Cir. 1993).

III. Mr. Corozzo's Status As A Subject Of The Investigation Charged In This Case Creates An Actual Conflict Of Interest

In light of the defendant Napoli's representation to Witness #2 that his lawyer, Mr. Corozzo, had advised, inter alia, that Witness #2 should not talk to law enforcement; that "you don't know nothing about it;" to "not [ ] tell [law enforcement] what they ask;" to say "I don't even remember;" and "to not volunteer nothing to nobody," Mr. Corozzo is a subject of the government's ongoing investigation into witness tampering that led to some of the charges in this case. This raises a fundamental, unwaivable conflict in his representation of Napoli, Sr. See United States v. Fulton, 5 F.3d 605, 608 (2d Cir. 1993) (stating that "[i]t is well-settled in this circuit that an actual conflict of interest exists when an attorney engages in wrongful conduct related to the charge for which the client is on trial."). At minimum, based on the facts described above, Mr. Corozzo is a potential witness in the investigation and to the events at issue in this case. At worst, he is a co-conspirator. Under these circumstances, Mr. Corozzo cannot render effective representation where, as here, pursuing certain strategies to defend Napoli on the obstruction charges could be detrimental to Mr. Corozzo personally. For example, it would not be in Mr. Corozzo's interest to advance an advice-of-counsel defense of the obstruction of Witness #2 charges since such a defense would necessarily implicate Mr. Corozzo. See id. at 610 (in disqualifying an attorney implicated in criminal conduct and rejecting the possibility of waiver, the court noted that "the attorney is not in a position to give unbiased advice to the client about such matters as whether or not to testify or to plead guilty and cooperate since such testimony or cooperation from the defendant may unearth evidence against the attorney."). Mr. Corozzo's possible participation in the criminal activity that is the subject of this indictment is a conflict that not only requires his disqualification, but results in an automatic reversal without a showing of prejudice were the Court to allow his continued representation.

IV. Mr. Corozzo's Status as a Potential Witness Further Contributes to the Conflict

      Where, as here, defense counsel is entangled in the facts of the defendant's case such that he should either be available as a witness or would, upon remaining as defense counsel, "become an unsworn witness for the accused," it is counsel's ethical duty to withdraw, and upon failing to do so, counsel should be disqualified, regardless of the defendant's expressed willingness to waive. Locascio, 6 F.3d at 931-34. Because the government, not the defendant, is prejudiced, "waiver is ineffective in curing the impropriety in such situation." Locascio, 6 F.3d at 931, 934; see also United States v. Arrington, 867 F.2d 122, 129 (2d Cir. 1989); United States v. Iorizzo, 786 F.2d 52, 57 (2d Cir. 1986); United States v. Kwang Fu Peng, 766 F.2d 82, 87 (2d Cir. 1985). Whether the government will or will not call counsel as a trial witness has no significance in ruling on a disqualification motion. Locascio, 6 F.3d at 934.

      In this case, Mr. Corozzo participated in some of the non-privileged consensually-recorded conversations the government intends to offer as evidence at trial. In addition, his client has relayed what is purported to be direction from Mr. Corozzo to further Napoli's efforts to tamper with Witness #2. With respect to this conduct, Mr. Corozzo will possess intimate knowledge of the accuracy of the testimony proffered. If Mr. Corozzo served as trial counsel, he would likely find himself in the position of arguing what "really" happened with regard to his discussions with Napoli and Witness #2. As such, any cross examination by Mr. Corozzo of the cooperating witnesses concerning these topics would leave the impression that Mr. Corozzo - the subject of the testimony - knows more about the testimony than the witness and that the witness is thus being untruthful. In this way, Mr. Corozzo's cross-examination would be transformed into powerful unsworn testimony. Similarly, any arguments to the jury dismissing such claims would carry far more force than from an attorney who was not operating as an unsworn witness. For example, if Mr. Corozzo were to argue about the meaning of what was said by Napoli or the other participants in the conversations (including himself), the jury could give added credibility to his interpretation due to his first-hand knowledge. The government would accordingly be placed at the exact disadvantage identified by the Second Circuit in Locasio and the other cases cited above. See, e.g., Locasico, 6 F.3d at 933 (in affirming disqualification of a lawyer, the court found that "his role as advocate may give his client an unfair advantage, because the attorney can subtly

11

impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination").

Alternatively, Mr. Napoli or his co-defendant in the obstruction charge may wish to call Mr. Corozzo in an effort to either dispute the assertions on the consensual recordings, negate Napoli, Sr.'s criminal intent or to rely on an advice-of-counsel defense. Mr. Corozzo's inability to testify in light of his representation of the defendant could seriously prejudice the defendants. For this additional reason, the Court should also disqualify Mr. Corozzo.

## Conclusion

For the reasons cited above, the government respectfully submits that Mr. Corozzo should be disqualified from serving as Gaetano Napoli, Sr.'s counsel. In addition, because Mr. Corozzo's conflicts are imputed to his law firm, Rubenstein & Corozzo, P.C., members of that firm must also be barred from representing Gaetano Napoli, Sr.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney

By: _____/s/_____
Amy Busa
Cristina M. Posa
Assistant U.S. Attorneys
(718) 254-6274/6668

12