JL:RB
F.#2007R00730

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          _____

    - against -                          08-CR-76 (JBW)

JOSEPH AGATE, et al.,

          Defendants.

- - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF GOVERNMENT'S
MOTION TO DISQUALIFY JOSEPH COROZZO, JR., ESQ.,
AND THE LAW FIRM OF RUBINSTEIN & COROZZO, P.C.

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

JOEY LIPTON
ROGER BURLINGAME
DANIEL BROWNELL
EVAN NORRIS
Assistant U.S. Attorneys

AMY LEGOW COHN
Special Assistant U.S. Attorney

## TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . 3

A.   Mr. Corozzo is an Associate of the Gambino Family and
House Counsel to the Gambino Family. . . . . . . . . . . 3

   1.   Mr. Corozzo's Involvement in the Gambino Family's
Illegal Activities. . . . . . . . . . . . . . . . . 3

      (a)  Mr. Corozzo Participated With Joseph Corozzo in
Discussions Concerning the Gambino Family's
Collection of Extortion Proceeds . . . . . . . . 4

      (b)  Mr. Corozzo Provided Gambino Family
Administration Money to Jailed Gambino Boss
Peter Gotti. . . . . . . . . . . . . . . . . . . 5

      (c)  Mr. Corozzo Serves as "House Counsel" to the
Gambino Family Using His Status as a Lawyer to
Further Gambino Family Interests in Myriad
Ways . . . . . . . . . . . . . . . . . . . . . . 6

          (i)   Mr. Corozzo Helps Incarcerated Gambino
Family Members Conduct Gambino Family
Business. . . . . . . . . . . . . . . . . . 6

          (ii)  Mr. Corozzo Advises Gambino Family Members
How to Thwart Law Enforcement. . . . . . . 9

          (iii) Mr. Corozzo Counseled a Gambino Member to
Perpetrate a Fraud on the Court in Order to
Receive a Shorter Sentence. . . . . . . . 10

          (iv)  The Gambino Family Uses Mr. Corozzo to
Prevent Individuals from Cooperating with
Law Enforcement. . . . . . . . . . . . . 11

              (A)  Conducting a Fraudulent
Representation. . . . . . . . . . . . 12

              (B)  Reporting Law Enforcement Contacts. . 13

      (d)  Mr. Corozzo Ordered a Shooting. . . . . . . . 15

i

(e)  Mr. Corozzo Used Extortionate Means to Collect
      Debts . . . . . . . . . . . . . . . . . . . .  15

(f)  Construction Industry Extortions.. . . . . . .  16

2.  Mr. Corozzo Has Been Recorded Pledging His
    Allegiance to the Boss of the Gambino Family. . . .  17

3.  Mr. Corozzo Was Proposed for Membership in the
    Gambino Family by Consigliere Joseph Corozzo. . . .  19

4.  Mr. Corozzo Attends Gambino Family Events Open Solely
    to Gambino Family Members and Associates. . . . . .  21

B.  Mr. Corozzo Has Represented Four Cooperating Witnesses
    Expected to Testify at Trial in This Case. . . . . . .  22

1.  Anthony Ruggiano. . . . . . . . . . . . . . . . .  22

(a)  1995 Queens Bookmaking Case. . . . . . . . . .  23

(b)  1997 Florida RICO Conspiracy Case. . . . . . .  24

2.  Salvatore Mangiavillano.. . . . . . . . . . . . .  25

3.  Salvatore Romano. . . . . . . . . . . . . . . . .  25

4.  CW#2. . . . . . . . . . . . . . . . . . . . . . .  25

C.  Prior Disqualification Motions.. . . . . . . . . . . .  26

1.  United States v. Yanotti. . . . . . . . . . . . .  26

2.  United States v. Pizzonia.. . . . . . . . . . . .  26

3.  United States v. Perrone. . . . . . . . . . . . .  27

APPLICABLE LAW. . . . . . . . . . . . . . . . . . . . . . . .  28

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . .  31

I.  Mr. Corozzo's Multiple Conflicts of Interest Require His
    Disqualification.. . . . . . . . . . . . . . . . . . . .  31

A.  Mr. Corozzo Was An Unsworn Witness to Events That Will
    Be the Subject of Trial Testimony.. . . . . . . . . .  32

1.  Favored Gambino Associate. . . . . . . . . . .  33

ii

       2.    The Foxwoods Tape. . . . . . . . . . . . . . . 35

       3.    Hudson & McCoy.. . . . . . . . . . . . . . . . 35

  B.   Mr. Corozzo Represented Multiple Cooperating Witnesses Who Are Expected to Testify at Trial. . . . . . . 37

       1.    Anthony Ruggiano.. . . . . . . . . . . . . . . 43

       2.    Salvatore Mangiavillano. . . . . . . . . . . 46

       3.    Salvatore Romano.. . . . . . . . . . . . . . . 47

       4.    CW#2.. . . . . . . . . . . . . . . . . . . . . 48

  C.   Mr. Corozzo's Involvement in the Racketeering Raises the Specter of a *Per Se* Conflict of Interest. . . . 50

  D.   Mr. Corozzo's Multiple Conflicts of Interest Must Be Considered In Collectively.. . . . . . . 54

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . 55

<u>PRELIMINARY STATEMENT</u>

The government submits this memorandum in support of its motion to disqualify Joseph Corozzo, Jr., Esq. ("Mr. Corozzo"), and the law firm of Rubinstein & Corozzo, P.C., from continued representation of the defendant Joseph Corozzo ("Joseph Corozzo").

On February 6, 2008, a grand jury sitting in the Eastern District of New York indicted Joseph Corozzo together with numerous other codefendants. The indictment charges Joseph Corozzo with racketeering conspiracy, including two predicate acts of extortion and extortion conspiracy, and one predicate act of narcotics distribution conspiracy. He is also charged with four substantive counts of extortion and extortion conspiracy. Joseph Corozzo has been an associate, soldier and captain in the Gambino organized crime family of La Cosa Nostra (the "Gambino family"); he currently serves as the Gambino family consigliere.

The government seeks the disqualification of Mr. Corozzo and Rubinstein & Corozzo, P.C., based on the following conflicts of interest:

1.   Mr. Corozzo is an unsworn witness to several events that will be the subject of trial testimony;

2.   Mr. Corozzo has represented four cooperating witnesses who are expected to testify at trial;

3.   Mr. Corozzo's involvement in the Gambino family's activities arguably implicates him in criminal conduct that would require his *per se* disqualification.

1

This motion differs from others previously filed
seeking Mr. Corozzo's disqualification. In those motions,
including one filed with this Court in United States v. Pizzonia,
Cr. No. 05-425 (JBW), the conflicts focused primarily on Mr.
Corozzo's past representation of one or more cooperating
witnesses. Here, Mr. Corozzo's most serious conflicts stem from
his involvement in the conduct of the Gambino family, allegations
supported not only by cooperating witness testimony, but by
recorded conversations of Mr. Corozzo. These conflicts require
his disqualification because they would insert him into the trial
as an unsworn witness, unfairly prejudicing the government and
tainting the proceedings. Further, his participation in the
Gambino family's affairs arguably implicates him in the same
racketeering conspiracy with which his client is charged — a *per
se* conflict of interest that would require his disqualification.

Finally, Mr. Corozzo has represented four cooperating
witnesses expected to testify at trial, all of whom are expected
to testify concerning information relating to Mr. Corozzo's prior
representation. With respect to one of these witnesses, Anthony
Ruggiano, this Court previously found that Mr. Corozzo
represented Ruggiano and that the resulting conflict warranted
disqualification but for the fact that it came to the Court's
attention mid-trial ("the difficulty is that I can't disqualify
counsel at this moment in the trial"). United States v.
Pizzonia, Cr. No. 05-425 (JBW), Trial transcript at 2644.

Several of these conflicts standing alone warrant Mr. Corozzo's disqualification; some require it. Taken together, as required by the Second Circuit, they render Mr. Corozzo's continued participation in the case untenable. Because his conflicts are imputed to the law firm of Rubinstein & Corozzo, P.C., its members must too be barred from representing Joseph Corozzo.[1]

FACTUAL BACKGROUND

A.  Mr. Corozzo is an Associate of the Gambino Family and House Counsel to the Gambino Family

Mr. Corozzo is not merely a lawyer who represents his father, Gambino family consigliere Joseph Corozzo, and has represented numerous members of the Gambino family in the past. He acts as an associate of and "house counsel" to the Gambino family, involved in Gambino family's illegal activities. These facts are demonstrated by, among other evidence, the testimony of multiple cooperating witnesses and recorded conversations.

1.  Mr. Corozzo's Involvement in the Gambino Family's Illegal Activities

Mr. Corozzo's involvement in the Gambino family's criminal enterprise covers a broad range of illegal activity. He has participated in the collection of extortion money, provided

_____

[1]  Mr. Corozzo's partner, Mr. Rubinstein, represents Arthur Zagari in the instant case. This representation too raises a conflict. This will be discussed in the government's forthcoming Curcio letter, which will address several potential conflicts pertaining to various defendants.

3

Gambino family administration funds to the incarcerated Gambino family boss, used his status as an attorney to further the Gambino family's illegal interests, and participated in acts of violence or threatened violence, including a shooting and the extortionate collection of debt.  As discussed more fully in the argument section below, Mr. Corozzo's involvement in such activity will not only make him an unsworn witness to numerous contested issues of fact at the trial of Joseph Corozzo, but arguably render him a participant in the same racketeering conspiracy with which his father is charged – both conflicts of interest requiring disqualification.

          (a)   Mr. Corozzo Participated With Joseph Corozzo in Discussions Concerning the Gambino Family's Collection of Extortion Proceeds

A cooperating witness ("CW#1") who is a former Gambino family associate with ties to former Gambino family boss John J. Gotti and incarcerated Gambino family boss Peter Gotti, is expected to testify that Mr. Corozzo participated in the Gambino family's attempts to collect hundreds of thousands of dollars extorted from a Long Island restaurant.  This testimony is supported by consensual recordings, including a recording capturing Mr. Corozzo discussing the Gambino family's attempt to collect the extortion proceeds — one of five recordings between CW#1 and Mr. Corozzo.

4

Starting in fall 2005, CW#1 recorded a series of conversations with defendant and Gambino family consigliere, Joseph Corozzo and others, including Gambino family acting boss John D'Amico, regarding the Gambino family's ability to collect money related to CW#1's prior extortion of Hudson & McCoy, a popular restaurant located in Freeport, Long Island. __

_____In one conversation on March 27, 2007, CW#1 and Joseph Corozzo met with Mr. Corozzo to discuss the extortion. During the conversation, Mr. Corozzo questioned CW#1 closely about the history of CW#1's extortion of Hudson and McCoy, the discussions CW#1 had with Gambino family acting boss John D'Amico and others about attempting to collect the money owed, and the Gambino family's prospects for collecting the money owed.

_____(b) Mr. Corozzo Provided Gambino Family Administration Money to Jailed Gambino Boss Peter Gotti

CW#1 also is expected to testify that the Joseph Corozzo used Mr. Corozzo to provide Gambino family administration money to incarcerated boss Peter Gotti through Gotti's son, Peter Gotti, Jr. This testimony again is supported by recorded conversations, including an April 24, 2007 conversation in which Peter Gotti, Jr. told CW#1 that Mr. Corozzo provided him with money from Joseph Corozzo and the Gambino family administration for his father on numerous occasions, and complained that he believed Mr. Corozzo was stealing a portion of the money intended for his father.

    (c)   Mr. Corozzo Serves as "House Counsel" to the
          Gambino Family Using His Status as a Lawyer to
          <u>Further Gambino Family Interests</u>

Michael DiLeonardo, a cooperating witness and former Gambino family captain, has testified that Mr. Corozzo has been on retainer since graduating from law school to act as house counsel for the Gambino family and is paid approximately $4,000 a month for those services.[2]  In return, Mr. Corozzo provides the Gambino family with immediate information concerning any arrested Gambino family members and associates he represents, and uses his status as a lawyer to perform the various illicit services detailed below.

    (i)   Mr. Corozzo Helps Incarcerated Gambino Family
         Members and Associates Conduct Gambino Family
         <u>Business</u>

The government is in possession of evidence showing that Mr. Corozzo uses his increased access to correctional facilities in order to allow incarcerated members of the Gambino family to communicate with each other, maintain control of their interests and positions within the Gambino family, issue orders pertaining to Gambino family business, and urge incarcerated members and associates of the Gambino family not to cooperate

---

[2]   DiLeonardo testified to these facts, as well as other facts attributed to him herein.  <u>See</u> <u>United States v. Peter Gotti, et al.</u>, Cr. No. 02-743 (RCC) (S.D.N.Y.); <u>United States v. John A. Gotti, et al.</u>, Cr. No. 04-690 (SAS)(S.D.N.Y.); <u>United States v. Pizzonia, et al.</u>, Cr. No. 05-425 (JBW).  DiLeonardo's testimony from a February 6, 2006 hearing in <u>Pizzonia</u> concerning Mr. Corozzo's disqualification is attached hereto as Exhibit A.

with the government.

Evidence that Mr. Corozzo has acted in such a capacity includes the testimony of multiple cooperating witnesses. For example, CW#1 is expected to testify that Mr. Corozzo relayed orders from incarcerated Gambino family boss Peter Gotti. This testimony is corroborated by numerous recorded conversations, including a conversation that took place during the March 27, 2007 meeting between CW#1, Gambino family consigliere Joseph Corozzo and Mr. Corozzo noted above, in which Mr. Corozzo repeatedly instructed CW#1 to make payments on a debt owed to Gotti.

Former Gambino family associate and cooperating witness Anthony Ruggiano has testified that Mr. Corozzo performed a very similar role for the Gambino family when Ruggiano was prosecuted for RICO conspiracy in the Southern District of Florida in 1997.[3] Shortly after his arrest, Ruggiano's lawyer told him that she could obtain a plea agreement offering a term of imprisonment of eight years.[4] Mr. Corozzo, who represented his uncle, Gambino family captain and current Agate fugitive Nicholas Corozzo in the same case, met with Ruggiano's lawyer, learned of the deal she

---

[3] Ruggiano testified to these facts, as well as other facts attributed to him herein, at an April 30, 2007 hearing in United States v. Pizzonia, et al., Cr. No. 05-425 (JBW). A transcript of his testimony is attached as Exhibit B.

[4] Ruggiano ultimately was sentenced to 112 months' incarceration.

negotiated and told her to "mind her own business."  See Pizzonia
trial transcript at 2610.  Mr. Corozzo then met with Ruggiano and
told him, "We're not taking no pleas," which Ruggiano understood
to mean that he could not take the plea "because his uncle and
they didn't want me to take the plea."  Id.

     Former Gambino family captain and cooperating witness
Michael DiLeonardo has provided similar testimony.  DiLeonardo
has testified that Mr. Corozzo acted as a conduit between Gambino
family member John A. Gotti, to whom DiLeonardo served as a close
lieutenant and mentor, and John J. Gotti, during the period in
which Gambino family boss John J. Gotti's was incarcerated and
his son, John A. Gotti, carried out his directions as the Gambino
family's acting boss.  CW#1 also is expected to testify that Mr.
Corozzo frequently visited John J. Gotti during his incarceration
in order to pass messages.  This testimony is corroborated by
consensual recordings.

     DiLeonardo also has testified that Mr. Corozzo visited
with Gambino family soldier Craig DePalma while DePalma was
incarcerated in an attempt to determine whether DePalma was
cooperating with the government.  Specifically, in 2001, while a
federal racketeering case against DiLeonardo was underway in
Atlanta, and prior to DiLeonardo's cooperation, DiLeonardo asked
Mr. Corozzo to determine whether Craig DePalma, a Gambino
soldier, would testify against DiLeonardo in the event that

DePalma received a trial subpoena from the government.  Mr. Corozzo met with DePalma, who was in prison at the time, and thereafter reported favorably to DiLeonardo that he had "nothing to worry about."  See United States v. Peter Gotti, et al., Cr. No. 02-743 (RCC), trial transcript at 2333.  At the subsequent trial, DePalma refused to testify, despite having done so previously under a grant of immunity in the grand jury, and DiLeonardo was acquitted.[5]

> (ii) Mr. Corozzo Advises Gambino Family Members
>      How to Thwart Law Enforcement

CW#1 is expected to testify that Mr. Corozzo helped his father, Gambino family consigliere Joseph Corozzo, evade law enforcement.  This testimony will be corroborated by multiple recorded conversations, including the March 27, 2007 meeting noted above between CW#1, Mr. Corozzo and his father.  In that recording, Mr. Corozzo is heard advising his father, who claimed that he was being followed by law enforcement, to avoid meeting with known organized crime figures while under surveillance, but to allow himself to be surveilled participating in benign activities, thus laying the groundwork for the argument that he does not participate in illegal Gambino family activities.

---

[5]     This Court previously found that Mr. Corozzo was acting in this role as an investigator rather than as DiLeonardo's attorney.

9

In a similar vein, a cooperating witness ("CW#2") who is former Gambino family associate is available to testify that in approximately 2001 he observed _Agate_ defendant and Gambino family member Vincent Dragonetti, who is the son-in-law of Mr. Corozzo's uncle, Gambino family captain Nicholas Corozzo, in conversation with Mr. Corozzo.  Following the conclusion of the conversation, Dragonetti approached CW#2 and told him that Mr. Corozzo had been reprimanding him for not "showing enough income" — _i.e._, that Dragonetti's reported income could clearly not support his lavish lifestyle and that Mr. Corozzo had been instructing him that he needed to report more income or risk exposing the fact that he earned substantial quantities of illegal money.

      (iii)        Mr. Corozzo Counseled a Gambino Member to Perpetrate a Fraud on the Court in Order to Receive a Shorter Sentence

Anthony Ruggiano has testified that in 1998, following his guilty plea to a RICO conspiracy in the Southern District of Florida, Mr. Corozzo met with Ruggiano and other codefendants at a joint-defense meeting.  Mr. Corozzo told Ruggiano that he should tell the court at sentencing that he had a drug problem so that he would be eligible for the Federal Bureau of Prisons' drug counseling program and could receive time off his sentence if he successfully completed the program.

10

At the time, Mr. Corozzo was aware from conversations with Ruggiano that he did not have a drug problem and had been drug-free since the late 1980s. On Mr. Corozzo's advice, Ruggiano told the court he had a drug problem and the court recommended that he receive drug counseling. The Bureau of Prisons ultimately did not accept Ruggiano into the drug counseling program because it learned that he did not have a drug problem.

On April 13, 2007, Mr. Corozzo withdrew from representing a defendant in <u>United States v. Biagioni</u>, 07 CR 141 (CBA), when it came to light that Mr. Corozzo had similarly counseled his client in that case to take Valium in an attempt to obtain drug treatment which would have benefited the defendant at the time of sentencing.

>    (iv) The Gambino Family Uses Mr. Corozzo to Prevent
>         <u>Individuals from Cooperating with Law Enforcement</u>

Mr. Corozzo is part of the Gambino family's effort to prevent individuals from cooperating with law enforcement. As described above, Mr. Corozzo has relayed messages from the Gambino family leadership to incarcerated individuals instructing them not to cooperate. In addition, Mr. Corozzo has represented a client under false pretenses to ensure that a "weak" individual who could implicate the Gambino family in criminal activity did not cooperate. Mr. Corozzo also has monitored and reported to the Gambino family administration law enforcement contacts with

11

Gambino family members and associates in order to ensure their loyalty and keep track of the government's investigations into the enterprise.

        (A)   <u>Conducting a Fraudulent Representation</u>

Former Gambino family associate and cooperating witness Salvatore Romano informed the government that Mr. Corozzo fraudulently represented a defendant who could have testified against Romano in order to ensure the defendant did not cooperate.

Romano is available to testify that in approximately 1999, Vincent Minerva, one of Romano's corrupt brokers and top earners in a securities fraud scheme was arrested. Romano viewed Minerva as "weak" and was concerned that he might cooperate with law enforcement, implicate Romano in criminal activity and expose the securities fraud conspiracy.

As a result, when Romano learned that Minerva was considering hiring Mr. Corozzo, Romano secretly arranged to meet with Mr. Corozzo. Romano knew that Mr. Corozzo was considered "house counsel" for the Gambino family, and that Mr. Corozzo would be loyal to Romano, and not to a client like Minerva. During Romano's meeting with Mr. Corozzo, Romano explained to Mr. Corozzo how Minerva could hurt Romano and various Gambino family members and associates with whom he carried out the securities fraud. Romano and Mr. Corozzo devised a strategy —

agreeing to tell Minerva that the criminal case against him was
not strong — designed to convince Minerva to hire Mr. Corozzo and
to not cooperate with law enforcement.  Romano and Mr. Corozzo
soon thereafter met with Minerva, and they were able to persuade
Minerva to hire Mr. Corozzo.

        Romano then arranged to have Mr. Corozzo secretly meet
with Romano each week so that Mr. Corozzo could brief Romano on
the status of Minerva's case, including whether the authorities
were seeking to question Minerva about Romano.  Romano also told
Mr. Corozzo to make sure that Minerva did not cooperate and
instead pled guilty.  To Romano's knowledge, Minerva, in fact,
never cooperated with the authorities and pled guilty in that
matter.

        In exchange for Mr. Corozzo's assistance with Minerva,
Romano paid Mr. Corozzo thousands of dollars and did not charge
him for certain parties Mr. Corozzo held at Romano's restaurant
in Staten Island, including large gatherings that cost several
thousand dollars.

        According to Romano, Mr. Corozzo never disclosed to
Minerva — Mr. Corozzo's client — their hidden agenda:  the
arrangement Mr. Corozzo made with Romano to keep Romano informed
of Minerva's case and to discourage Minerva from cooperating.

        (B)  Reporting Law Enforcement Contacts

        In keeping with Mr. Corozzo's role as "house counsel,"
former Gambino family associate and cooperating witness Anthony

Ruggiano has testified that on several occasions, he contacted Mr. Corozzo to advise him that he (Ruggiano) had been approached by law enforcement. Ruggiano contacted Mr. Corozzo so that Mr. Corozzo would report this to his father, Gambino consigliere Joseph Corozzo, and his uncle, Gambino captain Nicholas Corozzo, and put it "on record" that Ruggiano was approached.[6]

In 1999, after his father passed away, Ruggiano again contacted Mr. Corozzo after federal agents approached him in prison. Prison records show that Mr. Corozzo was on Ruggiano's telephone list at the time. In the early 2000s, Ruggiano contacted Mr. Corozzo after federal agents again approached him in prison about testifying at a trial in Miami. Subsequently, in November 2005, Ruggiano contacted Mr. Corozzo after federal agents approached him once again about becoming a cooperating witness.

In each instance, Mr. Ruggiano reported to Mr. Corozzo in order to follow Gambino family procedures. Mr. Corozzo's status as an attorney allowed the information to flow quickly and directly from the incarcerated Ruggiano to Joseph Corozzo and the Gambino family administration.

(d) Mr. Corozzo Ordered a Shooting

Cooperating witness Andrew DiDonato is available to

---

[6] Gambino family members and associates are required to report contacts with law enforcement to their superiors in order to allow the Gambino family to monitor both the allegiance of its members and associates and law enforcement activity.

testify that in the late 1980s, driving through Brooklyn after a
night of drinking with friends in Joseph Corozzo's car, Mr.
Corozzo became involved in a confrontation with a man in another
car.  When the man got out of his car and started walking towards
Mr. Corozzo's car, Mr. Corozzo woke up a dozing DiDonato and
urged him to shoot the man.  DiDonato did.  Mr. Corozzo,
DiDonato, and the others then sped away, leaving the man bleeding
on the street.

       The following day, Joseph Corozzo together with another
Gambino family member visited the hospital to speak with the
victim of the shooting and offered him money to forget about the
incident.  Meanwhile, Mr. Corozzo and DiDonato were summoned by
Gambino family captain Nicholas Corozzo, who was furious about
the shooting, and sent DiDonato to Florida in order to allow the
police investigation to die down.

       (e)  Mr. Corozzo Used Extortionate Means to
            Collect Debts

       Former Gambino family associate and cooperating witness
Anthony Ruggiano has testified that Mr. Corozzo used Gambino
family members to collect debts owed to Mr. Corozzo.

       In the first instance, Ruggiano testified that in the
mid-1990s, Mr. Corozzo was retained to represent Ralph LNU, an
individual who committed credit card fraud with Ruggiano.  When
Ralph failed to pay Mr. Corozzo all of the money owed for his
representation, Mr. Corozzo instructed Gambino family captain

15

Ronald "Ronnie One Arm" Trucchio and Gambino family associate John Setaro to contact Ruggiano in order to force Ralph to pay Mr. Corozzo. When Ralph still did not promptly pay, Mr. Corozzo enlisted his father Joseph Corozzo to ensure that the debt was paid.

Similarly, Ruggiano also has testified that in or around 1994, Mr. Corozzo was retained by Steve Litchman, a criminal associate of Ruggiano's, to represent him in a criminal case. When Litchman failed to pay Mr. Corozzo's full legal bill, Mr. Corozzo again instructed Trucchio to tell Ruggiano to meet with Mr. Corozzo. As requested, Ruggiano met Mr. Corozzo and Trucchio at a restaurant. At that meeting Ruggiano accused Mr. Corozzo of trying to be a "gangster," not a lawyer. See Pizzonia transcript at 2616-17. Mr. Corozzo responded, "I'm one of yous," an apparent reference to his status as an associate of the Gambino family. Id. After the meeting, Ruggiano succeeded in collecting the money for Mr. Corozzo, with Litchman agreeing to make $500 payments each week. Litchman made these payments to Ruggiano, and at Mr. Corozzo's request, Ruggiano left the payments for Mr. Corozzo with Gambino family member Dominick Pizzonia.

(f)  Construction Industry Extortions

Other evidence will show that on April 5, 1994, Mr. Corozzo together with many other Gambino members and associates, including Michael DiLeonardo and Frank Fappiano, former Gambino

16

family members and cooperating witnesses, attended a boxing match held at the Foxwoods Casino in Connecticut.  The casino monitored these individuals on videotape (with no sound) in and around the casino that evening.  In the videotape, Mr. Corozzo is shown to be actively engaged in conversation with many organized crime figures at Foxwoods.  Particularly, Mr. Corozzo remained in close proximity to John A. Gotti, who was acting boss of the Gambino family at the time, often speaking with him alone.  In fact, in a portion of the videotape, Mr. Corozzo is seen strolling and engaging in a one-on-one conversation with John A. Gotti, showing their close association.

Both DiLeonardo and Fappiano are expected to testify that they talked about the Gambino family's ongoing extortions in the construction industry with Gotti at this gathering.  While neither DiLeonardo nor Fappiano can testify that Mr. Corozzo participated in or was aware of such discussions, he was a witness to the events.

2.   Mr. Corozzo Has Been Recorded Pledging His
     Allegiance to the Boss of the Gambino Family

A March 2001 conversation with incarcerated Gambino family boss John J. Gotti further demonstrates Mr. Corozzo's overriding loyalty to the Gambino family and its leadership, and his participation in its activities.  Mr. Corozzo was recorded, pursuant to court-authorized electronic surveillance, meeting with Gotti in prison and discussing the status of various Gambino

17

family members and associates.  The following exchange took place in a discussion about whether Gambino family soldier Craig DePalma, the son of Gambino family soldier Greg DePalma, was cooperating with the government.

> Gotti:         What did you do with that knucklehead?
>
> Mr. Corozzo:   Which one?
>
> Gotti:         Craig.
>
> Mr. Corozzo:   I didn't do anything yet.  I, we were supposed to talk Friday--
>
> Gotti:         His wife call?
>
> Mr. Corozzo:   The other lawyer.  Yeah.  The other lawyer talked to him on Friday.  The other lawyer.  We were supposed to do it this Friday but I cancelled it and he cancelled it.  So, then Terry called me and said Craig, Greg wanted to see me, put me on the list.  I said okay.  I told her I'll see, I don't know what I'm doing right now.  But of course, you're more important, so I could always see Craig, later on, I don't need to speak to him.
>
> Gotti:         That case is . . . knucklehead.  He should understand that you're calling the shots around here.  I explained to this fucking moron more than two weeks ago, before I got sick.  This moron cocksucker explained to me.  Everything's all right.
>
> Mr. Corozzo:   I'll take care of it, don't worry.  I says, he told me--
>
> Gotti:         You told him?
>
> Mr. Corozzo:   Told him and I told his wife too.  He says--

18

```
Gotti:          A moron will tell you--

Mr. Corozzo:    He's a nervous wreck.  Make sure
                you're okay and everybody's okay.

Gotti:          Fucking son's a rat and you're a
                fucking weakling, c'mon.  We can't
                say it?  Then, we can't say it.  We
                are what we are.

Mr. Corozzo:    We'll always be that.

Gotti:          That's right.  To the end.

Mr. Corozzo:    Always.
```

3.    Mr. Corozzo Was Proposed for Membership in the
      Gambino Family by Consigliere Joseph Corozzo

        The government has obtained evidence that in or about

2004, at his father's request, the Gambino family attempted to

have Mr. Corozzo become a "made member" of the family — an honor

reserved for Gambino family associates who have proven themselves

especially trustworthy and useful to the enterprise.  First, a

cooperating witness ("CW#3") who is the former boss of a La Cosa

Nostra organized crime family other than the Gambino family is

available to testify that in approximately 2000, Gambino family

consigliere Joseph Corozzo met with CW#3 in person and requested

that CW#3 approve Mr. Corozzo for sworn membership in the Gambino

family.  CW#3 understood Joseph Corozzo's request to be part of

the Gambino family's effort to secure support for Mr. Corozzo's

induction from the bosses of the other La Cosa Nostra families, a

required condition precedent to membership.  CW#3 withheld his

approval on the grounds that he believed attorneys should not be

permitted to become inducted members of La Cosa Nostra.

This testimony is supported by, among other things, a recoding of a November 10, 2004 meeting between Gambino family acting captain Gregory DePalma and Gambino family associate Robert Vaccaro. During their conversation, DePalma and Vaccaro discussed Gambino family underboss and acting boss Arnold Squitieri's plan to induct Mr. Corozzo into the Gambino family as a sworn member.

DePalma:   Bozey (Arnold Squitieri) knows that this kid is red hot?

Vaccaro:   Of course.

DePalma:   I can't get over what you told me. I can't. Him and JoJo . . . the kid.

Vaccaro:   Yeah.

DePalma:   I can't get over it. I really can't. How the fuck you do that? The guy's a legitimate fucking lawyer. He's doing great. Now you want to make him a friend.

So, you understand what I'm saying? If your son is a professional guy, a lawyer, you want to make him?

Vaccaro:   You're telling me.

DePalma:   Are you fucking insane? I mean, I did my son. I don't know why I did my son. Do you want to do your son?

Vaccaro:   No.

DePalma:   Did he ever ask you?

Vaccaro:   No.

20

Later in the conversation, DePalma and Vaccaro discussed the sort of assistance Mr. Corozzo could provide the Gambino family as both a sworn member and an attorney.

DePalma:   A fucking lawyer, get the fuck out of here.

Vaccaro:   I don't know.

DePalma:   You sure of that?

Vaccaro:   Yeah.

DePalma:   You were there?

Vaccaro:   No, but I'm positive.

DePalma:   You know, I don't know what the reasoning could be except that, except that when he goes to visit prison clients he's got--

Vaccaro:   I know.

DePalma:   That's the only thing I can see.

Vaccaro:   Me too.

DePalma:   Things he shouldn't know as a lawyer.

In addition, as noted above, cooperating witnesses who are former members or associates of the Gambino family are available to testify that they were told of Joseph Corozzo's efforts to induct Mr. Corozzo into the Gambino family by other Gambino family members and associates.

(4)   Mr. Corozzo Attends Gambino Family Events Open Solely to Gambino Family Members and Associates

A cooperating witness ("CW#4") is available to testify that on December 19, 2007, Mr. Corozzo attended a Christmas party thrown by Gambino family acting captain Alphonse Trucchio. CW#4

will testify that the party was open only to Gambino family members and associates, and, in addition to Mr. Corozzo, was attended by six Agate defendants who are members of the Gambino family, including acting boss John D'Amico, acting underboss Domenico Cefalu and acting captain Frank Cali.  CW#4 also is available to testify that at the October 1, 2007 christening of Gambino family soldier Mario Cassarino's daughter, in which eight Agate defendants were in attendance, CW#4 observed Mr. Corozzo sitting and conversing with Gambino family administration members D'Amico and Cefalu.

B.   Mr. Corozzo Has Represented Four Cooperating Witnesses Expected to Testify at Trial in This Case

Mr. Corozzo has represented four cooperating witness the government expects will testify at trial in this case.  All of the cooperating witnesses, who are identified below, have indicated that they do not wish to waive the duties of loyalty and confidentiality owed to them from Mr. Corozzo's prior representations.

(1)   Anthony Ruggiano

Anthony Ruggiano, a former Gambino family associate and cooperating witness, is expected to testify at trial against Joseph Corozzo.  Mr. Corozzo's partner, Ronald Rubinstein, has represented Anthony Ruggiano, on numerous occasions in the past, including (i) a 1978 trial, (ii) a gambling case in the late 1980s, (iii) a grand jury subpoena in or about 1992, and (iv)

22

numerous cases during Ruggiano's teenage years.

The history between Mr. Corozzo and Ruggiano is equally, if not more, extensive. While Ruggiano has never entered into a formal retainer agreement with Mr. Corozzo as his lawyer, Mr. Corozzo has received attorney-client communications from Ruggiano under a joint defense agreement in the cases discussed below.[7]

(a)   1995 Queens Bookmaking Case[8]

In December 1995, Ruggiano and several other Gambino members and associates were charged in Queens County with illegal bookmaking. In that case, codefendants Frank Gitto and Ronald Ferrari paid Mr. Corozzo approximately $100,000 to represent all of the defendants. Mr. Corozzo hand-picked the other attorneys, including the firm of Hoffman and Pollok LLP, who entered a notice of appearance for Ruggiano. Ruggiano did not hire this firm nor did he pay them for representing him.

Ruggiano participated in a joint defense agreement with his codefendants. Pursuant to that agreement, Ruggiano conveyed confidences to Mr. Corozzo, who acted as lead counsel. Mr.

---

[7]    Both Mr. Corozzo and Mr. Rubinstein have previously been found to have represented Ruggiano based on these facts. United States v. Perrone, 2007 WL 1575248 at *5 (S.D.N.Y. 2007); United States v. Pizzonia, Cr. No. 05-425 (JBW), Trial transcript at 2644).

[8]    The facts set forth in this section are based on the testimony of Ruggiano in United States v. Pizzonia, 05 Cr. 425 (JBW), as well as statements proffered by the government therein.

Corozzo appeared on behalf of Ruggiano and other defendants at the arraignment and negotiated Ruggiano's bail. He maintained the recordings from the wiretap investigation in his office for review by Ruggiano and his codefendants. He presided over numerous joint defense meetings at which confidential communications were revealed. He directed the pretrial strategy and determined who would brief pretrial motions. He negotiated the guilty pleas for Ruggiano and other codefendants.

In fact, during the case, Ruggiano directed all of his questions to Mr. Corozzo. Ruggiano never spoke to Mr. Hoffman or Mr. Pollok on the telephone and met with them only one time each. It was Mr. Corozzo who conveyed the state's plea offer to Ruggiano. Mr. Corozzo told Ruggiano that the state offered him a plea of three to six years' imprisonment but would agree to two to four years' imprisonment if Ruggiano convinced codefendant Michael Guerrieri to accept one year imprisonment. Once Guerrieri agreed, Ruggiano, without the advice of Mr. Hoffman or Mr. Pollok, accepted the offer negotiated by Mr. Corozzo.

(b)  1997 Florida RICO Conspiracy Case

In 1997, Ruggiano and several other Gambino members and associates were charged in a RICO conspiracy case in the Southern District of Florida. Mr. Corozzo did not enter a notice of appearance on Ruggiano's behalf in the case, but, under a joint defense agreement, Ruggiano conveyed confidences to Mr. Corozzo, who was cocounsel for codefendant Nicholas Corozzo, Mr. Corozzo's

24

uncle.  As discussed, Mr. Corozzo also instructed Ruggiano to reject a plea offer and advised him to falsely tell the court at sentencing that he had a drug problem.

    (2)  <u>Salvatore Mangiavillano</u>

      Mr. Corozzo has acknowledged previously representing Salvatore Mangivillano,[9] a former associate in the Gambino family who is cooperating with the government and is expected to testify against Joseph Corozzo at trial.

    (3)  <u>Salvatore Romano</u>

      The government expects that cooperating witness and former Gambino family associate Salvatore Romano will testify at trial in this matter.  As detailed above, Mr. Corozzo represented Romano in connection with his criminal exposure in a securities fraud prosecution by fraudulently representing Romano's criminal associate Vincent Minerva in order to ensure that Minerva did not become a cooperating witness.  As noted, Mr. Corozzo met frequently with Romano to discuss the progress of his representation of Minerva, and accepted significant payment from Romano in return.

    (4)  <u>CW#2</u>

      Mr. Corozzo represented CW#2, who the government expects will testify at trial in this case, in two matters before

_____

    [9]  <u>See</u> <u>United States v. Yannotti</u>, 358 F. Supp. 2d 289, 295 (S.D.N.Y. 2004) ("[Mr.] Corozzo acknowledges that he indeed represented Mangiavillano in the past.").

the Securities and Exchange Commission, and in <u>United States v.</u>
<u>Jonathan Winston, et al.</u>, Cr. No. 00-1248 (NGG).[10]

C.    <u>Prior Disqualification Motions</u>

    1.    <u>United States v. Yannotti</u>

        Mr. Corozzo encountered certain of the same conflicts
in a racketeering trial that concluded in September 2005 in the
Southern District of New York.  There, Michael Yannotti, an
alleged Gambino solider, initially was represented by
Mr. Corozzo.[11]  The district court granted the government's
motion to disqualify Mr. Corozzo based on a combination of three
conflicts, one of which was the "serious conflict" presented by
Mr. Corozzo's prior representation of Salvatore Mangiavillano and
Michael DiLeonardo, who were expected to testify at trial in that
case.  <u>See</u> <u>United States v. Yannotti</u>, 358 F. Supp. 2d 289, 296-97
(S.D.N.Y. 2004).

    2.    <u>United States v. Pizzonia</u>

        In <u>United States v. Pizzonia</u>, Cr. No. 05-425 (JBW), the
government sought to have Mr. Corozzo disqualified from
representing Gambino family captain Dominick Pizzonia based on

_____

        [10]    In support of his motion for reassignment of this case,
Mr. Corozzo asserted that he did not represented CW#2 in <u>Winston</u>.
However, a review of the docket in that case shows that Mr.
Corozzo entered a notice of appearance for CW#2 on March 8, 2001
and was formally relieved as counsel on June 3, 2002.

        [11]    Yannotti was indicted for the murders of Robert Arena
and Thomas Maranga, among other crimes, the same murders Nicholas
Corozzo is charged with here.

certain of the conflicts set forth here.  The Court initially
denied the motion.  After Anthony Ruggiano became a cooperating
witness, however, the government asked the Court to preclude Mr.
Corozzo from cross-examining Ruggiano — a motion the Court
deferred until the middle of trial.  When the Court held a
hearing as to the extent of Mr. Corozzo's prior representation of
Ruggiano, and heard Ruggiano's testimony, it recognized the
problems presented by Mr. Corozzo's continued representation.
Indeed, the Court suggested that it would have disqualified Mr.
Corozzo had this issue been fully examined before the trial
started:

> The Court believes the witness' statements that he
> thought that counsel was in fact his attorney and
> his representative and could properly receive
> confidential communications which would be
> protected as a result of that relationship over a
> long period of time. . . . The difficulty is that
> I can't disqualify counsel at this moment in the
> trial . . . ."

(Tr. 2644).[12]

 3. United States v. Perrone

 In United States v. Perrone, the government sought to
disqualify Mr. Corozzo and Mr. Rubinstein from representing
Genovese family member Ciro Perrone two weeks before his retrial
when it was determined that Anthony Ruggiano would be called as a

---

 [12]  A copy of the Court's Pizzonia decision is attached as
Exhibit C.

cooperating witness.[13]  After finding that both Mr. Corozzo and
Mr. Rubinstein previously represented Ruggiano, and that this
representation raised a potential conflict of interest, the court
nevertheless denied the government's motion, finding that: (1)
disqualifying Mr. Rubinstein, who represented Perrone in the fist
trial, two weeks before the start of the retrial would create
"enormous" prejudice to Perrone, (2) the matters about which
Ruggiano would testify were not substantially related to Perrone,
since the charges involved "the Genovese family not the Gambino
family to which Mr. Ruggiano belongs," and (3) that "the
government has said that it plans to call Mr. Ruggiano only to
establish that Mr. Perrone is a member of the Genovese Crime
Family, not to testify to any of the substantive crimes charged
here." United States v. Perrone, 2007 WL 1575248 at *8 (S.D.N.Y.
2007).

## APPLICABLE LAW

A defendant's right to the effective assistance of
counsel includes the right to be represented by an attorney who
is free from conflicts of interest. E.g., Wood v. Georgia, 450
U.S. 261, 271 (1981); United States v. Perez, 325 F.3d 115, 125
(2d Cir. 2003). "While the right to select and be represented by
one's preferred attorney is comprehended by the Sixth Amendment,
the essential aim of the Amendment is to guarantee an effective

---

[13]    Ruggiano had not testified at the initial trial.

28

advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159(1988). A criminal defendant thus "does not have the absolute right to counsel of her own choosing." United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993).

When a court receives notice that defense counsel might be burdened by a conflict of interest, it must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from the alleged conflict. United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994). The Second Circuit groups conflicts of interest into three categories. United States v. Williams, 372 F.3d 96, 102 (2d Cir. 2004). "The first category describes those conflicts that are so severe that they are deemed *per se* violations of the Sixth Amendment. Such violations are unwaivable and [on appeal] do not require a showing that the defendant was prejudiced by his representation." Id. *Per se* conflicts of interest occur "only where trial counsel is not authorized to practice law and where trial counsel is implicated in 'the same or closely related criminal conduct' for which the defendant is on trial." Id. at 103 (quoting United States v. Fulton, 5 F.3d 605, 611 (2d Cir. 1993)).

The other two categories address actual and potential conflicts of interest. "An attorney has an actual . . . conflict

of interest when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action." <u>Perez</u>, 325 F.3d at 152. A potential conflict of interest exists where "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." <u>Id.</u>

If a court determines that an attorney suffers from an actual or potential conflict of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation, the court *must* disqualify that attorney. <u>E.g.</u>, <u>United States v. Lussier</u>, 71 F.3d 456, 461-62 (2d Cir. 1995); <u>see</u> <u>also</u> <u>Levy</u>, 25 F.3d at 153; <u>Jones</u>, 381 F.3d at 120; <u>United States v. Schwarz</u>, 283 F.3d 76, 95 (2d Cir. 2002). Further, in cases where, as here, numerous conflicts have been raised, "each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and his client." <u>United States v. Rahman</u>, 861 F. Supp. 266, 274 (S.D.N.Y. 1994); <u>see</u> <u>also</u> <u>Levy</u>, 25 F.3d at 157. In evaluating an actual or potential conflict of interest, actions of any member of a law firm are imputed to every member of the firm. <u>E.g.</u>, <u>United States v. Jiang</u>, 140 F.3d 124, 127 (2d Cir. 1998).

Notwithstanding a defendant's willingness to waive his attorney's conflict of interest, courts retain "substantial latitude" in refusing such waivers. <u>See</u> <u>Wheat</u>, 486 U.S. at 163.

30

This is so because "'[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" Locasio, 6 F.3d at 931 (quoting Wheat, 486 U.S. at 160); see also United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004) ("[D]isqualification . . . implicates not only the accused's right to counsel, but also the interests of the judiciary in preserving the integrity of its processes, and the government's interest in a fair trial and a just verdict."). *Per se* conflicts of interest, however, "are unwaivable." Williams, 372 F.3d at 102.

<u>ARGUMENT</u>

I.  Mr. Corozzo's Multiple Conflicts of Interest Require His Disqualification

Mr. Corozzo's representation is burdened by the multiple conflicts of interest presented by his status as an unsworn witness to events which will be the subject of trial testimony and his representation of four cooperating witnesses expected to testify at trial. These conflicts require his disqualification alone. But Mr. Corozzo's status as an associate in the Gambino family together with his participation in the Gambino family's criminal activities arguably render him subject to *per se* disqualification as a lawyer alleged to have participated in the same racketeering conspiracy for which his

client is charged — a conflict that not only requires his disqualification, but results in an automatic reversal without a showing of prejudice were the Court to allow his continued representation.

A.   Mr. Corozzo Was An Unsworn Witness to Events That Will Be the Subject of Trial Testimony

Where, as here, chosen counsel becomes entangled in the facts of the defendant's case such that he should either be available as a witness or would, upon remaining as trial counsel, "become an unsworn witness for the accused," it is counsel's ethical duty to withdraw, and upon failing to do so, counsel should be disqualified, regardless of the defendant's expressed willingness to waive.  Locascio, 6 F.3d at 931-34; see also United States v. Arrington, 867 F.2d 122, 129 (2d Cir. 1989); United States v. Iorizzo, 786 F.2d 52, 57 (2d Cir. 1986); United States v. Kwang Fu Peng, 766 F.2d 82, 87 (2d Cir. 1985).[14] Because the government, not the defendant, is prejudiced, "waiver is ineffective in curing the impropriety in such situation."  Id.

_____

[14]   EC 5-9 of the Model Code of Professional Responsibility provides that:

> If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case.  An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility.

at 934.  Importantly, the Second Circuit has determined that whether the government will or will not call counsel as a trial witness has no significance in ruling on a disqualification motion.  <u>Locascio</u>, 6 F.3d at 934.

Here, Mr. Corozzo is a witness to the following events that will be the subject of trial testimony: (1)  Mr. Corozzo's status as a favored Gambino family associate who assists his father in the performance of his duties as consigliere; (2) Mr. Corozzo's participation in the Hudson & McCoy extortion with his father; (3) Mr. Corozzo's attendance at the Foxwoods meeting at which Gambino family construction extortions were discussed; (4) Mr. Corozzo's advice to Joseph Corozzo about how to thwart surveillance by law enforcement; and (5) Mr. Corozzo's ordering of a shooting.  As detailed below, testimony concerning all these subjects will be properly elicited to provide evidence of Joseph Corozzo's ties to the Gambino family, his participation in the charged RICO conspiracy and substantive extortions, as necessary background to other relevant testimony, or in conjunction with cooperating witnesses' testimony concerning their prior criminal activity.

### 1.    Favored Gambino Associate

In detailing Joseph Corozzo's ties to the Gambino family, various cooperating witnesses are expected to testify concerning his familial ties to the enterprise, including Mr. Corozzo's position in the family and his activities on its

behalf.  This list will include the testimony of multiple cooperating witnesses concerning Mr. Corozzo's self-professed status as an associate, Joseph Corozzo's attempt to induct Mr. Corozzo as a "made" member of the Gambino family, Mr. Corozzo's many duties as house counsel, his role in passing money from his father and the Gambino family administration to incarcerated boss Peter Gotti, and his relaying of messages to his father concerning law enforcement contacts.  These actions serve as valuable enterprise evidence against Joseph Corozzo not only in those episodes in which he participated, but also where his power in the Gambino family is reflected through the treatment of his son.

With respect to all these matters, Mr. Corozzo will possess intimate knowledge of the accuracy of the testimony proffered.  As such, any cross examination of the cooperating witnesses concerning these topics would leave the impression that Mr. Corozzo – the subject of the testimony – knows more about the testimony than the witness and that the witness is thus being untruthful.  In this way, Mr. Corozzo's cross-examination would be transformed into powerful unsworn testimony.  Similarly, any arguments to the jury dismissing such claims would carry far more force than from an attorney who was not operating as an unsworn witness.  These issues would place the government at exactly the disadvantage identified in by the Second Circuit in <u>Locasio</u> and the other cases noted above.

Equally important, but from the opposite perspective, Mr. Corozzo's status as an unsworn witness would burden Joseph Corozzo in that could not call Mr. Corozzo as a witness to dispute the cooperating witnesses' assertions.

2.   Hudson & McCoy

Should the government not supersede and charge Joseph Corozzo with his role in the conspiracy to collect the proceeds of the Hudson & McCoy extortion, the government would seek to admit such evidence as proof of the enterprise, or otherwise pursuant to Rule 404(b) to show motive, intent and absence of mistake regarding Joseph Corozzo's participation in the charged extortions of a cement plant on Staten Island.  Because the recording identified above shows Mr. Corozzo, Joseph Corozzo and CW#1 engaging in this criminal activity side by side, Mr. Corozzo would become an unsworn witness to the events were his representation to continue.  As above, his arguments concerning the meaning of the tape would thus become powerful unsworn testimony, he would enjoy unfair advantage in cross-examination of CW#1, and his client would be deprived of the opportunity to call him as a witness to counter CW#1's account of the events.

3.   The Foxwoods Tape

The Foxwoods tape depicts meetings and discussions in which Mr. Corozzo is a participant, and it is direct evidence of certain contested facts that the government must prove at trial, including the enterprise's long-standing involvement in

35

construction industry-related extortions.  The Foxwoods tape will
show that Mr. Corozzo had a pre-existing relationship with
Michael DiLeonardo and Frank Fappiano as well as the association
among various members and associates of the Gambino family.  Both
DiLeonardo and Fappiano are expected to testify at trial
concerning Joseph Corozzo's participation in the cement company
extortions with which he is charged.  As concerns the Foxwoods
tape, they are expected to testify that they discussed the
Gambino family's extortion of the construction industry during
some of the time period that is depicted on this tape — testimony
that will corroborate their ties to the Gambino family, its
construction industry extortions, and each of their testimony by
mutually reinforcing each other.

By his presence at the gathering at Foxwoods, Mr.
Corozzo becomes a witness to events material to matters that will
be contested at trial.  Mr. Corozzo may thus find himself in the
position at trial of wishing to argue, for example, about what
"really" happened at the Foxwoods Casino gathering.  But he will
not be a witness who, like the other witnesses at trial, must
swear to tell the truth under oath and be subject to cross-
examination; instead he will be an unsworn witness.[15]  Moreover,

_____

[15]     Alternatively, there is the possibility that a co-
defendant or his own client may wish to call Mr. Corozzo as a
fact witness to dispute the government's contention as to what
went on at Foxwoods.  This raises a related but slightly
different problem, in which Mr. Corozzo would be an actual
witness for a co-defendant or his client's during the trial — yet

if Mr. Corozzo were to argue about the meaning of the Foxwoods tape, the jury could give added credibility to his interpretation due to his first-hand knowledge.  As such, his status as an unsworn witness will be extremely prejudicial to the government.  See, e.g., Locascio, 6 F.3d at 933 (in affirming disqualification of a lawyer, the court found that "his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination").  Indeed, merely by cross-examining DiLeonardo and Fappiano about the events depicted on the Foxwoods tape and their discussions at Foxwoods, Mr. Corozzo would in effect be testifying as he attempts to show that the government's witnesses are lying.

> B.   Mr. Corrozzo Represented Multiple Cooperating Witnesses Who Are Expected to Testify at Trial

An attorney's prior representation of a witness in a case against a current client presents an inherent conflict of interest.  Locascio, 6 F.3d at 931; United States v. Ioizzo, 786 F.2d 52, 57 (2d Cir. 1986) (same).  This conflict stems from the lawyer's continuing duties of loyalty and confidentiality to his former client:

> A lawyer's duty of absolute loyalty to his [former] client's interests does not end with his retainer.  He is enjoined for all time, except as he may be released by law, from disclosing matters revealed to him by reason

another reason why Mr. Corozzo's disqualification is necessary.

of the confidential relationship.

Rahman, 861 F. Supp. at 274 (internal quotations and citation omitted). These continuing duties necessarily clash with the no-less-paramount duties of loyalty and confidentiality to current clients:

> No matter how committed the lawyer is to carrying out his or her ethical obligations, the nearly unavoidable risk is that, in meeting the one, the attorney may necessarily, although unintentionally, denigrate the other. This clash of competing obligations also creates the appearance of impropriety, a potential violation of Canon 9 of the New York Judiciary Law, Code of Professional Responsibility.

United States v. Grisanti, 1992 WL 281434, at *5 (W.D.N.Y. April 14, 1992). The Second Circuit too has recognized the risk that a current representation may be aided even "unconsciously" by the fact of the earlier representation is such that it cannot be obviated by even the "most rigorous self-discipline" on the part of the attorney. Id. at *5 (quoting Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 571 (2d Cir. 1973)); United States v. Falzone, 766 F. Supp. 1265, 1275 (W.D.N.Y. 1991) (unfair for attorney to cross-examine prior client when he is in a position to use information gleaned from prior representation "either purposely or inadvertently"). Indeed, "[i]t is hard to conceive of a conflict of interest between clients that would not be

serious." <u>Kelly</u>, 870 F.2d at 857.[16]

Because the continuing obligation to the former client bars a lawyer from using information obtained during the prior representation that would adversely affect that client in the present proceeding, in representing the current client, the lawyer labors under significant restraints. See <u>United States v.</u>

_____

[16] There are several Disciplinary Rules in the New York State Code of Professional Responsibility that also apply to the conflict issue in this case. The New York Code of Professional Responsibility, Disciplinary Rule ("DR") 5-105 states in part:

> A lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests[.]

> [A] lawyer may represent multiple clients if a disinterested lawyer would believe that the lawyer can competently represent the interest of each and if each consents to the representation after full disclosure of the implications of the simultaneous representation and the advantages and risks involved.

Furthermore, DR 5-108 states in part:

> [A] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure:

> (1) Thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.

> (2) Use any confidences or secrets of the former client . . .

James, 708 F.2d 40, 45-46 (2d Cir. 1983); United States v. Cunningham, 672 F.2d 1064, 1072-73 (2d Cir. 1982); United States v. Gotti, 9 F. Supp. 2d 320, 328 (S.D.N.Y. 1998). First, the lawyer is "ethically barred" from cross-examining former clients. Rahman, 861 F. Supp. at 277; see also United States v. Moscony, 927 F.2d 742, 750 (3d Cir. 1991) (noting that "an attorney who cross-examines former clients inherently encounters divided loyalties"); United States v. Massino, 303 F. Supp. 2d 258, 262 (E.D.N.Y. 2003) (finding where an attorney has previously represented a cooperating witness, the attorney "cannot ethically cross-examine [the cooperating witness] without his consent"). This effectively precludes a lawyer from vigorously cross-examining his former client or commenting on his credibility, which may be essential to the effective representation of his current client.

Such conflicts can require disqualification. In United States ex rel. Stewart v. Kelly, 870 F.2d 854, 856 (2d Cir. 1989), the Second Circuit found that where defense counsel's former client would be a government witness against the defendant, the conflict required disqualification. The court reached this verdict even though: (1) the prior representation involved a wholly unrelated matter, (2) defense counsel did not glean any confidential information from the former client, and (3) the defendant was willing to have his counsel's cross-examination of the witness limited to matters set forth in the

witness's rap sheet.  In reaching this holding, the Second
Circuit found disqualification to be necessary because the
defendant's interests would best be served by "vigorous cross-
examination of the informant in a manner wholly inconsistent with
the informant's interests" — a task that defense counsel could
not perform without "violat[ing] the rights of the informant" to
expect continued loyalty and confidentiality from his former
attorney.  Id. at 857; see also United States v. Malpiedi, 62
F.3d 465, 469 (2d Cir. 1995) (finding lawyer prohibited from
seeking to "conduct a thorough, no-holds-barred cross-examination
. . . because of [the lawyer's] obligations as [the witness's]
prior attorney").

      The continuing duty of loyalty acts not only to
prohibit an attorney from attacking former clients through cross-
examination, but also from challenging them in argument to the
jury, or even through the investigation and pursuit of an
otherwise plausible line of defense.  See Rahman, 861 F. Supp. at
277 (holding law firm "ethically barred" from "mak[ing] arguments
that could hurt a former client"); New York v. Liuzzo, 167 A.D.2d
963, 562 N.Y.S.2d 303 (4th Dep't 1990) (interpreting Code of
Professional Responsibility as prohibiting "attack [on] former
client with respect to the subject matter of the earlier
representation even if the information used in the attack comes
from sources other than the former client").

41

Where representation of a former client is substantially related to representation of the current client — i.e., involving the same subject matter — the Second Circuit has repeatedly found an actual conflict of interest requiring disqualification. See, e.g., Malpiedi, 62 F.3d at 467 (reversing the guilty verdict because defendant's attorney represented a government witness during grand jury proceedings in the same case); Ciak v. United States, 59 F.3d 296, 304 (2d Cir. 1995) (reversing guilty verdict because defendant's attorney represented a government witness in related forfeiture proceeding), abrogated on other grounds by Mickens v. Taylor, 535 U.S. 162 (2002); James, 708 F.2d at 46 (affirming disqualification of attorney who formerly represented head of narcotics organization in related case, finding "that the present issues are substantially related to the subject matter of the past representation, and that defense counsel quite likely have received confidential information from the witness" such that "even the constitutional dimension of a criminal defendant's right to counsel of his choice does not give the defendant the right to take advantage of his preferred attorney's confidential knowledge gained from prior representation of the witness").

Here, Mr. Corozzo has represented four cooperating witnesses that the government expects to call at trial. Much of the testimony of these witnesses will necessarily encompass the subject of Mr. Corozzo's prior representation and/or information

42

gleaned during the representation.  Under the cases above, Mr.
Corozzo owes strict, continuing duties of loyalty and
confidentiality to each of his former clients, which cannot be
honored consistent with his vigorous representation of Joseph
Corozzo.  Taken alone, each is sufficient to warrant
disqualification; together, they present a conflict that no
rational defendant could continue to seek Mr. Corozzo's counsel
on this matter.

      1.   <u>Anthony Ruggiano</u>

      The expected testimony of cooperating witness and
former Gambino family associate Anthony Ruggiano creates
significant ethical issues for Mr. Corozzo.

      This Court previously found that Ruggiano and Mr.
Corozzo have a prior attorney-client relationship that imposes on
Mr. Corozzo ongoing duties of loyalty and confidentiality.
<u>United States v. Pizzonia</u>, 05 Cr. 425 (JBW), trial transcript at
2644 ("The Court believes [Ruggiano's] statements that he thought
[Mr. Corozzo] was his attorney and his representative and could
properly receive confidential communications which would be
protected as a result of that relationship over a long period of
time.").

      In the current trial, Ruggiano is expected to provide
significant evidence against Joseph Corozzo.  First,  Ruggiano is
expected to testify that he knew Joseph Corozzo to be a longtime
member of the Gambino family who attained the rank of

consigliere, and will detail the same family ties to the Gambino family discussed above.  This will necessarily include testimony as to the positions held by Nicholas Corozzo and Mr. Corozzo, which, in turn, will require discussion of various events involving Mr. Corozzo, such as Corozzo identifying himself as an associate ("I'm one of yous") during his collection of debts on Mr. Corozzo's behalf.  Next, in reviewing his own criminal history, Ruggiano is expected to testify concerning the role played by Mr. Corozzo in relaying messages from the Gambino family leadership concerning whether and when to plead guilty, and advising Ruggiano to lie to a court concerning a drug problem in hopes of receiving time off his sentence.  Finally, as detailed above, Ruggiano is expected to testify that he understood that he was to contact Mr. Corozzo whenever he was approached by law enforcement so that Mr. Corozzo could report it to his father, consigliere Joseph Corozzo, and fulfill the Gambino family requirement of placing such contacts "on record."

Given this testimony, Mr. Corozzo's representation is fatally conflicted.  To provide effective representation Mr. Corozzo will be required to attack Ruggiano's testimony concerning his contacts with Joseph Corozzo and Joseph Corozzo's entrenched role in the Gambino family.  Because of Mr. Corozzo's duties of loyalty and confidentiality toward Ruggiano, however, he cannot carry out such attacks.  Ruggiano's expected testimony about lying to his sentencing court is based on communications

that took place wholly within the context of his attorney-client relationship with Mr. Corozzo.  Information concerning Ruggiano's status as an associate of the Gambino family and a participant in its illegal activities — both necessary components of his testimony — were also part of the communications encompassed by this representation.  And while Ruggiano's remaining trial testimony does not stem from confidential communications conveyed in the joint defense setting, this testimony is inextricably intertwined with Ruggiano's relationship with Mr. Corozzo, to which the long-standing attorney-client relationship between the two men provides relevant context and background.[17]  As such, Mr. Corozzo's representation of Ruggiano places him in a position where he must either violate duties owed to his former client or his current one.

For these reasons, under the cases above, Mr. Corozzo should be disqualified in order "to avoid the prospect of a conflict of interest which potentially could confer an unfair advantage on [the defendant] . . . or adversely affect [the prior client's] interests.  United States v. DiTommaso, 817 F.2d 201, 220 (2d Cir. 1987); see also United States v. Cunningham, 672 F.2d 1064, 1072 (2d Cir. 1982) ("The principle is well established that an attorney should be disqualified from opposing

---

[17]     In addition to his individual relationship with Ruggiano, the conflicts of Mr. Corozzo's law partner, Ronald Rubinstein are imputed to him.  Together, they represented Ruggiano from the early 1970's until after 2000.

a former client if during his representation of that client he obtained information relevant to the controversy at hand.").

    2.    <u>Salvatore Mangiavillano</u>

      Mr. Corozzo's prior representation of cooperating witness and Gambino family associate Salvatore Mangiavillano raises the same issues, and warrants the same result.

      Mr. Corozzo cannot contest that he previously represented Mangiavillano, <u>United States v. Yannotti</u>, 358 F. Supp. 2d 289, 295 (S.D.N.Y. 2004), and that he thus owes him continuing duties of confidentiality and loyalty.

      With respect to Joseph Corozzo, Mangiavillano is expected to testify about both the Gambino family's control of the production of concrete on Staten Island and about Joseph Corozzo's longstanding membership in the Gambino family and his strong familial ties to the family, including those of his brother, Nicholas Corozzo, and son, Mr. Corozzo, who he will identify as a Gambino family associate.  In other words, Mangiavillano will provide direct evidence concerning the charges against Joseph Corozzo.

      As above, this places Mr. Corozzo in the untenable position of being forced to choose between the ethical duties owed to his past and current client.  While Mangiavillano's testimony concerning the Gambino family's control over the concrete industry in Staten Island was not the direct subject of the representation Mr. Corozzo provided — he was charged as a

Gambino associate in a racketeering conspiracy with predicate acts including bank robbery and burglary in that case — that representation did encompass facts, such as Mangiavillano's relationship to the Gambino family and his participation in its criminal activities, that will be relevant to his testimony concerning Joseph Corozzo's membership in the Gambino family and his participation in its affairs.  As such, for the reasons above, Mr. Corozzo's prior representation of Mr. Mangiavillano creates a serious conflict of interest that warrants his disqualification.

        3.    <u>Salvatore Romano</u>

        Mr. Corozzo's representation of former Gambino family associate and cooperating witness Salvatore Romano does not fit neatly within professional norms.  Not surprisingly, when Mr. Corozzo acted as Romano's agent in fraudulently representing a Romano accomplice at Romano's request to ensure that he did not become a cooperating witness, he did not file a notice of appearance.  Nevertheless, as Romano sought Mr. Corozzo out as an attorney, Mr. Corozzo accepted the assignment presented, and their interactions thereafter focused tightly on Romano's criminal exposure, an attorney client relationship was formed.  <u>Pizzonia</u>, 415 F. Supp. 2d at 179 (stating that an attorney client relationship exists where a person requests legal services of a lawyer and the lawyer agrees to perform them).  As such, Mr. Corozzo owes Romano continuing duties of confidentiality and

loyalty.

With respect to Joseph Corozzo, Romano will provide enterprise evidence concerning his position in the Gambino family and his extensive ties to the family. With regard to the latter, among other things, Romano is expected to testify that a soldier in the Gambino family told him that Joseph Corozzo placed Mr. Corozzo up for induction as a "made" member of the Gambino family.

Because Mr. Corozzo's representation of Romano is inextricably intertwined with both men's roles as associates in the Gambino family, Mr. Corozzo would be unable to cross Romano concerning the above testimony without violating his ongoing ethical responsibilities to him. Thus, for the reasons above, this conflict too warrants disqualification.

    4.    <u>CW#2</u>

Mr. Corozzo's multiple representations of CW#2 also create serious conflicts of interest.

As detailed above, Mr. Corozzo represented CW#2 in two matters before the SEC, as well as in <u>United States v. Winston, et al.</u>, No. 00-CR-1248 (NGG), a large securities fraud prosecution in which he entered a notice of appearance and appeared at the initial proceedings in the case. As such, Mr. Corozzo owes CW#2 continuing duties of confidentiality and loyalty.

48

As to Joseph Corozzo, CW#2 is expected to provide significant enterprise proof concerning Joseph Corozzo's leadership position in the family, including an incident in which Joseph Corozzo, as captain to Charles Carneglia, who controlled CW#2, settled a dispute between CW#2 and another associate of the Gambino family. CW#2 is expected to testify that Joseph Corozzo used his leadership position in the family to immediately resolve the dispute in CW#2's favor after it was brought to his attention by Carneglia at a wedding attended by numerous members and associates of the Gambino family. CW#2 will also provide testimony concerning the strength and depth of Joseph Corozzo's ties to the Gambino family, testimony that, as above, will include recounting the positions held by Nicholas Corozzo, who CW#2 can identify as a Gambino family captain, and Mr. Corozzo, who CW#2 can identify as a Gambino family associate.

This testimony again creates a conflict between the ethical duties Mr. Corozzo owes to CW#2 and to his client. CW#2's expected testimony concerning Joseph Corozzo's position in and ties to the Gambino family will draw on facts encompassed in that representation since CW#2 was charged as an associate of the Gambino family, participating in a Gambino family stock fraud. As such, for the reasons above, Mr. Corozzo's prior representation of CW#2 creates a serious conflict of interest that warrants his disqualification.

C.   Mr. Corozzo's Involvement in the Racketeering
     Raises the Specter of a *Per Se* Conflict of Interest

_____   Mr. Corozzo's involvement in the criminal activities of the Gambino family arguably creates a *per se* conflict of interest that requires his disqualification.  As noted above, a *per se* conflict of interest exists where a defendant's counsel is implicated in the same or closely related criminal conduct to the conduct with which his client is charged.  Williams, 372 F.3d at 103; see also Fulton, 5 F.3d at 611; United States v. Cancilla, 725 F.2d 867, 869-71 (2d Cir. 1984).  The Second Circuit has explained that in such circumstances an attorney "cannot be free from fear that a vigorous defense should lead the prosecutor or trial judge to discover evidence of the attorney's own wrongdoing doing."  Fulton, 5 F.3d at 611.

     For the *per se* conflict of interest rule to apply, the Court need not find that defense counsel actually engaged in crimes closely related to those with which the defendant is charged.  Id. at 611.  Rather, allegations from a single witness regarding defense counsel's involvement in such criminal activity require disqualification "where there is a reasonable probability that a witness's allegations are true."  Id.  Further, "when a government witness alleges that he has direct knowledge of criminal conduct by defense counsel, for purposes of constitutional analysis, we must treat such allegations as though they are credible."  Id. at 612.  An attorney facing such

50

allegations can only avoid disqualification where a district court finds following a hearing that it can "definitely rule out the possibility that the allegations are true." Id. at 613.

As noted above, *per se* conflicts of interest cannot be waived. Williams, 372 F.3d at 102 (*per se* Sixth Amendment violations "are unwaivable"); see also Fulton, 5 F.3d at 613 ("Where a government witness implicates defense counsel in a related crime, the resultant conflict so permeates the defense that no meaningful waiver can be obtained."). As such, in Fulton, the Second Circuit reversed a conviction obtained after the district court advised the defendant that a lone cooperating witness alleged that his attorney engaged in criminal conduct related to the conduct with which the defendant was charged and the defendant waived the conflict.[18] Moreover, *per se* conflicts

---

[18]    In United States v. Rondon, 204 F.3d 376, 379-80 (2d Cir. 2000), a defendant appealing his trial conviction argued that he was the victim of a *per se* conflict of interest despite his prior knowledge that his attorney had been disbarred and his attorney's admission to represent him at trial *nunc pro tunc*. In setting forth the *per se* rule, the Rondon court stated that it applied only in instances where the alleged conflict was unknown to the defendant at the time of the representation, suggesting that a knowing waiver might be possible. Id. In Williams, while explicitly acknowledging that "we do not reach the issue of . . . a *per se* conflict of interest," the Second Circuit nevertheless attempted to square Rondon with Fulton's holding that a defendant's knowing waiver of his attorney's conflict of interest could not stand where the attorney engaged in conducted related to the crimes charged. 372 F.3d at 105. In this effort, while noting that the district court in Fulton advised the defendant of his attorney's conduct and the defendant subsequently waived of any resulting conflict, the Williams court stated that it was "unclear" whether the Fulton defendant knew of his attorney's criminal conduct and that "[t]hus we consider it unresolved in

51

Case 1:09-cr-00466-BMC Document 427-6 Filed 03/24/19 Page 56 of 254

of interest are not only unwaivable, but are of such a serious nature that if allowed to persist through trial and conviction, on appeal they result in "automatic reversal without a showing of prejudice." Id. (internal quotations omitted).

     Under Fulton and other Second Circuit precedent, Mr. Corozzo's continued representation raises serious concern that he may be subject to a *per se* disqualification. First, Mr. Corozzo has been alleged to have participated in criminal conduct. As detailed above, Mr. Corozzo is involved in the Gambino family's criminal enterprise, in particular, he has (i) participated in the Gambino family's efforts to recover the Hudson & McCoy extortion proceeds, (ii) passed illegal Gambino family funds to jailed Gambino family boss Peter Gotti, (iii) used his status as a lawyer to help the enterprise conduct its ongoing illegal business, thwart law enforcement, enforce loyalty among members and associates, and defraud the courts, (iv) ordered a shooting, and (v) collected debts through extortionate means.

     Second, Mr. Corozzo's criminal activity is arguably related to the crimes with which his father and client is charged. Joseph Corozzo is charged in count one's racketeering

-------------------

this Circuit whether the *per se* conflict rules are applicable where the defendant is aware of the facts underlying what would otherwise be a *per se* conflict." Id. The Second Circuit has thus expressly left this question open, and it is thus possible that the conflict will be found to be *per se* even if the defendant is aware of the relevant facts.

conspiracy, including predicate acts of extortion, extortion conspiracy and cocaine trafficking, as one of the leaders of the Gambino family, the alleged racketeering enterprise.  Mr. Corozzo, who is involved in the Gambino family's criminal activity, who has identified himself as a Gambino family associate, and who was proposed for induction into the Gambino family as a member — is thus arguably alleged to have engaged in the same RICO conspiracy for which his father is charged.

Third, the allegations concerning Mr. Corozzo's participation in the Gambino family's affairs stem not from a lone cooperating witness as in <u>Fulton</u>, but from the statements of more than seven cooperating witnesses.  Each witness's testimony is corroborated not only by the other witnesses' testimony, but by substantial other evidence, including multiple recorded conversations involving other Gambino family members and associates who are not cooperating with law enforcement, *including Mr. Corozzo himself*.

Over the course of the case, there is a significant concern that Mr. Corozzo's conflicts would "affect virtually every aspect" of his representation, including, most obviously, strategic decisions concerning the cross examination of the many cooperating witnesses with knowledge of Mr. Corozzo's criminal activities and whether to subject Joseph Corozzo to a government cross examination that could expose those activities.

If Mr. Corozzo's representation were permitted to continue and it were determined on appeal that his activity did create a *per se* conflict of interest, it would require "'automatic reversal without a showing of prejudice.'" Williams, 372 F.3d at 103 (quoting United States v. John Doe No. 1, 272 F.3d 116, 125 (2d Cir. 2001). Such a result would deeply prejudice the government and waste judicial resources.

### D. Mr. Corozzo's Multiple Conflicts of Interest Must Be Considered Collectively

Many of the actual and potential conflicts of interest detailed above warrant Mr. Corozzo's disqualification alone. These conflicts, however, should not be segregated. Rather, under Levy, the Court must consider all conflicts, including the possible *per se* conflict, together in evaluating the need for disqualification. 25 F.3d at 257. Given the overwhelming conflict of interest that results, Mr. Corozzo's continued representation cannot be countenanced. This is so not simply because (a) no rational defendant would seek his representation, and (b) the government would be prejudiced by the unsworn witness issues which are not just Joseph Corozzo's, but the government's to waive, but also to prevent Mr. Corozzo's continued representation from "jeopardiz[ing] the interests in ethical practice and the appearance of fairness identified by the Supreme Court in Wheat." United States v. Ramos, 350 F. Supp. 2d 413, 424 (S.D.N.Y. 2004) (citing Wheat, 486 U.S. at 164).

CONCLUSION

For the foregoing reasons, the government's motion to disqualify Mr. Corozzo and the law firm of Rubinstein & Corozzo should be granted.

Dated:     Brooklyn, New York
           March 20, 2008

                                        BENTON J. CAMPBELL
                                        United States Attorney
                                        Eastern District of New York


                                        _____/s/_____
                                        Joey Lipton
                                        Roger Burlingame
                                        Assistant U.S. Attorneys
                                        (718) 254-7000

3500-MDL-49


GOVERNMENT
EXHIBIT
3500-MDL-49
05 CR 425 (JBW)

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,   :
4                                :
                  Plaintiff,     :    CR-05-425
5                                :
            -against-            :    United States Courthouse
6                                :
                                 :    Brooklyn, New York
7
     DOMINICK PIZZONIA,          :
8                                :
                  Defendant.     :
9                                :    February 6, 2006
                                 :    2:00 p.m.
10   - - - - - - - - - - - - - X

11                   TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE JACK B. WEINSTEIN
12              SENIOR UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff:      ROSLYNN R. MAUSKOPF, ESQ.
                             United States Attorney
15                           BY:  MITRA HORMOZI, ESQ.
                                  JOEY LIPTON, ESQ.
16                           Assistant United States Attorneys

17   For the Defendant:      JOSEPH COROZZO, ESQ.
                             HENRY MAZUREK, ESQ.
18

19

20

21   Court Reporter:         FREDERICK R. GUERINO, C.S.R.
                             225 Cadman Plaza East
22                           Brooklyn, New York
                             718-330-7687
23

24   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
25
```

1    the past and was house counsel or is house counsel to the

2    Gambino family.  So if you would like for us to put on our

3    witness at this time?

4              THE COURT:  Put the witness on, then I will decide

5    who can cross-examine.

6              MS. HORMOZI:  Okay.

7              I apologize, Judge.  We also need to do -- there was

8    a superseding indictment filed on January 8th, and so the

9    defendant has not yet been arraigned on the superseding

10   indictment.

11             THE COURT:  Does he want it read?

12             MR. COROZZO:  No, your Honor.  I reviewed the

13   indictment with Mr. Pizzonia, who has authorized me to enter

14   a plea of not guilty at this time.

15             THE COURT:  Is that correct?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  All right.

18             MS. HORMOZI:  Okay.  Thank you.

19             THE COURT:  Swear the witness, please.

20   M I C H A E L    D i L E O N A R D O,

21             called as a witness, having been first duly sworn,

22             testifies as follows:

23             THE COURT CLERK:  Be seated.

24             State and spell your name for the record.

25             THE DEFENDANT:  Michael DiLeonardo,

DiLeonardo
**3502-VVVVV'**

FREDERICK R. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

Case 1:10-cr-00600-DLI Document 104-76 Filed 01/08/13 Page 63 of 254

DiLeonardo - Direct/Hormozi

1   BY MS. HORMOZI:

2

3   Q   Good afternoon, Mr. DiLeonardo.

4   A   Good afternoon.

5   Q   Sir, how old are you?

6   A   Fifty.

7   Q   Where were you born?

8   A   Brooklyn, New York.

9   Q   How long did you live in Brooklyn?

10  A   Over four years.

11  Q   Did you attend high school?

12  A   Yes.

13  Q   How far did you get post high school?

14  A   I went to high school and I went to college after high

15  school.  I graduated high school.

16  Q   Did you complete college?

17  A   No.

18  Q   Where did you live after you left Brooklyn?

19  A   Staten Island.

20  Q   Until when?

21  A   Forty-seven years old.

22  Q   What happened in June of 2002, Mr. DiLeonardo?

23  A   I was arrested in this case --

24          THE COURT:  Keep your voice up, sir.

25  A   On the Fred Weiss case.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00600-NGG Document 487 Filed 06/18/13 Page 64 of 254

DiLeonardo - Direct/Hormozi

1  Q    What type of charges were you arrested on?

2  A    Murder, racketeering, extortion.

3  Q    What was the criminal enterprise that you were charged

4  with being affiliated with?

5  A    The Gambino family.

6  Q    How long had you been a member of the Gambino family?

7  A    Since 1988

8  Q    What happened on Christmas Eve of that year?

9  A    I was straightened out.

10 Q    Who was the boss of the Gambino family in December 1988?

11 A    John Gotti.

12 Q    Were other men made with you that night?

13 A    Yes.

14 Q    Over the course of your involvement with the Gambino

15 family until your arrest in June 2002, what types of crimes

16 did you engage in?

17 A    At that time assaults, shylocking, stock fraud, money

18 laundering, murder, conspiracy to murder.

19 Q    Is it fair to say that prior to your imprisonment in

20 June 2002, you spent most of your adult life committing

21 crimes of one sort or another?

22 A    That's correct.

23 Q    How many murders were you involved in?

24 A    One conspiracy to murder and two murders.

25 Q    Who were the people?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cv-00700-ARR Document 44-6 Filed 04/18/08 Page 65 of 254

DiLeonardo - Direct/Hormozi

1   A    Fred Weiss, Jack (last name unknown) and the conspiracy

2   was Frank Hydell.

3        THE COURT:  Conspiracy was what?

4        THE WITNESS:  Franks Hydell.

5   Q    Did all three of those people end up getting killed?

6   A    Yes.

7   Q    Mr. DiLeonardo.  Did you shoot any of the victims?

8   A    No.

9   Q    Starting with Jack, whose last name you don't know, what

10  was your involvement?

11  A    I drove diversion or backup car.

12  Q    Did anyone ask you to get involved in that murder?

13  A    The order came from Paul Castellano.

14  Q    Who was Paul Castellano at the time?

15  A    He was the boss of the Gambino family.

16  Q    Approximately when was Jack murdered?

17  A    I believe it was '83.

18  Q    How about Fred Weiss?

19  A    Fred Weiss was '89.

20  Q    What was your involvement in his murder?

21  A    I was supposed to lure Fred Weiss to a house, murder him

22  and bury him.

23  Q    Did anyone else ask you to get involved in that murder?

24  A    Yes.  The order came from John Gotti.

25  Q    And was Fred Weiss killed that day?

DiLeonardo - Direct/Hormozi

1    A    No.

2    Q    Was he later killed?

3    A    Yes.

4    Q    Were you involved in the actual murder?

5    A    No.

6    Q    Who asked you to get involved initially?

7    A    That came from Joe Watts.  The order was from John Gotti

8    to Joe Watts to me.

9    Q    You mentioned you were involved in the murder conspiracy

10   of Frank Hydell.

11        When was Frank Hydell murdered?

12   A    He was murdered in '98.

13   Q    What was your role in the murder conspiracy?

14   A    I facilitated a message to Huck Carbonaro and George

15   Lombardozzi.

16        THE COURT:  You drop your voice.  Try to talk across

17   the microphone, please.

18   Q    So, who was Huck Carbonaro?

19   A    He was a soldier in the Lou Vallario crew.

20   Q    And Lou Vallario was who?

21   A    The captain of the Gambino family.

22   Q    And the second person you named, Huck Carbonaro?

23   A    George.

24   Q    I'm sorry.

25   A    He was a soldier with Danny Marino.  Danny was a

Case 1:18-cv-00900-KAM-RER Document 104-76 Filed 05/18/21 Page 67 of 254

DiLeonardo - Direct/Hormozi

1   captain.

2   Q   Were you in any other way involved in the Hydell murder,

3   aside from passing the message?

4   A   No.

5   Q   Mr. DiLeonardo, were you charged with the murder or

6   murder conspiracy of Jack or Frank Hydell at the time of your

7   arrest?

8   A   No, I was not.

9   Q   How did the government learn of your involvement in

10  those acts?

11  A   Through my debriefings.

12  Q   At the time of your arrest in June 2002, what rank did

13  you hold in the Gambino family?

14  A   I was a captain.

15  Q   And when did you become an official captain in the

16  Gambino family?

17  A   Sometime in '92, '93.

18  Q   Who was running the family in 2002?

19  A   Pete Gotti was the boss in 2002.

20  Q   Who made the decision to promote you to captain?

21  A   John Gotti, Sr.

22  Q   Where was John Gotti, Sr. at the time that you became

23  captain?

24  A   He was in jail.

25  Q   To your knowledge, how was John Gotti, Sr. communicating

Case 1:10-cr-00600-BCB Document 1-4 Filed 08/10/09 Page 68 of 254

DiLeonardo - Direct/Hormozi

1    his wishes to the street while he was in jail?

2    A    Through visits of his friends and family and through

3    lawyers.

4    Q    Mr. DiLeonardo, did you ever use lawyers to help you

5    communicate with other members of the Gambino family?

6    A    Yes.

7    Q    Who?

8    A    Joe Corozzo, Richard Rehbock, and Linda Sheffield.

9    Q    By Joe Corozzo you mean the person sitting at the table

10   right now?

11   A    That's correct.

12   Q    How did you know Joseph Corozzo?

13   A    I met him early on through his father and Uncle John,

14   Jr. from coming around the club or clubs.

15   Q    And at the time of your arrest, what role did Joseph

16   Corozzo, Sr., the father, have, if any, in the Gambino

17   family?

18   A    He was our consiglieri.

19   Q    How about Mr. Corozzo's uncle, Nicky Corozzo?

20   A    Nicky was a captain and previously on the committee.

21   Q    And you also mentioned that you met Joseph Corozzo, the

22   lawyer, through John A. Gotti, Jr.

23       What was John A. Gotti's relationship to Joseph Corozzo,

24   when you first met Mr. Corozzo?

25   A    They were friends.

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

12

DiLeonardo - Direct/Hormozi

1  Q    Do you know if John A. Gotti helped Mr. Corozzo in any

2  way while Mr. Corozzo was in law school?

3  A    Yes.  John had told me that he was going to help Joe-Joe

4  along, and that when he became a lawyer, he was going to use

5  him primarily to help him with the family, see guys in jail,

6  things of that nature.

7  Q    How do you know this?

8  A    John told me.

9  Q    What was your relationship with John A. Gotti?

10  A    At the time nobody was closer to John than me.

11      MR. MAZUREK:  Your Honor, I will ask for a time frame.

12      THE COURT:  Try to fix the time, if you can.

13  A    I would say around '92, '91.  In those days --

14      THE COURT:  Excuse me.  Don't volunteer.  When I

15  give an order, it is to the attorney to ask you.

16      THE WITNESS:  Excuse me.

17      THE COURT:  Okay.  Proceed.

18

19      MR. HORMOZI:  Thank you, Judge.

20  BY MS. HORMOZI:

21  Q    Did John A. Gotti do anything for Mr. Corozzo, once Mr.

22  Corozzo became a licensed lawyer?

23  A    Yes.  He put him on the payroll.

24  Q    Again, how do you know that?

25  A    John told me and I seen payments.

FREDERICK R. GUERTNO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Direct/Hormozi

1   Q    You personally saw payments made from John A. Gotti to

2   Mr. Corozzo?

3   A    That's correct.

4   Q    Do you recall where you were when you saw any of these

5   payments?

6   A    One of the times was in a restaurant called Villa

7   Russo's on Lefferts and 101st.

8   Q    Did Mr. Corozzo ever travel with John A. Gotti and

9   others?

10  A    Yes.

11  Q    Did he travel with others to Foxwoods in 1994?

12  A    That's correct.

13  Q    What was the purpose of you going to Foxwoods?

14  A    We had to meet the guys who handled the Connecticut

15  business.  Louie Bruge (ph), who was a captain with us, and

16  there was also a fight that night.  So John coordinated to go

17  up there for a little pleasure and business.

18  Q    Was anyone else with you, Mr. Corozzo, John A. Gotti,

19  Jr., and the Lou that you mentioned for this social family

20  business event?

21  A    Yes.  Jack D'Amico, who was a captain; Frank Fappiano,

22  who was a soldier; Frank Cali, who was an associate; Charlie

23  Fish, he was a soldier with the Colombo family; Mario, which

24  was Louie's nephew, was a soldier with Louie; Joe Fassaro,

25  who is an associate of Louie; another fellow named Brad, who

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Direct/Hormozi

1    is going out with Louie Bruge's daughter.

2    Q   Mr. DiLeonardo, was Gambino family business discussed

3    that night?

4    A   Yes.

5    Q   Was Mr. Corozzo present when Gambino family business was

6    discussed?

7    A   Yes.

8    Q   You mentioned earlier that John Gotti put Mr. Corozzo on

9    the payroll.

10       Did he tell you how much he was paying him,

11   approximately, a month?

12   A   Started out with 4,000 a month.

13   Q   For how long was Mr. Corozzo on the Gambino family

14   payroll, as far as you know?

15   A   Until I was incarcerated.

16   Q   Was that in 2002?

17   A   That's correct.

18   Q   Do you know who was paying Mr. Corozzo, after John A.

19   Gotti was incarcerated in 1998?

20   A   Yes, Pete Gotti.

21   Q   And how do you know that?

22   A   Pete told me.

23   Q   Mr. DiLeonardo, did you ever use Mr. Corozzo's services

24   as a lawyer?

25   A   Yes, I did.

Case 1:08-cr-01010-BSJ Document 41-6 Filed 06/04/09 Page 72 of 254

DiLeonardo - Direct/Hormozi

1   Q   When?

2   A   During the course of my trial.

3   Q   Which trial?

4   A   Excuse me, the trial in Atlanta.

5   Q   Approximately what year was that, do you recall?

6   A   2001.

7   Q   And was it in the spring of 2001, approximately?

8   A   Yes, probably March or April of 2001.

9   Q   What was that trial about?

10  A   That was an extortion of Scores Nightclub and Gold Club

11  in Atlanta and money laundering.

12  Q   And why did you call upon Mr. Corozzo?

13  A   We had seen a witness list that an individual named

14  Craig DePalma was going to testify against us.

15  Q   Who was Craig DePalma?

16  A   A soldier in John Jr.'s crew.

17  Q   Why did you call upon Mr. Corozzo?

18  A   I wanted him to go up there and see Craig.  I couldn't

19  send my lawyers in Atlanta because I wanted to keep it apart

20  from the Atlanta case.  I didn't want any obstruction seen by

21  the government, so I independently sought out Mr. Corozzo,

22  who I was comfortable with and taking care of our family

23  business, and asked him if he would go up and see Craig.

24  Q   I'm sorry, where was Craig DePalma in 2001?

25  A   Allenwood Prison.

DiLeonardo - Direct/Hormozi

1   Q   Do you know Craig DePalma's father?

2   A   Yes.

3   Q   Who was he?

4   A   Greg DePalma, an acting captain.

5   Q   You mentioned that Mr. Corozzo was not your primary

6   lawyer in that case; is that correct?

7   A   That is correct.

8   Q   How did you contact Mr. Corozzo?

9   A   I called his office.

10   Q   Were you out on bail?

11   A   Yes.

12   Q   Where did you meet him, if you recall?

13   A   I met him off the Belt Parkway in Brooklyn, the Bay 8th

14   Street exit.  I believe it was Independence Avenue.

15   Q   Did you ask him to visit Craig DePalma at the time?

16   A   Yes, I did.

17   Q   Did he agree?

18   A   Yes.

19   Q   Did he report back to you?

20   A   Yes, he did.

21   Q   What did Mr. Corozzo tell you?

22   A   He said the kid I told him that he went to the grand

23   jury and that everything was okay, referring to me, and the

24   kid looked like he was going to stand up.

25   Q   And do you remember where you were when he reported back

DiLeonardo - Direct/Hormozi

1  to you?

2  A    The same location as previously.

3  Q    Sir, did Craig DePalma testify against you at your trial

4  in Atlanta?

5  A    No, he did not.

6  Q    What was the verdict in the Atlanta case against you?

7  A    I got an acquittal.

8  Q    Were you innocent?

9  A    No.

10  Q    Did you ever ask Mr. Corozzo to do anything else for

11  you?

12  A    Yes.  On the list later on an individual named John

13  DeGiorgio came up.

14  Q    Who was John DeGiorgio?

15  A    He was a nephew and cousin to John Gotti, Sr.

16  Q    And when you say on the list, what list are you talking

17  about?

18  A    The witness list.

19  Q    For your Atlanta case?

20  A    That's correct.

21  Q    What did you ask Mr. Corozzo to do?

22  A    To go up and see John, Jr. and find out if it was true

23  was he going to testify.  If he was, if he had any dirt that

24  we could use against him at trial, or if they could influence

25  him into not testifying against me.

DiLeonardo - Direct/Hormozi

1   Q    What did Mr. Corozzo say when you asked him to do this?

2   A    He objected and said he was directed by John Gotti, Sr.

3   - at the time Senior being in Springfield - wanted to hear

4   everything firsthand before it went anywhere else, upon his

5   insistence.  I found out John was dying at the time and in

6   bad shape to go see John.  He said no, this is coming from

7   the boss, and he's going to bring it there.

8   Q    Did Mr. Corozzo say anything about John Gotti, Sr.'s

9   relationship to John A. Gotti, John Gotti  Jr., at the time?

10  A    Yes.  He said he was mad at him.

11  Q    Did Mr. Corozzo tell you how John Gotti, Sr. had learned

12  -- I'm sorry.  Did he tell you why he was mad at him?

13  A    Yes.  It was two reasons.  One was that he took the plea

14  DiLeonardo, that he thought he should have gone to trial.

15  And the second was he learned from Greg DePalma, who was also

16  in the same prison, that Junior, upon his arrest Craig got

17  mad at him, father and son, and took all of the monies away

18  from him.

19  Q    Do you know if Mr. Corozzo spoke to Greg DePalma?

20  A    Yes.

21  Q    How do you know that?

22  A    He told me, Joe-Joe.

23  Q    Did you know if Mr. Corozzo passed messages from Craig

24  Senior and Greg DePalma?

25       MR. MAZUREK:  Time sequence, your Honor.

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

DiLeonardo - Direct/Hormozi

1  BY MS. HORMOZI:

2  Q   This is back when you are speaking to Mr. Corozzo about

3  your Springfield case.

4      Did Mr. Corozzo tell you if he was able to speak to Greg

5  DePalma as well?

6  A   Yes.  He had spoken to him previous to my conversation I

7  believe, also.  This is leaning more towards I would say May

8  and June of --

9  Q   Of 2001?

10  A   Yes.

11  Q   What was your relationship with John Gotti, Sr.,

12  Mr. DiLeonardo

13  A   Very close.

14  Q   Do you know if Mr. Corozzo spoke to John Gotti, Sr.

15  about your case in the spring of 2001?

16  A   Yes, he did.

17  Q   How do you know that?

18  A   He came back that he wanted to see me, called me, and I

19  met him in New York.

20  Q   What did he tell you that John Gotti, Sr. had said?

21  A   He said John was very upset with me for two reasons.

22  One, for breaking protocol and not going to see his father

23  before I had seen him, being his father was a captain at the

24  time.

25  Q   When you say his father, who are you referring to?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Direct/Hormozi

1    A    Corozzo, Joey's.

2    Q    Okay.

3    A    And the second being that I dealt with his nephew John

4    DeGiorgio, and he wanted to know how I dealt with him and why

5    did I DiLeonardo with his nephew.

6    Q    What was your reaction?

7    A    I was very upset by that.

8    Q    Mr. DiLeonardo, did you ever pay Mr. Corozzo for any

9    work he did for you in the Atlanta case?

10   A    Yes.

11   Q    How much did you pay him?

12   A    $1,000.

13   Q    How did you pay him?

14   A    I paid him by check.

15   Q    Was that typical for you to pay by check?

16   A    Not really, but in this case I wanted to show the

17   government or anybody else it would look like that we had a

18   lawyer/client privilege.  By check I could show that.

19   Q    Do you recall approximately when you gave him that

20   check?

21   A    I would say March or April of 2001.

22   Q    Where did you have a checking account?

23   A    Staten Island Savings Bank.

24   Q    Did you have any discussion with Mr. Corozzo when you

25   gave him the check?

Case 1:08-cr-00200-SLT Document 376 Filed 06/04/09 Page 78 of 254

1   A     Yes.  He was being gracious.  He said he really didn't

2   want it, but I insisted upon him taking it.

3   Q     Do you know if the check was ever cashed?

4   A     No.

5   Q     I'm sorry, I don't know if I asked, how much was the

6   check for?

7   A     1000.

8   Q     Okay.

9         Mr. DiLeonardo, do you have any personal animus against

10  Joseph Corozzo, the father, or any members of Joseph Corozzo

11  family?

12  A     I'm not too happy with his father the way he treated me

13  after I got arrested in that case.

14  Q     What do you mean by that?

15  A     After my loyalty in the Gambino family, standing ready

16  for trial in another case, upon me not getting bail and

17  sitting there, I was taken down and broken, made a nonentity,

18  and it lays at his father's feet and others.

19  Q     When you say you were broken, what do you mean by that?

20  A     I was taken down from being a captain and also as a

21  friend, as a wiseguy.  I was on the shelf.

22  Q     Sir, has that affected your testimony here today in any

23  way?

24  A     No.

25  Q     After your 2002 arrest, did you make a decision as to

22

DiLeonardo - Direct/Hormozi

1    how to proceed with your case?

2    A    Yes.

3    Q    What was the decision?

4    A    To cooperate.

5    Q    Have you signed a cooperation agreement with the

6    Southern District of New York's U.S. attorney's office?

7    A    Yes.

8    Q    Pursuant to that agreement, did you plead guilty to

9    certain crimes?

10    A    Yes.

11    Q    Have you been indicted for all of the crimes that you

12    pled to?

13    A    No.

14          THE COURT:  Pled to or admitted?

15    BY MS. HORMOZI:

16    Q    Admitted to?

17    A    No.

18    Q    And subsequently pled to?

19    A    No.

20          THE COURT:  Well, if he pled to them, how is he

21    indicted?

22          MS. HORMOZI:  He provided the information, your

23    Honor.  Let me rephrase, I apologize.

24    BY MR. HORMOZI:

25    Q    Sir, at the time did you subsequently plead guilty to

DiLeonardo - Direct/Hormozi

1   crimes that you told the government about?

2   A    That's correct.

3   Q    Okay.

4        What is the maximum penalty you are facing?

5   A    Life.

6   Q    What is your understanding of your obligations under the

7   cooperation agreement?

8   A    To come in and tell the truth when called.

9   Q    Have you in fact testified at trials in the Southern

10  District?

11  A    Yes.

12  Q    What do you understand a breach of the cooperation

13  agreement to be?

14  A    If I lie.

15  Q    What happens if you breach the agreement?

16  A    They tear up my agreement.

17       MS. HORMOZI:  No further questions.

18       THE COURT:  Do you want to take a break?

19       MR. MAZUREK:  Yes, Your Honor, if I may for a moment,

20  your Honor.

21       THE COURT:  All right.  Take five minutes enough?

22       MR. MAZUREK:  That's fine.

23       THE COURT:  A five-minute break.

24       (A recess is taken at 3:35 p.m.)

25

DiLeonardo - Cross/Mazurek

1      (Judge Weinstein enters the courtroom at 3:40 p.m.)

2    THE COURT:  Proceed.

3    MR. MAZUREK:  Thank you, your Honor.

4  CROSS-EXAMINATION

5  BY MR. MAZUREK:

6  Q    Mr. DiLeonardo, Joseph Corozzo, Jr., the lawyer, never

7  filed a notice of appearance and your behalf; is that

8  correct?

9  A    I have no idea

10  Q    Did he ever represent you in court?

11  A    No.

12  Q    Did he ever make any appearance in court that you ever

13  remember?

14  A    No.

15  Q    Did you ever ask him to appear for you in court?

16  A    No.

17  Q    So when you said you don't remember whether he filed a

18  notice of appearance, do you remember now?

19  A    No, I wouldn't know what he did.

20  Q    On your behalf, sir, I'm asking did he ever file a

21  notice of appearance to represent you in a criminal case in

22  court?

23  A    I guess not.  But my point being is that I don't know

24  what the procedure is when you represent somebody.  I'm not a

25  lawyer.  You go fill a paper out and pass it into the court

DiLeonardo - Cross/Mazurek

1 system? I don't know that.

2 Q  What you do know is in order for someone to stand up in

3 court to represent you, they have to notice their appearance

4 to the judge; is that correct?

5 A  I would assume that's correct.

6 Q  You assume.

7    Based upon your career experience as a criminal

8 defendant in cases, is that how you remember it?

9 A  Yes.

10 Q  Did Mr. Corozzo ever file any papers on your behalf that

11 you are aware of?

12 A  Same answer, I do not know.

13 Q  Did he ever file a motion on your behalf?

14 A  No, I didn't have the any legal proceedings with him

15 that way.  His job for me was being a courier of messages.

16 Q  My question to you, sir, is whether in court there was

17 any representation by Mr. Corozzo where he filed papers on

18 your behalf?

19    MS. HORMOZI:  Objection, Your Honor, asked and answered.

20    THE COURT:  I will allow it?

21 Q  You want me to repeat the question?

22 A  No, no.  No, he has not.

23 Q  Now, sir, as a career criminal, you had to over the

24 years get used to being able to know and be aware of criminal

25 defense lawyers.  Correct?

DiLeonardo - Cross/Mazurek

1   A    That's correct.

2   Q    Criminal defense lawyers were assets that you needed in

3   order to continue your career as a criminal, correct?

4   A    It would help out my career.

5   Q    Okay.

6        Over the years, sir, you did get to know a few criminal

7   defense lawyers, right?

8   A    That's correct.

9   Q    And that was from a very early age.  You were first

10  arrested when you were a teenager; is that correct?

11  A    Yes, I would say so, my early twenties.

12  Q    Then again you were arrested in your first adult case in

13  the federal system in about September 2000, correct?

14  A    That is correct.

15  Q    And that was in the Atlanta case, correct?

16  A    Correct.

17  Q    That was the extortion that you are talking about with

18  the nightclubs, right?

19  A    That's correct.

20  Q    And in September of 2000, you did not ask Joe Corozzo to

21  represent you; is that correct?

22  A    That's correct.

23  Q    You have other counsel?

24  A    Yes.

25  Q    The first counsel that you hired was whom, sir?

Case 1:08-cv-00200-GBC Document 46-76 Filed 06/04/09 Page 85 of 254

DiLeonardo - Cross/Mazurek

1   A    Nick Gravante.

2   Q    Nick Gravante was someone -- that's Nick Gravante, Sr.

3   or Jr.?

4   A    Junior.

5   Q    Nick Gravante, Jr. was someone who you were familiar

6   with at a young age?

7   A    Not at a young age.  I knew him later on in life.  I

8   knew the family, not the son.

9   Q    They grew up in the same neighborhood in Brooklyn as

10  your family; is that correct?

11  A    Yes.

12  Q    And you had used the services of other family members

13  who were lawyers before you retained Nick Gravante, Jr.; is

14  that correct?

15  A    That's correct.

16  Q    In fact, you used the services of Nick Gravante's

17  father, Nick Gravante, Sr.; is that correct?

18  A    That's correct.

19  Q    He did tax work for you; is that correct?

20  A    That's correct.

21  Q    He helped you in the sale and contracting of properties;

22  is that correct?

23  A    Correct.

24  Q    You also used the services of a lawyer by the name of

25  Richard Gravante, Nick Gravante, Sr.'s son; is that correct?

DiLeonardo - Cross/Mazurek

1    A    Correct.

2    Q    Richard Gravante was someone who assisted you also in

3    tax preparation; is that correct?

4    A    That's correct.

5    Q    When I say tax preparation, you submitted false tax

6    returns on numerous occasions; is that correct?

7    A    That's correct.

8    Q    And is it your testimony, sir, that you would give false

9    information to the lawyer, who would then prepare the tax

10   returns based upon your false tax information?

11   A    Right.  He had no knowledge of it.

12   Q    And then there were a number of transactions that you

13   would use Richard Gravante for; is that correct?

14   A    That's correct.

15   Q    In the civil context?

16   A    That's correct.

17   Q    And this was before September of 2000, correct?

18   A    Correct.

19   Q    He helped you sell properties, correct?

20   A    Correct.

21   Q    Buy two houses that you purchased in Staten Island,

22   right?

23   A    That's correct.

24   Q    One on 98 Seacrest, that was your own personal home

25   where you lived with your first family; is that correct?

Case 1:03-cr-00200-SLT Document 146-76 Filed 06/04/09 Page 86 of 254

DiLeonardo - Cross/Mazurek

1  A    That's correct.

2  Q    And he also helped you to purchase a house on 40

3  Oceanside Avenue on behalf of your girlfriend Madeline; is

4  that correct?

5  A    That's correct.

6  Q    That's at the time when you were living a double life.

7  You were still married to Toni Marie and also had a child and

8  were in a relationship with Madeline; is that correct?

9  A    I believe when I got the second house I was estranged

10  from my first wife.

11  Q    That's because she became aware of the second life you

12  were leading?

13      MS. HORMOZI:  Objection, your Honor?

14  Q    With Madeline right?

15      THE COURT:  I will allow it.

16  A    That's correct.

17  Q    And, again, the lawyer, Richard Gravante, was helping

18  you with respect to these kinds of transactions, the real

19  estate transactions?

20  A    Yes.

21  Q    In fact, you know who Mary Loobey?

22  A    That's Richard's wife.

23  Q    She's also an attorney?

24  A    That's correct.

25  Q    And she helped you with your divorce from your first

Case 1:03-cr-00200-GEB Document 476 Filed 06/04/09 Page 87 of 254

DiLeonardo - Cross/Mazurek

1   wife Toni Marie?

2   A    That's correct.

3   Q    Okay.

4        Now, earlier today on your direct examination you said

5   it was not typical for you to pay lawyers with checks,

6   correct?

7   A    Yes, that's correct.

8   Q    When you testified to that, you meant normally you pay

9   lawyers by paying them cash; is that correct?

10  A    At times, if I needed to.

11  Q    Other then checks and cash, sir, are there other ways

12  you can pay people?

13  A    What I mean is if I needed to pay them by cash, I would.

14  Q    I'm trying to understand what you said on your direct

15  examination testimony.

16       You said it was not typical to pay by check; is that

17  correct?

18  A    That's correct.

19  Q    Other than cash, is there a third option that you would

20  pay lawyers?

21  A    No.

22  Q    Okay.

23       Now, for all of the transactions that we talked about,

24  the representations of Richard Gravante and Nick Gravante,

25  Sr., did you pay for the real estate transactions --

Case 1:03-cv-00630-DRH Document 416-76 Filed 06/04/09 Page 88 of 254

DiLeonardo - Cross/Mazurek

1   representation on the real estate transactions?

2   A    Sometimes there were and most of the times they didn't

3   take any money from me.

4   Q    Okay.

5        Sometimes there were payments?

6   A    Yes.  Sometimes we paid them by check, the business with

7   Metropolitan Stone and stuff like that.

8   Q    What about for the tax returns, let's start there?

9   A    No, I don't believe Richard ever charged me.

10  Q    Richard Gravante never charged you for any personal work

11  he did for you?

12  A    No.

13  Q    Never paid him cash?

14  A    No.

15  Q    Nick Gravante, Sr., did he ever ask for any payments?

16  A    I believe that's the one he was tied in with Richard on

17  the sale of Metropolitan Stone.  We gave them a fee.

18  Q    For his personal representation.

19       Did you ever pay Nick Gravante, Sr.

20  A    I don't remember, no.

21  Q    So they did this work for you for gratis?

22  A    Yes.

23  Q    These people you just knew from the neighborhood in

24  Brooklyn; is that correct?

25  A    My father-in-law and Nick Gravante, Sr. were very, very

DiLeonardo - Cross/Mazurek

1   friendly and he never charged them, either.

2   Q    Let me ask you this, sir, you said Nick Gravante, Jr.

3   was someone you got to know later on in life; is that

4   correct?

5   A    Yes.

6   Q    He's one of the sons of Nick Gravante, Sr.?

7   A    That's correct.

8   Q    Is the same true of Richard Gravante?

9   A    About the same time, maybe Richard's a little earlier.

10  Q    What time frame are we talking about?

11  A    I got married in '85, so sometime after '85, I would

12  say.

13  Q    How old were you?

14  A    I was 30.

15  Q    How old were Richard and Nick Gravante than you?

16  A    A couple of years my junior.

17  Q    At that point both were practicing lawyers licensed here

18  in New York; is that correct?

19  A    I'm not sure.  I believe so, but I'm not sure.

20  Q    Well, you had them perform legal services on your

21  behalf.  You didn't want people performing legal services on

22  your behalf who weren't licensed and practicing lawyers?

23  A    The first time I dealt with Nick as a lawyer --

24  Q    Which Nick are we talking about?

25  A    Junior.  The first time I dealt with him was my case in

DiLeonardo - Cross/Mazurek

1  Atlanta, that was in 2000. That's my first experience with

2  Nick Gravante, Jr. Richard was partners with his father, but

3  his father primarily handled me and my in-laws at the time,

4  so I didn't really DiLeonardo with Richard in those days,

5  early '85/86, I don't think so.

6  Q    These were lawyers who you believed were going to be

7  able to practice and perform legal services on your behalf;

8  is that correct?

9  A    That's correct.

10  Q    All right.

11       These lawyers, they weren't in--- did they consider your

12  case a pro bono case?

13  A    I don't know. It was gratis, like I said, because of my

14  relationship with my father-in-law. I offered to pay. Gave

15  them a bottle of wine at times.

16  Q    As far as you know, their practices were for profit,

17  private practice?

18  A    That's the business.

19  Q    Now, let's go back, sir, to your case in September 2000.

20       That was a federal criminal case; is that correct?

21  A    That's correct.

22  Q    That was in a district in Georgia; is that correct?

23  A    Northern District of Georgia.

24  Q    And who reached out to Nick Gravante, Jr., if you

25  recall, to represent you in that case?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1    A    I went to him.

2    Q    That was the first time that you had dealings with Nick

3    Gravante, Jr.?

4    A    For myself, yes.

5    Q    Well, sir, do you recall an investigation out of White

6    Plains in Westchester County?

7    A    Yes.  That was around -- simultaneous, yes, with this.

8    Right.  That started around '98, that's correct.

9    Q    I'm sorry, I guess I'm a little confused.

10        I was asking you whether the Atlanta case in September

11   of 2000, which is when you learned the indictment came down

12   against you, was the first time that you dealt with Nick

13   Gravante; is that correct, Nick Gravante, Jr.?

14   A    Yes.  It goes before that.  Let me explain it.  I will

15   explain it to you.

16   Q    Well, let me ask you, and perhaps I can get to the point

17   more quickly.

18        You are aware that prior to your indictment in the

19   Northern District of Georgia, there was an investigation that

20   was going on here in New York, right?

21   A    That's correct.

22   Q    That was an investigation -- a joint tax force

23   investigation between the New York State Attorney General's

24   office and the U.S. attorney's office in the Southern

25   District of New York; is that correct?

Case 1:03-cr-00929-NGG Document 446-76 Filed 06/04/09 Page 92 of 254

DiLeonardo - Cross/Mazurek

1    A    Right, through White Plains.

2    Q    And you knew that that investigation was related to the

3    Scores Nightclub and your involvement with potential

4    extortion of that nightclub; is that correct?

5    A    That's correct.

6    Q    You knew that at least two years prior to the indictment

7    in the Atlanta case; is that correct?

8    A    That's correct.

9    Q    So let's go back.  We are now in 1998.

10         Isn't it true, sir, that you had Nick Gravante, Jr. --

11   you retained his services with respect to the White Plains

12   investigation?

13   A    That's correct.

14   Q    Okay.

15        Again with respect to Nick Gravante, Jr. you had just

16   mentioned a short time ago that the first time in which you

17   dealt with Nick Gravante, Jr. for yourself, and I believe you

18   used the term "for myself," was with respect to the Atlanta

19   indictment.

20        What did you mean by the term "for myself" ?

21   A    For me being with Nick?

22   Q    Yes?

23   A    Well, Nick, when he first started out early on, like I

24   said, we knew him from the neighborhood, and I believe he was

25   looking to go with Shargel's office, and that's how I knew

Case 1:08-cr-00700-JBW Document 46 Filed 06/04/09 Page 93 of 254

DiLeonardo - Cross/Mazurek

1   Nick and Jimmy DiPietro and all of those lawyers.

2   Q    I guess I'm confused.

3        When you say you used Nick Gravante, Jr. for myself, did

4   you mean that as in relation as opposed to someone else?

5   A    I'm not clear, I'm sorry.

6   Q    You used the term I went to Nick Gravante, Jr. for

7   myself for the first time in the Atlanta indictment?

8   A    Yes, for me.

9   Q    My question is:  When you said "for myself," were you

10  referring to as opposed to versus other people or the

11  organization or the enterprise?

12  A    No.  I know there was times, like I said, he was looking

13  to hook up with Shargel's office, which I don't know for sure

14  if he got in there.  He wanted to start his tenure with

15  Shargel.

16  Q    I'm not asking about Nick Gravante --

17       THE COURT:  Let him answer.

18       MS. HORMOZI:  Thank you.

19  A    Like I said, that was my dealings with Nick, because I

20  knew his family through the neighborhood.  He may have gotten

21  on the John Gotti, Sr. case at that stage, the latter case.

22  Q    But you had never used Nick Gravante, Jr. until now, we

23  have discovered, for the White Plains investigation?

24  A    I wouldn't use when discovered.  I made it all inclusive

25  in the Scores case up until my indictment --

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1  Q    I know what you said.

2            THE COURT:  Don't interrupt the witness.

3  A    Up until '98, when the Scores case started, up until my

4  indictment in 2000, in my mind that's all the same case.  It

5  was an offshoot of the Scores case.

6  Q    Prior to the 1998 investigation of you up in White

7  Plains from New York State A.G.'s office and Southern

8  District of New York, had you used Nick Gravante, Jr. for any

9  criminal work?

10 A    I don't believe so.

11 Q    In the investigation -- and it was around 1998 that you

12 first learned that you were a potential target of the A.G.'s

13 investigation up in White Plains?

14 A    Yes, after John Junior gets arrested in the case.

15 Q    Okay.  That's when you seek the services of a criminal

16 defense lawyer?

17 A    That's correct.

18 Q    Prior to that time, you hasn't had the opportunity to

19 retain a criminal defense lawyer on your behalf?

20 A    Yes, there was one other time with the teamsters -- when

21 I had to resign from Local 282, I used Aroni and DiPietro to

22 handle that matter.  I don't remember anything else, offhand.

23 Q    And you are talking about the lawyer Al Aroni?

24 A    That's correct.

25 Q    He was also your business partner; is that correct?

Case 1:03-cv-00700-DGE Document 44-76 Filed 06/04/09 Page 96 of 254

DiLeonardo - Cross/Mazurek

1   A   Yes, in the pool room.

2   Q   You owned a pool room in Brooklyn together?

3   A   That's correct.

4   Q   Okay.

5       He also was from the neighborhood in Brooklyn?

6   A   He lived I believe on Ocean Parkway, but he was a

7   neighborhood lawyer.  He was around all the time, Al.

8   Q   When you mentioned neighborhood lawyer, that's your

9   neighborhood in Brooklyn where he grew up?

10  A   He came from another neighborhood, Ocean Parkway.  He

11  was always around the neighborhood looking for business.

12  Q   So you had retained him prior to retaining Nick

13  Gravante, Jr. on another matter?

14  A   That's correct.

15  Q   You mentioned a fellow by the name of DiPietro?

16  A   James, yes.

17  Q   And how did you know James DiPietro?

18  A   I got to know him again through Al Aroni.

19  Q   He was another criminal defense lawyer from Brooklyn?

20  A   That's correct.

21  Q   Would you say, also, that he was one of the many fellows

22  who was always around?

23  A   No.  Jimmy wasn't always around, Al was.

24  Q   Al was.

25      Al brought DiPietro around after to get business?

FREDERICK R. GUERINO, C.S.R.    OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1   A    Yes.

2   Q    And he's one of the lawyers, again, that you retained on

3   your behalf?

4   A    That's correct.

5   Q    And approximately when was that, sir?

6   A    I think I retained him either '91 or '92.  I'm not sure.

7   Q    Now, when you retained Nick Gravante Jr. in 1998, this

8   was after you had used the services of other lawyers in his

9   family; is that correct?

10  A    Right.

11  Q    Did you pay Nick Gravante, Jr. for services and

12  representations of you in both the White Plains investigation

13  and the Atlanta indictment?

14  A    Yes, I gave him a check.

15  Q    How many times did you give him checks?

16  A    I believe it was once.

17  Q    You gave him one check for --?

18  A    I think it was $5,000.  I don't recall.  I believe maybe

19  it was 5,000.

20  Q    And that was the totality of payments that you gave Nick

21  Gravante, Jr. for his representation of you in investigations

22  in two separate federal districts; is that correct?

23  A    Yes.  The first was basically some phone calls and one

24  or two meetings at his office with some people, but that was

25  it, and him bringing me down to Atlanta on two occasions.

40

DiLeonardo - Cross/Mazurek

1   Q    Okay.

2        And when was the payment of that check?

3   A    I would say somewhere early -- September, October 2000,

4   maybe.

5   Q    Of which year?

6   A    2000.

7   Q    I'm sorry, September, October 2000.

8        So, prior to that payment, you did not give any -- you

9   didn't give any cash to Nick Gravante, Jr.; is that right?

10  A    No.

11  Q    You didn't make any payments prior to that and he was

12  representing you for approximately two years before the

13  indictment in Atlanta?

14  A    Well, it wasn't representation of two years.  Like I

15  said, it was a couple of phone calls in the beginning to

16  White Plains, maybe two or three phone calls, a meeting or

17  two in his office, and I believe it was twice that I went to

18  Atlanta years later.

19       MS. HORMOZI:  Judge, may I ask the relevance of this

20  line of questioning?

21       THE COURT:  No.  It deals with credibility,

22  obviously.

23  BY MR. MAZUREK:

24  Q    May I ask, do you recall the account from which you made

25  the $5,000 payment?

FREDERICK P. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

41

DiLeonardo - Cross/Mazurek

1   A    It was probably the same account from Staten Island

2   Savings.

3   Q    Staten Island Savings.

4        And since you cooperated, sir, you provided all of the

5   information that you had to the government with respect to

6   your finances, including bank accounts; is that correct?

7   A    That's correct.

8   Q    The representation that Nick Gravante, Jr. did for you

9   prior to the time of your indictment, sir, you had a number

10  of meetings with your lawyer, correct?

11  A    Meaning Nick?

12  Q    Yes?

13  A    Yes.

14  Q    You would go up to his office; is that correct?

15  A    That's correct.

16  Q    You would get information from him about his

17  conversations with other defense lawyers on the case, right?

18  A    Yes, at times.

19  Q    In fact, you, as someone who is a savvy criminal

20  yourself, would want to press your lawyer to get information

21  from other potential targets of the investigation, right?

22  A    In which case are we talking?

23  Q    Talking about generally, that's how you perceived it?

24  A    I was getting that information directly from John

25  Junior.

DiLeonardo - Cross/Mazurek

1   Q    Well, you testified, sir, that -- I mean, you used

2   lawyers to assist you in gathering information about

3   investigations against you, correct?

4   A    Yes, but how I come to Nick Gravante was I got a message

5   from John Junior, after he gets arrested that I may be

6   arrested in the case.  So that's how I initially go to Nick

7   Gravante and tell him that I may be arrested.

8   Q    But one of the things you know, sir, from your life in

9   crime is that you always want to get information about what

10  other people who may be targeted in an investigation are

11  doing with respect to that investigation?

12  A    Yes.

13  Q    Right.  You want to know whether someone is talking to a

14  prosecutor, correct?

15  A    Yes, that would have been nice.

16  Q    You wanted to know whether the person is going to give

17  testimony in the grand jury, right?

18  A    That's correct.

19  Q    You want to know if someone is going to cooperate with

20  the government, right?

21  A    That's correct.

22  Q    In fact, that's one of the ways you learned, sir, that

23  when you decided to cooperate, that that avenue is available

24  to you, correct?

25  A    Which avenue?

Case Case111:00:00-06:00-00-04-04-BREJEO Document 04-B76 FIEd F150063 8210099 Page 0.601 of 0.5250 254

DiLeonardo - Cross/Mazurek

1  Q    The avenue of cooperation?

2  A    Of course other people may cooperate.

3  Q    Yes.

4  A    No, that's not why I cooperated.

5  Q    That's one of the reasons.  You wanted to be one of the

6  first ones to get the benefit from the government?

7  A    No, that's not correct.

8  Q    That's not one of the reasons?

9  A    The main primary reason is the administration broke me.

10  I was fighting my case, counselor.  I was paying lawyers up

11  until I cooperated.

12  Q    Now, you just -- well, you just mentioned that you were

13  paying lawyers.

14        Other than the $5,000 one time payment to Nick Gravante,

15  Jr., who were these attorneys that you are paying that you

16  were fighting the case?

17  A    Which case are we talking about?

18  Q    Sir, you just mentioned right now one of the things you

19  were fighting your case is you are were paying lawyers.

20        Who were you paying prior to your cooperation?

21  A    Again, which case are we talking about?  The first case

22  Stevie Kaplan paid for the lawyer.  I didn't pay for a

23  lawyer.

24  Q    Okay.  You still haven't told us who you were paying?

25  A    The second case I paid Craig Gillen, who was my attorney

Case 1:08-cr-00060-WBJ-BLP Document 48-76 Filed 09/08/09 Page 101 of 254

DiLeonardo - Cross/Mazurek

1   in my second case, and Eric Franz, who was my second lawyer

2   in that case.  I paid both of them by check.

3   Q    And this is the second case, meaning your arrest, in

4   June of 2002?

5   A    That's my case in 2000 -- June of 2002, that's correct.

6   Q    Well, we'll get to that case and the payments that you

7   allege to have made to these other lawyers in your second

8   case.

9        Let's go back to the Atlanta case again in September of

10  2000.

11       Did there come a time, sir, when Nick Gravante, Jr. no

12  longer represented you in the Atlanta case?

13  A    That's correct.

14  Q    And did that happen immediately after the indictment or

15  what was the time frame of that?

16  A    No, he brought me down there when I was indicted.  He

17  brought me down there to self-surrender.

18  Q    And after that did he do any other work for you?

19  A    No.  I was looking for a lawyer.  He was still my lawyer

20  from down there, the lawyer of record, until I found another

21  lawyer.

22  Q    By the way, at that time do you know where Nick

23  Gravante, Jr. was employed?

24  A    What firm?

25  Q    Yes?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

45

DiLeonardo – Cross/Mazurek

1    A    I'm not sure.  His office was I believe in Times Square,

2    42nd Street, around that area.

3    Q    Was he a partner in his firm Barrett & Gravante; is that

4    correct?

5    A    That sounds familiar.  I'm not sure if that's the exact

6    one.

7    Q    That's a law firm with numerous lawyers; is that

8    correct?

9    A    Yes, I seen other lawyers up there.

10   Q    And that law firm had its own billing practices; is that

11   fair?

12   A    I would assume so.

13   Q    Who would charge a typical hourly fee for their

14   services, their lawyer services?

15   A    Yes.  I understand lawyers charge a flat rate or by the

16   hour.

17   Q    Okay.

18        Again, the total amount of payments that you made to

19   this law firm for Nick Gravante, Jr.'s representation was a

20   single check for $5,000?

21        MR. LIPTON:  We object.  I don't think this is really

22   credibility, the amounts of payments to attorneys.  It goes

23   to something that is not credibility, Judge.  I don't think

24   it is relevant, certainly outside the scope of direct.  We

25   have been doing this for 15 minutes now.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00300-BNE Document 487 Filed 05/08/10 Page 104 of 254

DiLeonardo - Cross/Mazurek

1    THE COURT:  Overruled.

2    MR. MAZUREK:  Thank you, your Honor.

3  BY MR. MAZUREK:

4  Q   Now, Nick Gravante, Jr. was no longer going to represent

5  you past his assistance in self-surrendering you in Atlanta;

6  is that correct?

7  A   Until I found another attorney, right.

8  Q   Right.

9      How did you find another attorney?

10  A   Steve Kaplan.

11  Q   Could you tell the Judge who Steve Kaplan was?

12  A   A codefendant of mine in the Atlanta case.

13  Q   Was Steve Kaplan involved in the enterprise, the Gambino

14  family, that you were charged in?

15  A   In that case I believe he was the enterprise.

16  Q   Okay.

17      How did he help you find an attorney?

18  A   There were 17 codefendants -- 17 defendants on that

19  indictment and Stevie got just about every lawyer for every

20  defendant.

21  Q   Sir, was Joseph Corozzo, Jr., did he represent any of

22  the individuals on that indictment?

23  A   No, he did not.

24  Q   At that time were you still talking to John Gotti, Jr.?

25  A   He was in prison.

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

Case 1:08-cv-00360-KMW Document 437 Filed 05/06/10 Page 104 of 254

1  Q    Were you still talking to him through people who were

2  passing messages?

3  A    At which time frame are we talking about?

4  Q    The time that you were indicted in Atlanta, September

5  2000?

6  A    Yes, through Richard Rehbock and Linda Sheffield, yes.

7  Q    Did John Gotti, Jr. direct you to an attorney that you

8  were supposed to retain?

9  A    In that case, the Atlanta case?  Not retained.  He

10  wanted me to speak with my lawyer, Eric Franz, to visit with

11  him while he was in the hole in Atlanta.

12  Q    Okay.

13       So let me get this right.  Steve Kaplan referred you to

14  an attorney and his name was Craig Gillen.

15       Where was Craig GIllen from?

16  A    Atlanta.

17  Q    Who paid Craig Gillen for your representation in the

18  Atlanta case?

19  A    Steve Kaplan.

20  Q    Did anyone else pay Craig Gillen, other than Steve

21  Kaplan?

22  A    Not that I know.

23  Q    Were you involved in all of your payments with your

24  attorney for the Atlanta indictment Craig Gillen?

25  A    No.

Case 1:10-cr-00300-KBF Document 148 Filed 05/03/11 Page 105 of 254

DiLeonardo - Cross/Mazurek

1    Q    You said Steve Kaplan was charged as his own enterprise

2    in the Atlanta case?

3    A    I believe they made him the enterprise.

4    Q    Did Steve Kaplan pay for any other representation of

5    yours?

6    A    No.

7    Q    Now, you mentioned an individual by the name of Eric

8    Franz?

9    A    Yes.

10    Q    Who is Eric Franz?

11    A    He's my attorney that I used in Atlanta and also this

12    case, the latter case.

13    Q    And how did you come upon retaining the services of Eric

14    Franz?

15    A    He was Tore LoCascio's lawyers -- one of Tore LoCascio's

16    lawyers.

17    Q    Who was Tore LoCascio?

18    A    A captain in the Gambino family.

19    Q    Did Mr. LoCascio refer you to Eric Franz?

20    A    I believe Larry Bronson was an attorney for Tore, and

21    during the course of that Scores case, Eric had most of the

22    tapes or was familiar with most of the tapes from the Scores

23    case, and they were going to run parallel to my case, and

24    that's how I bring Eric in.

25    Q    Who paid for the services of Eric Franz in the Atlanta

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00600-ILG Document 104-76 Filed 08/21/09 Page 106 of 254

DiLeonardo - Cross/Mazurek

1   case?

2   A   Stevie Kaplan.

3   Q   Did anyone else pay Mr. Franz, as far as you know?

4   A   Yes.  I gave him some monies.

5   Q   When you say gave him some monies, how did you do that?

6   A   The end of the case Stevie Kaplan had stuck him for some

7   money, was like $3500, and I paid him off.

8   Q   How did you pay him?

9   A   Cash.

10  Q   Was the $3500 cash that you paid Eric Franz the total

11  amount that you paid for the representation in the Atlanta

12  indictment?

13  A   Once in a while I would give Eric another thousand here

14  and there in his pocket for doing the right case.  He was

15  under paid in that case.

16  Q   And that case eventually went to trial, correct?

17  A   That's correct.

18  Q   And it was a four or five-month long trial; is that

19  right?

20  A   Four months to the day.

21  Q   A four-month trial in the spring/summer of 2001; is that

22  correct?

23  A   April 30th to August 30th.

24  Q   Now, you used the services of other attorneys during the

25  Atlanta trial; is that correct?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00309... Document 104... Filed 06/08/10... Page 108 of 254

1  A    Joe Corozzo, not for the case, for outside purposes.

2  Q    We'll get to that.

3       What about Richard Rehbock?

4  A    No, that was John Jr.'s lawyer who John wanted me to

5  speak with him and pass messages at times when he was down,

6  Richard.

7  Q    You testified in the past that Richard Rehbock was house

8  counsel to John Gotti, Jr.; is that right?

9  A    Yes.  John used to give him that same $4,000 a month

10 that he gave Joe-Joe.

11 Q    John Gotti, Jr. would pay Richard Rehbock 4-, $5,000 a

12 month?

13 A    That's correct.

14 Q    And when you used the term testifying as "house

15 counsel," what do you mean, sir?

16 A    Somebody who is very close to our family, who we can

17 trust with certain matters, and they are at our beck and

18 call.

19 Q    For representation in criminal cases?

20 A    Any purpose, especially with Joe Corozzo.

21 Q    When you say any purpose, for representations in

22 criminal cases; isn't that right, as a criminal defense

23 lawyer?

24 A    Criminal cases and how I facilitated him and delivered

25 messages for John Gotti, Sr.  That's not a criminal case.

Case 1:10-cr-00654-BRE Document 0487-6 Filed 06/08/2010 Page 109 of 254

1    Q    It is for representation of individuals who are facing

2    criminal charges like yourself; is that correct?

3    A    Or obstructing witnesses.

4    Q    Okay.

5         Well, let me ask you this, sir:  Let's talk about Craig

6    DePalma.

7         Craig DePalma, his name appeared on a witness list

8    sometime in 2001; is that right?

9    A    Yes, I believe it did.

10   Q    When you use the term "witness list," what are you

11   referring to?

12   A    I believe the government provides a list of names that

13   may be called at trial.

14   Q    And when do they produce that list or when did they

15   produce that list in the Atlanta case?

16   A    I think it was real premature, I believe so.

17   Q    I'm sorry?

18   A    I believe it was premature.

19   Q    Was premature.  What do you mean by that?

20   A    Maybe three months, because our first trial date was

21   January of that year, and I think we had seen the list a

22   little later on, maybe February.

23   Q    February of 2001?

24   A    Yes.

25   Q    Is that correct?

Case 1:10-cr-00900-KBF Document 476 Filed 05/08/12 Page 109 of 254

DiLeonardo - Cross/Mazurek

1   A    Yes.

2   Q    And you noticed the name of Craig DePalma on that

3   witness list?

4   A    Him and DeGiorgio and John Jr.

5   Q    And you were on bail at this time?

6   A    Right.

7   Q    Represented by both Gillen and Franz, correct?

8   A    Later on, yeah.

9   Q    I'm sorry, later on?

10  A    Later on Eric.  First Craig got in the case real late,

11  Gillen, maybe the end of March.

12  Q    And prior to that Eric Franz was representing you?

13  A    Well, I don't believe he was on the docket.  I'm not

14  sure.

15  Q    Well --

16  A    I --

17  Q    You earlier testified to --

18          THE COURT:  Let him finish his answer.

19          MR. MAZUREK:  Yes.

20  A    I believe Nick stayed on until I found an attorney that

21  could take over officially in the case, and Eric was interim

22  before that.

23  Q    So Eric was still representing you before Craig Gillen

24  got on the case?

25  A    I believe so, but I don't know.  Like I said, if he went

DiLeonardo - Cross/Mazurek

1   to court and signed up, like you explained earlier, I'm not

2   sure if that happened.   I don't recall that.

3   Q    But he was doing legal tasks on your behalf, correct?

4   A    Mine and Stevie Kaplan, right, that's correct.

5   Q    One of them would be to monitor potential witnesses in

6   the case that the government would have against you, correct?

7   A    Eric's role, like I said, mainly the tapes.   He was

8   going to listen to all of those tapes.

9   Q    He had no role in preparing information that could be

10  used in cross-examination of government witnesses?

11  A    Like I said, whatever information he had and binders he

12  had from the first case, he brought over, yes, he did.

13  Q    Okay.

14       You never asked Eric Franz to go visit Craig DePalma who

15  appeared on the witness list?

16  A    Like I said, I wanted to keep it away from anything that

17  was very close to the time of this Atlanta case.   I didn't

18  want any perception of obstruction, that I'm sending my

19  lawyers up to see a guy that may be a witness against me or

20  another member of organized crime.

21  Q    You wanted no record to show that you were potentially

22  directing a lawyer to go and interview a government witness,

23  right?

24  A    Yes.   I could give you another example, if you would

25  like.   John, Jr. who asked to see Eric Franz during the

FREDERICK R. GUERINO, C.S.R.       OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1    course of my trial when he was brought down in May, I believe

2    John was brought down, he wanted a daily report from Eric

3    Franz what was going on in that trial and I didn't allow it

4    to happen.  So I did not use Eric in the Atlanta case I don't

5    believe in that capacity.

6    Q    So, it is your testimony that you found another lawyer

7    and it happened to be Joe Corozzo, Jr.; is that correct?

8    A    That I found another lawyer?

9    Q    A lawyer not involved in your Atlanta case, correct?

10   A    That's correct.

11   Q    Now, when you were on bail in the Atlanta case, were you

12   living in Atlanta at the time?

13   A    I was traveling back and forth on the weekend.

14   Q    During the week you were in Atlanta, correct?

15   A    I was on trial.

16   Q    And on weekends you would come back to New York every

17   weekend?

18   A    Not every weekend, no.  We would work a lot.

19   Q    One of the weekends you came back to New York you said

20   you met with Joseph Corozzo, Jr.; is that right?

21   A    That's correct, or it was before, pretrial.  It may have

22   been pre-April 30th, maybe not when I was on trial.  I

23   started the trial April 30th, so I was home more before I

24   started the trial.

25   Q    Well, sir, to the best of your recollection, can you

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cv-00300-JBW Document 104-3 Filed 06/24/09 Page 112 of 254

DiLeonardo - Cross/Mazurek

1  recall when it is that you alleged to have met with Joseph

2  Corozzo, Jr. regarding Craig DePalma?

3  A    Yes, that was either March or April.

4  Q    March or April.

5       Did you have any lawyer attempt to contact Craig DePalma

6  from the time that you first received the witness list in

7  early January, to the time right before trial started, when

8  you said you went to New York to meet with Joe Corozzo?

9  A    No, I don't believe so.

10 Q    It first became an issue for you just directly before

11 trial, even though you had the witness list for three months

12 before?

13 A    John Jr.'s name was on that list, too, so there was a

14 lot of people's names on that list that I can recall that

15 didn't concern me until we started to get down to brass

16 tacks, so to say.

17 Q    And when you came to New York and met with Joseph

18 Corozzo, you asked him to visit with Craig DePalma; is that

19 right?

20 A    That's correct.

21 Q    And also a John DeGiorgio?

22 A    Not to visit John DeGiorgio.  To visit John Gotti, Jr.

23 about DeGiorgio.

24 Q    You had made these two requests at the same meeting?

25 A    No.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cr-00076-FB Document 104-76 Filed 08/24/09 Page 114 of 254

DiLeonardo - Cross/Mazurek

1   Q    They were the separate meetings?

2   A    Yes.

3   Q    How far apart were these meetings?

4   A    Like I said earlier, I think they might have been a

5   month or so apart because DeGiorgio took the stand maybe

6   around June, I believe.

7   Q    So -- well, let me ask you first, which was the first

8   meeting, the meeting that you had in connection with Craig

9   DePalma or DeGiorgio?

10  A    DePalma first.

11  Q    And it was the Craig DePalma meeting where you paid

12  Joseph Corozzo a $1,000 check to visit Mr. DePalma in

13  Allenwood Prison?

14  A    That's correct.

15  Q    The second time was you had a request whether you would

16  speak to John Gotti Jr. about John DeGiorgio?

17  A    That's correct.

18  Q    And John DeGiorgio is John Gotti, Jr.'s cousin?

19  A    First cousin.

20  Q    Did you give a payment to Joseph Corozzo at the second

21  meeting?

22  A    No.

23  Q    When you met with Joseph Corozzo regarding Craig

24  DePalma, the witness list for the Atlanta investigation had

25  been available for approximately three months; is that right?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00800-KAM Document 104 Filed 06/08/21 Page 15 of 254

1   A    Like I said, I'm not sure, but I believe we first got

2   the list around that time.

3   Q    Okay.

4        So, to the best of your recollection, it was available

5   for a two or three month period?

6   A    I think so.

7   Q    Sir, did you not -- well, Craig DePalma's family had

8   asked Joseph Corozzo to visit with Craig DePalma?

9   A    I have no idea.

10  Q    I believe you testified in the past regarding this visit

11  that you asked Joseph Corozzo to make to Craig DePalma,

12  correct?

13  A    Yes.

14  Q    In fact, in the testimony at a couple of trials, you

15  said that you asked Joseph Corozzo to visit Craig DePalma to,

16  in your word, feel his pulse; is that correct?

17  A    That's one of the reasons, yes.

18  Q    Let me ask you, between January and April when you met

19  with Joseph Corozzo, Jr., did you mention your concern about

20  Craig DePalma's name on the witness list to anyone else?

21  A    I believe I discussed it with Eric and some of the other

22  lawyers down there, Steve Sadow.

23  Q    Did you discuss it with any of your criminal cohorts?

24  A    Like I said, the only one I really talked to in that

25  case was Steve Kaplan.

Case 1:10-cv-00300-KMW Document 104-76 Filed 08/24/09 Page 116 of 254

1  Q    Well, you had meetings with other individuals during

2  this time who were part of the Gambino enterprise; is that

3  correct?

4  A    Like I just said, I thought you were referring to the

5  case itself.  My partner and I discussed it with Eddie

6  Garafola.

7  Q    Who else did you discuss it with?

8  A    I don't remember who else I talked to about this at that

9  time.

10  Q    Did you discuss the fact that John Gotti, Jr. was on the

11  witness list with other members of your crew?

12  A    Yes, but I just wrote down like originally with Craig

13  DePalma.  There was a lot of people's names they just through

14  up on this list that I remember.  My childhood friends I

15  believe were on there.  I wrote it off.  I started to get

16  more concerned as time came closer to the trial.

17  Q    During this period of time, sir, we are talking now

18  right before the trial in Atlanta was to begin, you were

19  still receiving messages from John Gotti, Jr., correct?

20  A    Yes, I was receiving messages from him.

21  Q    How would you receive messages from him?

22  A    Through Michael McLaughlin and Johnny Boy Ruggiero, his

23  brother Peter.

24  Q    And these individuals, were they friends or associates

25  with Craig DePalma?

Case 1:08-cr-00240-BMC Document 1487 Filed 08/24/09 Page 116 of 254

DiLeonardo - Cross/Mazurek

1   A   Yes, they were friendly with him.

2   Q   So did you discuss Craig DePalma's being on the witness

3   list with these individuals?

4   A   No, I didn't at that time.

5   Q   You never mentioned it?

6   A   No.  Like I said, I had no concerns up until we got

7   closer to trial.

8   Q   And John Gotti, Jr., did he ever pass a message

9   regarding his concern whether Craig DePalma was on the

10  witness list?

11  A   No.  I don't know if he had seen the list.

12  Q   Did you speak to his lawyer, Mr. Rehbock, about the

13  witness list?

14  A   I believed later on when he came down, I'm not sure.  I

15  can't remember that for sure.

16  Q   What's your best memory of when John Gotti, Jr. came

17  down to Atlanta?

18  A   In the early part of May.

19  Q   Had you met with John Gotti, Jr.'s lawyer, Richard

20  Rehbock, prior to the time that John Gotti, Jr. was brought

21  down to Atlanta?

22  A   No.  I had several conversations with Richard and Joe

23  Corozzo about some tapes from the Scores' case that I wanted

24  to get that John was holding as custodian of.

25  Q   You tried to get copies of wiretap tapes that had been

FREDERICK R. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

Case 1:10-cr-00600-BMC Document 437 Filed 06/24/09 Page 117 of 254

DiLeonardo - Cross/Mazurek

1   produced as part of the White Plains case; is that correct?

2   A    That's correct.

3   Q    And did you mention at that point -- did you generally

4   talk about who was on the witness list?

5   A    No.

6   Q    With Richard Rehbock?

7   A    No, not really.  I don't believe I did.  I wasn't

8   getting too much cooperation.

9        THE COURT:  No, don't volunteer.  Just answer the

10  question, please.

11       THE WITNESS:  Sorry, your Honor.

12  BY MR. MAZUREK:

13  Q    You met with Richard Gotti, Jr. during the Atlanta

14  trial, didn't you?

15  A    Richard Gotti, Jr.?

16  Q    Yes?

17  A    I don't remember meeting Richie Gotti, Jr.

18  Q    Well, if agents had recorded the fact that you had told

19  them that you had met with Richie Gotti, Jr. during the

20  Atlanta trial, does that help you refresh your recollection

21  whether you did or not?

22  A    No.

23  Q    What about Johnny Boy Ruggiero, did you speak with him

24  during the Atlanta trial?

25  A    I don't remember that.  I'm not sure.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:18-cr-00600-KAM-RER Document 118 Filed 08/21/09 Page 1 of 254

DiLeonardo - Cross/Mazurek

1     MR. MAZUREK:  Your Honor, if I may show the witness a

2   document?

3     MS. HORMOZI:  Objection, Judge.

4        THE COURT:  Mark it.

5        MR. MAZUREK:  It is marked as 3500-19A.

6        THE COURT:  Yes.

7        MR. MAZUREK:  For identification.

8   BY MR. MAZUREK:

9   Q    I will ask you to look at a document to see if it

10  refreshes your recollection.

11       Can you review that and tell me if that helps you

12  refresh your recollection on whether you met with Richard

13  Gotti, Jr. during the Atlanta trial, and, in fact, that's

14  what you told the agents during one of your many, many

15  proffer sessions?

16       MS. HORMOZI:  Objection to form.

17       THE COURT:  Overruled.

18  A    I don't remember.

19  Q    You still don't remember that?

20  A    No.

21       (Whereupon, the Judge reads over the document.)

22  BY MR. MAZUREK:

23  Q    Well, sir, do you remember that in the year 2000 you

24  were meeting with Peter Gotti approximately once a week in

25  Brooklyn, and I'm talking about John Gotti, Jr.'s brother now

FREDERICK R. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

Case 1:10-cv-00306-TLW-Document 104-76 Filed 06/08/10 Page 119 of 254

DiLeonardo - Cross/Mazurek

1   Peter?

2   A    Yes, I met Pete through the years, sure.

3   Q    You would say you were probably meeting with him

4   approximately once a week, correct?

5   A    Probably would be, sure.

6   Q    Now, again, your testimony here today is, despite these

7   frequent meetings with cohorts of yours, you did not discuss

8   the witness list in the Atlanta trial against you with these

9   individuals, correct?

10  A    No.

11  Q    Never came up?

12  A    I told you I spoke with Eddie Garafola and I spoke with

13  my lawyers.

14  Q    And these are the only individuals that you spoke to

15  about the potential witnesses who you believed were part of

16  the Gambino crime family, correct?

17  A    Yes, I believe so.

18  Q    And Craig DePalma was someone who these individuals,

19  Ruggiero, Richie Gotti, Peter Gotti, Jr., John Gotti, Jr.'s

20  brother, would all know, correct?

21  A    Sure.

22  Q    You never asked these individuals about what was up with

23  Craig DePalma and why his name appears on a witness list, yes

24  or no?

25  A    First of all --

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-06090-JBW Document 1047-6 Filed 05/03/10 Page 120 of 254

DiLeonardo - Cross/Mazurek

1   Q    Yes or no, sir?

2   A    No.

3   Q    It is a simple question.

4   A    No, I did not.

5   Q    In your meeting with John Gotti, Jr.'s brother Peter,

6   did you ever talk to him about the fact that his brother was

7   subpoenaed down to Atlanta?

8   A    His brother?

9   Q    John Gotti, Jr. was subpoenaed, had to go down to

10  Atlanta, in these frequent once a week meetings, did you

11  speak to his own brother about that?

12  A    They're nephew --

13  Q    Yes or no?

14  A    They're nephew and uncle.  They are not brothers.

15       MR. MAZUREK:  Just a moment, your Honor.

16       (Pause)

17  BY MR. MAZUREK:

18  Q    We are talking about Peter Gotti, who is the brother of

19  John Gotti, Jr.

20       Do you know that John Gotti, Jr. has a brother named

21  Peter?

22  A    Yes, I do.

23  Q    You should know that, right?

24  A    Right.

25  Q    This is the brother who you just testified to about your

FREDERICK R. GUERINO, C.S.R.    OFFICIAL COURT REPORTER

Case 1:10-cv-00900-VEB Document 14-37 Filed 06/08/10 Page 121 of 254

DiLeonardo - Cross/Mazurek

1    once a week meetings with, correct?

2    A    No.

3    Q    Why are you telling me now uncle and nephew?

4    A    Pete Gotti, Jr. I would see once a week, not Pete Gotti.

5    Peter Junior is your question.

6    Q    You testified, correct, in a case very recently against

7    John Gotti, Jr. in the Southern District, correct?

8    A    That's correct.

9    Q    And you were asked this question, is it not true:

10    "Question:  When was the next time after that that John

11    Gotti Jr. directed you to do something with the loanshark

12    money you were holding?"

13    Your answer was: "That would be around April, May of

14    2000.

15    "Question:  How do you place that in a point in time?

16    "Answer:  I used to see his brother Peter for

17    appointments in Brooklyn once a week.  We were keep in touch

18    that way.  And Peter told me one time that his brother needed

19    some money."

20    So we are talking about Peter Gotti, the brother of John

21    Gotti, Jr., right?

22    A    Now what is the date you said, what's the date?

23    Q    April, May 2000, that's the earlier question I asked?

24    A    I don't think I was on trial.  I didn't get arrested

25    until September 2000, counselor.

Case 1:00-cv-00474-BMC Document 487 Filed 06/24/09 Page 122 of 254

DiLeonardo - Cross/Mazurek

1  Q    My question is:  You were just meeting with the brother

2  of John Gotti, Jr. Peter in that time frame?  You had said

3  yes.

4  A    Yes, but we were talking in context of the witness list

5  and when I got a witness list.  I wasn't arrested yet.  How

6  could I get a witness list?

7  Q    I was asking whether you were in contact with the

8  brother Peter at that time?

9  A    Where, between April of 2000, absolutely.

10  Q   And you didn't maintain contact with him after that?

11  A   No.

12  Q   You didn't?

13  A   No, not that I remember.

14  Q   That's your testimony?

15  A   Yes.

16  Q   When do you recall that Joseph Corozzo came back to meet

17  with you about a meeting that he had with Craig DePalma?

18  A   I would say it was in a couple of weeks, within that one

19  I had talked to him in March or April.

20  Q   Which is it March or April or April or May?

21  A   March or April.

22  Q   And he reported back to you -- he did not report back to

23  you anything that Craig DePalma testified to in the grand

24  jury, correct?

25  A   No specifics, just that he went into the grand jury.

FREDERICK R. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

Case 1:10-cv-00900-VEB Document 14-3 Filed 03/21/09 Page 124 of 254

DiLeonardo - Cross/Mazurek

1   Q    And that was the extent of your information that you

2   received from Mr. Corozzo about Craig DePalma?

3   A    Yes.  He says I wouldn't be hurt, that I had nothing to

4   worry about, and the kid looked like he was going to stand

5   up.

6   Q    Did you later have the opportunity to review Craig

7   DePalma's grand jury testimony?

8   A    Correct.

9   Q    Did it implicate you in any way?

10  A    I believe he said some things about me, but he didn't

11  say that I ever got part of that $100,000 extortion money.

12  Craig said it only went to the John Junior.

13  Q    So, in effect, it exonerated you?

14  A    That's correct.

15          THE COURT:  I couldn't hear what you said.

16          MR. MAZUREK:  In effect it exonerated him.

17          THE COURT:  Is that a question?

18  A    Yes, it did.

19  Q    And did you ever receive any messages from John Gotti,

20  Jr. through Mr. Corozzo during the time period --

21  A    No.

22  Q    Of your April trial?

23  A    I don't believe so.

24  Q    The $1,000 check that you paid to Mr. Corozzo, that was

25  out of the Staten island Savings Bank account?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

67

DiLeonardo - Cross/Mazurek

1    A    Yes.

2    Q    You are aware that there is no record of any check

3    existing of $1,000 to Mr. Corozzo?

4    A    I have no knowledge of that.

5    Q    Did you review or did the government ask you to review

6    before your testimony today any of the records from your bank

7    account?

8    A    When I was estranged from my wife, she was the sole

9    custodian of any of my records.  I didn't take any records

10   out of my house.  She has them all.

11   Q    My question is:  Prior to your testimony here today, did

12   the government have you review any documents?

13   A    No.

14   Q    No documents whatsoever?

15   A    No.

16       MR. MAZUREK:  Your Honor, I will mark for identification

17   as Defense Exhibit A documents that have been produced to the

18   government.  These are bank statements from Michael

19   DiLeonardo's Staten Island Savings account for the year 2001

20   from January through the beginning of November of 2001.

21       If I may show them to the witness?

22       THE COURT:  Yes.

23   BY MR. MAZUREK:

24   Q    I will ask you to review those documents, sir, if you

25   could find within the year 2000 one bank statement of any

Case 1:11-cr-00630-DLI Document 40-6 Filed 06/08/12 Page 26 of 226 PageID #: 254

DiLeonardo - Cross/Mazurek

1   check of $1,000 that was issued to Joseph Corozzo?

2       THE COURT:  Did you look through it?

3       MR. MAZUREK:  Yes.

4       THE COURT:  Is it on there?

5       MR. MAZUREK:  No?

6           THE COURT:  Okay.  That's enough.

7

8           MR. MAZUREK:  Likewise, Judge, I'm going to mark for

9   identification Defense Exhibit B.  These are cancelled checks

10  from Michael DiLeonardo's Staten Island Savings Bank account

11  from March 2001 through December 2002, March 10, 2001 through

12  December 23, 2002.  These also have been shown to the

13  government.

14          To expedite matters, there's no $1,000 check to

15  Joseph Corozzo.

16          I would ask that both these exhibits be admitted for

17  the purposes of the hearing?

18          THE COURT:  Admitted.

19          (Whereupon, Defense Exhibits A and B were received

20  and marked in evidence, as of this date.)

21

22          MR. MAZUREK:  Your Honor, maybe this is a good time

23  for a five-minute break

24          THE COURT:  It isn't a good time.  When are you

25  going to finish your cross?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00300-KBF Document 1047 Filed 06/08/2010 Page 126 of 254

DiLeonardo - Cross/Mazurek

1      MR. MAZUREK:  I still have about another 45 minutes

2      THE COURT:  You want a five-minute break?

3      MR. MAZUREK:  Sure.

4      THE COURT:  Five minutes.

5      (A recess is taken at 3:40 p.m.)

6      (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DiLeonardo - Cross/Mazurek

1        (Judge Weinstein enters the courtroom at were 3:45

2   p.m.)

3        MR. MAZUREK:  Your Honor, may I proceed?

4        THE COURT:  Yes.

5        MR. MAZUREK:  Thank you.

6   BY MR. MAZUREK:

7   Q    Mr. DiLeonardo, during your direct examination today you

8   said that with respect to the meeting that you requested a

9   lawyer to have with Craig DePalma, you didn't want your

10  Atlanta attorneys to do that, correct?

11  A    That's correct.

12  Q    You didn't want to because you were afraid it would look

13  obstructionist with the government, correct?

14  A    Correct.

15  Q    So instead of having your attorneys in Atlanta visit

16  Craig DePalma, you had Joseph Corozzo, right?

17  A    That's correct.

18  Q    Joseph Corozzo, who the government knew at the time or

19  had information to believe that his father, Joseph Corozzo,

20  Sr., was a member of the Gambino crime family; is that

21  correct?

22  A    That's correct.

23  Q    And whose uncle, Nicholas Corozzo, was alleged to have

24  been part of the ruling committee of the Gambino family; is

25  that right?

Case 1:10-cr-00800-KAM Document 1087 Filed 05/08/13 Page 129 of 254

DiLeonardo - Cross/Mazurek

1   A    That's correct.

2   Q    So instead of having your Atlanta lawyer, so that it

3   wouldn't look obstructionist to visit a witness, you had

4   Joseph Corozzo, who was infinitely familiar to the government

5   as being part of the Gambino family, correct?

6   A    That's correct.

7   Q    And you paid him by check, correct?

8   A    That's correct.

9   Q    And so there would be a record of the payment that you

10  made to him?

11  A    For lawyer/client privilege.  --

12  Q    Let me ask you, sir, you never got along with the

13  Corozzo family, correct?

14  A    There was no pending beefs or arguments at that time,

15  but there was a little friction, I would say.

16  Q    You always associated the Corozzo family with what you

17  would call the Queens faction, correct?

18  A    That's correct.

19  Q    I'm talking about the Corozzo family.  Let me make

20  clear, you are talking about Joseph Corozzo, Sr., correct?

21  A    Correct.

22  Q    And Nicholas Corozzo, correct?

23  A    That's correct.

24  Q    And you've always known Joseph Corozzo, Jr. to be the

25  son and nephew of those two individuals, correct?

FREDERICK R. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

72

DiLeonardo - Cross/Mazurek

1    A    Correct.

2    Q    And, today, sir, you have been called in to testify in

3    this hearing against Joseph Corozzo, Jr., correct?

4    A    Correct.

5    Q    Whose uncle you believed wanted to have you killed; is

6    that right?

7    A    I never found that out for sure, but I know he threw me

8    out of the mob.

9    Q    And that was probably the worst single experience of

10    your life; is that right?

11    A    Yes, it was a devastating blow to me to be thrown out of

12    the mob, yes.

13    Q    And I believe you had testified before it that it was

14    the singular reason that you decided to cooperate with the

15    government, correct, at the time?

16    A    At the time, that was what pushed me over the edge, one

17    of the reasons.

18    Q    Because, in your words, sir, they took my cause away

19    when they broke me, right?

20    A    Yes.

21    Q    And you speak about a cause like it's a Katrina relief

22    victim, but you are talking about the Mafia?

23    A    I wouldn't put those poor people as any analogy with the

24    mob, counselor.

25    Q    It is your cause?

Case 1:08-cr-00076-BMC Document 1048-6 Filed 06/08/21 Page 130 of 254

DiLeonardo - Cross/Mazurek

1   A    Katrina relief, there a lot of people down there.

2   Q    For your cause, meaning for your position with this

3   enterprise, is that correct?

4   A    That's correct.

5   Q    And you associated Joseph Corozzo, Sr. with breaking

6   you, with destroying your cause in life?

7   A    That's correct.

8   Q    You also felt that Nicholas Corozzo, Joseph Corozzo,

9   Jr.'s uncle, may have at some point wanted to kill you,

10  correct, wanted you dead?

11  A    I figured in time that would have happened, maybe.  I

12  don't know that for sure, counsel.  It is just speculation on

13  my part.

14  Q    Well, you had testified to it before as one of the

15  reasons why you rejected a position within the Gambino

16  administration, correct?

17  A    That's correct.

18  Q    You rejected the offer, and I believe the offer you said

19  was from Peter Gotti; is that correct?

20  A    John Junior, actually.

21  Q    To be consiglieri?

22  A    Consiglieri.

23  Q    Is my pronunciation not correct?

24  A    You can have it your way.

25  Q    And you rejected the position within the administration

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cr-00030-ABJ Document 1087 Filed 08/21/09 Page 131 of 254

DiLeonardo - Cross/Mazurek

1   of the family, something that is quite an honor in your

2   world, correct?

3   A    Right.

4   Q    It's a top position to control the entire enterprise,

5   correct?

6   A    One of the top.

7   Q    One of the top.  And you rejected it?

8   A    That's correct.

9   Q    And you rejected it principally because you felt that if

10  you had accepted it, there could be a time when Nicholas

11  Corozzo could have you knocked off, murdered; is that

12  correct?

13  A    That was a speculation on my part and it was not worth

14  the position.

15  Q    It was speculation enough that you turned down a reward

16  in your life of your cause; is that correct?

17  A    That's correct.  I was happy being a captain, earning

18  the money I was earning.

19  Q    But in your position in your life, in your cause, having

20  a position of leadership within the family is quite an honor?

21  A    I would have loved to have it on different

22  circumstances.

23  Q    And the reason you didn't have it was because of

24  Nicholas Corozzo, your fear of Nicholas Corozzo, correct?

25  A    There was several components that went into that.  It

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1  wasn't just him per se, Nicky Corozzo.  There was so many

2  reasons.

3  Q    That's what you testified to, sir, under oath in a trial

4  as recent as last August, the John Junior?

5  A    I also testified that was one of the components of my

6  thinking.

7  Q    Was it a significant component that your life was at

8  stake?

9  A    That's right.

10  Q    It seems to me --

11  A    Again, speculation on my part. --

12  Q    Speculation enough to make a decision based upon that

13  belief, correct?

14  A    Again, several components went into me making that

15  decision.

16  Q    That is one significant one, you just testified to that,

17  correct?

18  A    It was a significant one.

19  Q    Another problem with the Queen's faction, so to speak,

20  was that they were always in your mind trying to separate you

21  from the Gottis, correct?

22  A    Later on through Pete, not through Junior.  I don't

23  believe through Junior.

24  Q    Let me ask you this:  There was a point very early on in

25  your position with this family that you were summoned by John

DiLeonardo - Cross/Mazurek

1  Gotti, Sr. to go to Queens, correct?

2  A    He summoned me a lot.  You have to be more specific.

3  Q    I will.

4      The summer of 1988 you were summoned there because John

5  Gotti, Sr. was upset with you because he felt you were a coke

6  head; is that right?

7  A    No.  He had heard from somebody that I was using a lot

8  of cocaine.

9  Q    All right.

10      And the term that was used was "coke head," right?

11  A    Coke head, yes.

12  Q    You didn't like to be called a coke head?

13  A    No.

14  Q    And you responded to that allegation by saying it was

15  absolutely false; it must be coming from the Queens guys,

16  correct?

17  A    No, I did not say that.

18  Q    You never said that?

19  A    No.  I thought it was the Brooklyn faction, a skipper or

20  two over there.  I wasn't sure.

21  Q    Well, who were at that time what you considered the

22  Brooklyn faction?

23  A    Well, it was the older guys from my neighborhood.  I

24  just assumed it may have been Jimmy Brown.

25  Q    And they were saying that because there was a jealousy

Case 11-00600   Document 1043  Filed 05/08/13   Page 134 of 254

DiLeonardo - Cross/Mazurek

1   towards you; is that right?

2   A    No.  They where trying to knock me off the list for

3   whatever their reasons, I don't know.  I never discovered if

4   it was true or not or who told them it was speculation.

5   Q    Who are you talking about when you are referring to

6   "they" ?

7   A    They who brought the message to John.

8   Q    You don't know for sure?

9   A    He said he would tell me one day, but never got the

10  opportunity.

11  Q    Did you believe that there were jealousies from the

12  so-called Queens faction for you to be hanging out with the

13  Gottis?

14  A    No, not at that stage, I don't think so.  I wasn't even

15  a friend then.  I wasn't a factor at that point.

16  Q    What about later on?

17  A    Later on, yes.  Nicky had made some comments to me, his

18  uncle Nick.

19  Q    What were those comments, what kinds of comments?

20  A    Well, we were going to a lot of weddings and wakes, too

21  many.  We had a high profile.  I was telling Junior to stop

22  with the weddings and wakes.  Between all of these

23  surveillances, it would hurt us in the long run.  And his

24  uncle Nicky went to affairs and liked to have his chest out

25  walking around self-emoting himself, I guess, and I took John

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00060-800-000 Document 04876 Filed 00/03/10 Page 6 of 254

DiLeonardo - Cross/Mazurek

1   down off that position and kept everybody away from weddings

2   and wakes, except if it was in your crew or had a personal

3   relationship going back years with these people.

4   Q    Not to interrupt, but I'm trying to get directly to the

5   point of what kinds of comments that led to you believing

6   that Nicky Corozzo was trying to separate you from --

7   A    Nicky said, you got your way, no more weddings and

8   wakes, but it wasn't in a complimentary fashion the way he

9   told me.

10  Q    How often would you be in the company socially of Nicky

11  Corozzo or Joseph Corozzo, Sr., other than at weddings and

12  wakes?

13  A    I went to dinner with Nicky and Lenny DiMaria once.  I

14  believe it was towards Christmas of '94.  Nicky was looking

15  to take me to dinner for a long time.  He was going out and

16  meeting all of the skippers at that time who were on the

17  committee and having a relationship with them.  I was

18  probably the only skipper he didn't go to dinner with.  I

19  told John, this guy keeps asking me, and he was in Danny

20  Marino's regime at that time, and I told John I have to go,

21  the guy will get insulted.  He says go.  I met him and Lenny

22  DiMaria for dinner, and that's really the only social

23  activity I did with him when it was just us.

24  Q    That was back in 1994.  There was nothing since then?

25  A    I think he gets arrested in '96.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cr-00076-BMC Document 476 Filed 06/08/09 Page 137 of 254

DiLeonardo - Cross/Mazurek

1    Q    So it is fair to say that you had no social relationship

2    with Nicholas Corozzo or Joseph Corozzo, Sr.?

3    A    That's correct.

4    Q    You just knew them as individuals who could cause you

5    harm with respect to your position in the family?

6    A    That was something that came later on when I was

7    deciding to be consiglieri or not; that was factored in.

8    Q    And you also did have little to no socializing with

9    Joseph Corozzo, Jr.; is that correct?

10   A    John liked Joe-Joe a lot, junior, and brought him to a

11   lot of functions.

12   Q    Did you have occasion to speak with Joseph Corozzo, Jr.

13   on a number of social occasions?

14   A    Yes, just general talk.

15   Q    One particular occasion that you had mentioned earlier

16   was a trip to Foxwoods.  That's a casino; is that correct?

17   A    That's correct.

18   Q    And when was that?

19   A    I believe '94.

20   Q    You said you went with a number of individuals.  What

21   was it, approximately six or seven individuals?

22   A    Yes, maybe a little bit more.

23   Q    More than that?

24   A    Maybe.

25   Q    And how did you travel to Foxwoods on that occasion, if

Case 1:10-cr-00654-LBS Document 104-876 Filed 06/08/21/09 Page 137 of 254

DiLeonardo - Cross/Mazurek

1   you recall?

2   A   I believe I went by limousine.

3   Q   And were there multiple limousines that went to Foxwoods

4   in this group or multiple cars?

5   A   I don't think so.  It was just us, John Junior and

6   myself and others, Jackie D'Amico.  I don't remember who else

7   was in the limousine.

8   Q   Do you recall Joseph Corozzo, Jr. being there?

9   A   I can't say for sure.

10  Q   Once you arrived at the casino, you said that there was

11  business discussed during this trip?

12  A   Right.

13  Q   Do you remember where you were when this business was

14  discussed?

15  A   Generally we were in the casino.  It was one specific

16  meeting between John and myself and my brother-in-law.  Then

17  during the course of the evening we went to have dinner and

18  some business was talked there.

19  Q   Do you have any recollection of what that business was?

20  A   It was about the Connecticut rackets, shylock money

21  bookmaking money, things like that, that Louie Bruge and

22  Jackie D'Amico were handling.

23  Q   Did all of the individuals who went to the casino go to

24  dinner together?

25  A   Yes, I believe so.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1  Q    So, there were approximately ten people at the dinner

2  table?

3  A    Give or take.

4  Q    You had mentioned somebody's son-in-law at the dinner

5  table or also had dinner that night.

6       Who were you referring to?

7  A    A fellow named Brad.  I don't know his last name.

8  Q    There was an individual within that group of people who

9  went to Foxwoods on that particular trip who you were not

10  very trusting of; is that right?

11  A    That's correct.

12  Q    Who was that?

13  A    Joe Fassaro.

14  Q    Why were you not trusting of him on that trip?

15  A    I had seen a 302 about another individual, Nicky

16  Lasorsa, who was in Louie Bruge's crew, and there were things

17  marked out, when Jackie "The Nose" brought it in and reviewed

18  it, sounded as if this Joe could have been involved.

19  Q    So you didn't want him to overhear any conversations

20  relating to business; is that correct?

21  A    I don't recall if he was left out of some meetings.  I'm

22  sure he was.  My meeting directly he was left out of.

23  Q    When you say your meeting, what was your meeting?

24  A    I brought my brother-in-law Frankie Fappiano, and we had

25  discussed some things about Local 23, and the three of us

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cv-00800-KBF Document 487 Filed 05/21/09 Page 139 of 254

DiLeonardo - Cross/Mazurek

1  huddled and I talked about that.

2  Q    Well, in fact you believed Joe Fassaro was cooperating

3  at that point; is that correct?

4  A    I had a little idea.  I couldn't say because Louie Bruge

5  was looking to straighten him out, and unless you have

6  evidence of a guy is no good, it is his product and his

7  problem.

8  Q    And if you believe that someone might be a problem in

9  terms of cooperating with the government as a witness, you

10  certainly didn't want any business information to be talked

11  about in the open in front of --   --

12  A    Yes, that would be correct, but Louie Bruge was vouching

13  for the guy.

14  Q    In fact -- I'm asking what actually happened.  In fact,

15  you made sure when you were talking business at any meeting

16  you were having on this trip, you did it in the confidence of

17  those you needed to talk to, correct?

18  A    I did it with mine, what I did with myself, right.

19  Q    And you didn't have any conversations with Joseph

20  Corozzo, Jr. with respect to business of the family, correct,

21  during that?

22  A    Yes, that's correct.

23  Q    In fact, you spent most of that trip gambling, right?

24  A    No, I didn't gamble at all.  They gave me a couple of

25  quarters shooting crap.

FREDERICK R. GUERINO, C.S.R.     OFFICIAL COURT REPORTER

Case 1:08-cr-00760-BRE-BB Document 048-76 Filed 06/01/09 Page 41 of 254

DiLeonardo - Cross/Mazurek

1    Q    Did you go to the boxing match?

2    A    Yes, I did.

3    Q    And during that entire trip, again you didn't have any

4    conversation with Joseph Corozzo, Jr. that you remember

5    relating to any business?

6    A    No, just that I thought we were being surveilled.

7    Q    Now, when you said you had the information with respect

8    to Joe Fassaro from a 302, where would you get your F.B.I.

9    302 reports?

10   A    Jackie "The Nose" got it.

11   Q    Would you often get information from government evidence

12   or discovery through other people that you knew in your crew

13   and so forth?

14   A    Yes, through just about all of the families, if they had

15   something interesting, they would pass it around.

16   Q    Would you go to Nick Gravante's office, for example,

17   when he was your lawyer, to review 302 reports?

18   A    I know we got discovery.  I don't know which 302s came

19   out at that time.  I don't know if there was anything in

20   their case.

21   Q    Did you get FBI 302 reports from your lawyer, Eric

22   Franz?

23   A    I believe he had some stuff.  I'm not sure about FBI

24   302.

25   Q    You reviewed government evidence when produced?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1   A    Yes.  We got Borghese stuff and other witnesses later

2   on.  I just don't remember what time frame.  I reviewed

3   discovery, yes, there was.

4   Q    You would often ask your lawyers to keep you apprised

5   whenever the government produced discovery, correct?

6   A    Yes.

7   Q    So that you could review it, correct?

8   A    Yes.

9   Q    And take back any information that you thought was

10  threatening or might be of potential harm to you and your

11  crew and talk to other members of your crew; is that correct?

12  A    That's what you are obligated to do, yes.

13  Q    Now, there came a time after you were acquitted in the

14  Atlanta case -- that was the end of the summer of 2001; is

15  that correct?

16  A    That's correct.

17  Q    The next time that you got in trouble was an arrest in

18  2002; is that correct?

19  A    That's correct.

20  Q    And that was in the Southern District of New York?

21  A    Right.

22  Q    At that time who the did you retain when arrested in the

23  Southern District of 2002?

24  A    Eric Franz and Craig Gillen.

25  Q    These were the same lawyers that represented you in the

Case 1:10-cr-00600-KAM Document 487 Filed 06/21/13 Page 142 of 254

DiLeonardo - Cross/Mazurek

1  Atlanta case; is that correct?

2  A    That's correct.

3  Q    And in June of 2002, did you make any payments to hire

4  Craig Gillen or Eric Franz?

5  A    Yes, I did.

6  Q    What were those payments?

7  A    Craig I gave one check at that time for, I believe,

8  $50,000.

9  Q    Where was that check from?

10  A    I believe -- no, that was out of, I believe, an escrow

11  account that Richard Gravante had for me.

12  Q    Richard Gravante maintained an escrow account in your

13  behalf?

14  A    Yes.

15  Q    This is the same Richard Gravante who you never made a

16  single payment for legal representations; is that correct?

17  A    That's correct.

18  Q    How much money was maintained in an escrow account for

19  Richard Gravante?

20  A    It was sale of a property or -- I don't remember exactly

21  what the money was.  Give me a minute, I would think of it,

22  but it was $100,000.

23  Q    And this $100,000 was available to you whenever you

24  needed it?

25  A    Yes.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cv-00300-DAB Document 104-3 Filed 05/08/2009 Page 144 of 254

DiLeonardo - Cross/Mazurek

1   Q    So you took $50,000 and gave it to Craig Gillen when you

2   got arrested in June of 2002?

3   A    That's correct.

4   Q    That's the first time that you remember paying Craig

5   Gillen any money for any representation for you?

6   A    That's correct.

7   Q    And you also made payment to Eric Franz, correct?

8   A    I made several payments to Eric.

9   Q    How did you pay Mr. Franz for the June 2002

10  representation?

11  A    I had an account that was my construction account.  I

12  had just started a company and I believe I had maybe about

13  $5,000 in it, and the company was Madco.  I gave him the

14  checkbook and I signed it.  I think we took 5,000 out of

15  there, from the Staten Island Savings Bank account.  I

16  believe whatever I had left in there I gave to him, and I

17  gave him some cash.

18  Q    How much cash did you give Mr. Franz, do you recall?

19  A    Off the top of my head, maybe 5,000.

20  Q    In the Southern District case, unlike the Atlanta case,

21  you didn't receive bail initially; is that correct?

22  A    Right.  I didn't receive bail in the first case, that's

23  correct.

24  Q    So, you were in custody from the time that you were

25  arrested in January 2002 actually until just recently this

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 2:11-cv-08060... Document 1087 Filed 08/21/09 Page 145 of 254

DiLeonardo - Cross/Mazurek

1  past June, correct?

2  A     June 24th.

3  Q     So am I correct?

4  A     Correct.

5  Q     So how would you go about making payments to your

6  lawyers while in custody?

7  A     I believe he brought up the checkbook.

8  Q     Who is he?

9  A     Eric.

10  Q     Eric Franz?

11  A     Yes, that's who we are talking about.

12  Q     Okay.

13  A     And I believe he brought it up to get my signature on

14  the check.  Yes, I believe that's how it happened.

15  Q     What about the cash payments?

16  A     The cash?  Let's see how we got the cash.  I believe it

17  was through a friend of mine Andrew, who was holding the

18  cash.

19  Q     Who was Andrew?

20  A     A friend of mine.

21  Q     Does he have a last name?

22  A     Morano.

23  Q     And when did you -- when did you have these cash

24  payments or talk to Andrew Morano to have these cash payments

25  made to Eric Franz?

Case 1:10-cr-00300-KBJ Document 1087 Filed 05/08/21 Page 145 of 254

DiLeonardo - Cross/Mazurek

1  A   I believe that was in October.

2  Q   October of which year?

3  A   '02.

4  Q   When you say that was late, what were you referring to?

5  A   Just before I cooperated.

6  Q   Okay.

7     How many times did you direct your friend Andrew Morano

8  to make payments to Eric Franz?

9  A   I believe it was one time, Andrew had $5,000 of my money

10  going way back.

11  Q   How much money did Andrew Morano have of your money?

12  A   That's it.

13  Q   Only $5,000?

14  A   He had owed me 5,000, and I never bothered him for it,

15  but I was having problems getting money.

16  Q   You never asked Andrew Morano to hold money for you?

17  A   5,000.

18  Q   I guess I'm confused.

19     You were saying that this is money that Andrew Morano

20  had owed you?

21  A   He was holding it for me.  He was holding it, so he owed

22  it to me.

23  Q   How did you communicate to Mr. Morano regarding the

24  $5,000 payment?

25  A   I had Eric reach out for him.

FREDERICK R. GUERINO, C.S.R.     OFFICIAL COURT REPORTER

Case 1:10-cr-00600-KAM Document 376 Filed 05/06/13 Page 1 of 254

DiLeonardo - Cross/Mazurek

1   Q    You asked Eric to call Andrew Morano to collect $5,000?

2   A    That's correct.

3   Q    Did you communicate with Andrew Morano after your

4   arrest?

5   A    No.

6   Q    Why not?

7   A    I wasn't communicating with anybody, just about.

8   Q    You wrote a lot of letters from jail?

9   A    Yes.  I wasn't going to put that in a letter.

10  Q    So if you needed to communicate with people, how would

11  communicate with people when you were in jail at that time?

12  A    Through the lawyer.

13  Q    Which lawyer?

14  A    Eric.

15  Q    Did you ever use your lawyer, Craig Gillen, in that

16  capacity?

17  A    No.

18  Q    Why not?

19  A    I wouldn't compromise him at that point being he was

20  from Atlanta, would trust him or talk to him.

21  Q    You were willing to compromise your lawyer Eric Franz?

22  A    Maybe it's a poor choice of words compromise.

23  Q    It is your word?

24  A    Exactly.  I said maybe it's a poor choice of words, but

25  he was familiar with everything here and people were more

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1    comfortable with Eric.

2    Q    This fellow Andrew Morano, did you ever have him make

3    any cash payments to anyone else, other than Eric Franz?

4    A    No.

5    Q    Did Andrew Morano ever meet Eric Franz prior to Eric

6    going to collect $5,000 for you?

7    A    I'm not sure.  Might have, but may not.  I'm not sure.

8    Q    How would they know each other?  How might have they

9    known each other?

10   A    I gave Eric Andrew's number.

11   Q    For what reason or capacity?  --

12   A    To collect that 5,000.

13   Q    I'm talking about prior to that?

14   A    If he was in my company.  But I really didn't see Andrew

15   too much in those days.  I'm not sure.

16   Q    Who was Andrew, besides a friend?

17   A    I knew him from 16 as a friend.

18   Q    Was he involved in your enterprise activities?

19   A    No.  I got him a job down the pier years ago.

20   Q    Why did you let him have a loan of $5,000?

21   A    He held the money for me.  It wasn't a loan.  He held

22   the money for me.  I was spending money at a rapid rate.

23   Q    Why would Eric Franz have any feeling of confidence

24   collecting money from someone he never heard you mention

25   before?

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

Case 1:10-cv-00600-TPG Document 104-76 Filed 06/08/11 Page 148 of 254

DiLeonardo - Cross/Mazurek

1  A   I don't know.  You would have to ask him that.

2  Q   How did you convince Eric Franz to do that for you?

3  A   I said he's a friend of mine and he's has $5,000 of my

4 money.

5  Q   You were comfortable if you gave Eric Franz an order he

6 would comply with it?

7  A   A request.  I wouldn't say I would order him.

8  Q   What if he said no?

9  A   Then he said no.

10  Q   Did you ever make a request of him, you have to do this,

11 and him saying no?

12  A   I don't remember him ever saying no.

13  Q   For the Southern District case that you were arrested on

14 and eventually cooperated in, were the only payments that you

15 made the ones that you just testified to for lawyers?

16  A   I believe so.

17  Q   Would you have Eric Franz -- you did have Eric Franz

18 visit you at the MCC while in custody from June 2002; is that

19 correct?

20  A   That's correct.

21  Q   And you would also ask him to deliver written messages

22 on your behalf; is that right?

23  A   Yes.

24  Q   And these messages you would put in envelopes; is that

25 right?

Case 1:10-cr-00800-KAM Document 487 Filed 06/08/09 Page 149 of 254

DiLeonardo - Cross/Mazurek

1   A   That's correct.

2   Q   And you would pass them to Mr. Franz in the MCC,

3   correct?

4   A   In the visiting room.

5   Q   In the visiting room.

6       To whom would you have Mr. Franz deliver these written

7   messages to?

8   A   Louis Patriani who was a friend of mine.

9   Q   This was the only individual you would have Eric Franz

10  pass written messages to?

11  A   Written, yes.  Verbal, no.

12  Q   You also asked him to pass verbal messages?

13  A   That's correct.

14  Q   To whom did you ask him to pass verbal messages?

15  A   Joe Watts.

16  Q   How many times?

17  A   I believe it was twice.

18  Q   What were these messages?

19  A   If he had any material or anything that could help me

20  fight this case with the case I was in, the Fred Weiss,

21  because I learned at that point Joe Watts pled out to Fred

22  Weiss' murder conspiracy, I believe.

23  Q   What was second message, I'm sorry?

24  A   It was all about the same thing, about getting material,

25  what lawyers we could see, that Joe knew I could get some

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cv-00300-KBF Document 1087 Filed 06/21/09 Page 150 of 254

DiLeonardo - Cross/Mazurek

1    material on them.

2    Q    You previous willing testified in a trial, right, that

3    you had used both Mr. Rehbock and Eric Franz to communicate

4    to other members of the Gambino crime family while on bail;

5    is that right?

6    A    Yes.

7    Q    And these were verbal messages, written messages, or

8    both?

9    A    Both.

10   Q    How many times did you ask Mr. Franz to pass written

11   messages to Louie Mariani while you were in custody?

12   A    Could be about half dozen, I'm not sure.

13   Q    Did you ever ask Joe Corozzo, Jr. to pass messages to

14   anyone while in custody?

15   A    No, I didn't see him at the MCC.

16   Q    And, sir, another lawyer by the name of Linda Sheffield

17   came to visit you once?

18   A    I believe I met her a couple of times.

19   Q    A couple of times that was during the Atlanta trial?

20   A    That's correct.

21   Q    And the purpose of those meetings was for her to pass

22   messages to you from other members of the Gambino crime

23   family?

24   A    No.  She represented John Junior, not other members.

25   She was representing him at that time.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00600-KAM Document 876 Filed 06/08/21 Page 152 of 254

DiLeonardo - Cross/Mazurek

1    Q    She came to visit you to pass messages to you from John

2    Jr.?

3    A    At that time to see what was going on and she got cold

4    feet later on.

5    Q    In fact, you had no contact with Joseph Corozzo, Jr.

6    during the time after you were arrested in June of 2002 in

7    the Southern District of New York case; is that correct?

8    A    That is correct.

9    Q    Now, there came a time in the prosecution of that case

10   that you decided -- strike that.

11       Let me go back for a second.

12       In your direct testimony you had mentioned that you

13   recall a meeting at a restaurant, I believe the name was Via

14   Russo's, that Joe Corozzo, Jr. was at?

15   A    Villa Russo.

16   Q    Villa Russo.

17       Do you remember approximately when that was?

18   A    Early '90s, '92, '93, '94, right around there.

19   Q    That's the best of your memory?

20   A    Yes.

21   Q    What time of year was that?

22   A    I don't know.

23   Q    Do you remember anything about that, about the reason

24   that your meeting at that restaurant?

25   A    Yes.  John used to -- I believe every Monday night John

FREDERICK R. GUERINO, C.S.R.    OFFICIAL COURT REPORTER

Case 1:08-cr-00760-JBW Document 476 Filed 06/18/09 Page 152 of 254

DiLeonardo - Cross/Mazurek

1   Junior, every Monday or Wednesday, he would meet there - I'm

2   note sure of the day - and he had some people come by to see

3   him.

4   Q    So this one time you recall a Joe Corozzo, Jr. to be

5   present at the table; is that right?

6   A    No, this one time where he got the money, but he was

7   there often.

8   Q    So one time you saw him there where you are saying he

9   was given money by John Junior?

10  A    Yes.  I had just given John money.  So he said, I have

11  to give this to the lawyer.          --

12  Q    Did you see John Junior give money to him?

13  A    Yes, I did.

14  Q    So, your memory is you gave money to John Gotti, Jr.

15  that night?

16  A    Yes.

17  Q    And John Gotti, Jr. passed that money on to Joseph

18  Corozzo?

19  A    Not all of it.

20  Q    How did you pass the money to John Gotti, Jr.?

21  A    I put it in his hand.

22  Q    In an envelope or cash?

23  A    Yes, cash in a rubber band.

24  Q    What denominations?

25  A    Multiples of fifties and hundreds.

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

Case 1:08-cr-00076-JBW Document 1087 Filed 05/08/09 Page 153 of 254

DiLeonardo - Cross/Mazurek

1   Q    And how much?

2   A    I think it was 10,000.

3   Q    And you recall John Gotti, Jr. then taking the money and

4   only giving part of it to Joseph Corozzo Jr.?

5   A    He said he had to give him money, so I know he was

6   getting between 4- and 5,000, that's what he told me he gave

7   him every month, and that's what he took out and gave him.

8   Q    Well, let me ask you this, you were all sitting at the

9   table together?

10  A    Yes.

11  Q    And John Gotti, Jr. is talking to you about separating

12  the money out, I got to pay Joseph Corozzo, Jr.?

13  A    Yeah, that's what he did.

14  Q    And Joseph Corozzo, Jr. is right there?

15  A    No, it was before he got there.

16  Q    Before he got there?

17  A    Yes.

18  Q    So John Gotti, Jr. decides to have a conversation with

19  you about the money he just gave you, that he was supposed to

20  split it and give some of it to Joseph Corozzo, Jr.?

21  A    Yes.  John and I were close.  We discussed a lot of

22  things.

23  Q    That particular night you have a specific recollection

24  of him saying, oh, that money, I have to give some of it to

25  Joseph Corozzo, Jr.?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cr-00076-BMC Document 487 Filed 05/03/09 Page 154 of 254

DiLeonardo - Cross/Mazurek

1   A    Yes.

2   Q    Before Joseph Corozzo, Jr. got there?

3   A    Yes.  John would explain to me the expenses he had --

4   Q    I'm asking you now, you have a specific recollection of

5   this one incident, correct?

6   A    Yes.

7   Q    And when Joseph Corozzo, Jr. later arrived at the

8   restaurant --

9   A    Yes?

10  Q    Did he have dinner with you, do you remember that?

11  A    Yes, he had dinner.

12  Q    Do you remember what was discussed at dinner that night?

13  A    No.

14  Q    Do you remember Joseph Corozzo, Jr. saying anything to

15  you that night at dinner?

16  A    General talk, yes.  I don't remember the specifics of

17  the talk.  It is a long time ago.

18  Q    With respect to that night and that particular payment

19  that you say you witnessed back in the early 1990s, do you

20  have any specific recollection or knowledge of that

21  particular payment by John Gotti, Jr., did he say anything to

22  you as to why he was giving that to Joseph Corozzo, Jr. on

23  that single occasion?

24  A    That was his monthly payment.

25  Q    That was told to you at a different time, correct?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cr-00076-BMC Document 1487 Filed 06/08/09 Page 155 of 254

DiLeonardo - Cross/Mazurek

1   A    At many different times.

2   Q    Well, on that night, was there any conversation that you

3   had with John Gotti, Jr. about the work that Joseph Corozzo,

4   Jr. may have been doing for John Gotti, Jr. for that payment?

5   A    He worked for Junior because that was his job.

6   Q    That's not my question.

7        My question is -- you seem to remember this conversation

8   you had with John Gotti, Jr. on that occasion.

9        Did he specifically tell you the work that Joseph

10  Corozzo, Jr. was doing for John Gotti, Jr. at that time?

11  A    There was no work, counselor. There was no work,

12  counselor.  This was his pay.  This was his salary every

13  month.

14  Q    Did he tell you that?

15  A    Yes.

16  Q    On prior occasions?

17  A    Yes.

18  Q    So you are saying that Joseph Corozzo Jr. was getting

19  paid for doing nothing?

20  A    No.  He was retained by John Junior to do whatever he

21  wanted him to do.

22  Q    You are saying he was doing no work at that time based

23  upon your recollection?

24  A    John wasn't arrested, so it wasn't a case that John was

25  arrested on.  That was his salary, his retainer to be

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:08-cr-00076-BMC Document 104-8 Filed 06/06/11 Page 57 of 252 0254

DiLeonardo - Cross/Mazurek

1  counsel.

2  Q    To be counsel of John Gotti, Jr.?

3  A    Of the Gambino family.

4  Q    Well, what is it that you are aware of at that time that

5  Joseph Corozzo, Jr. was doing on behalf of the Gambino

6  family?

7  A    Anything that John Junior wanted him to do, go visit

8  guys in jail.

9  Q    But do you have any knowledge of anything specific that

10 he was doing at that time?

11 A    No, sir.

12 Q    Nothing?

13 A    No.

14 Q    You also testified on your direct examination that you

15 wanted Joseph Corozzo to visit with John Gotti, Jr. about his

16 cousin John DeGiorgio; is that correct?

17 A    That's correct.

18 Q    That visit never happened.  He refused to visit him?

19 A    He was instructed to see John Senior, instead of Junior.

20 Q    My question, sir, is:  Joseph Corozzo never performed

21 the task that you requested of him, correct, with respect to

22 DeGiorgio?

23 A    As far as I know, no.

24 Q    And you didn't pay him for that, for something he didn't

25 do?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:10-cr-00654-JBW Document 148-6 Filed 06/30/13 Page 158 of 254

DiLeonardo - Cross/Mazurek

1    A    No.

2    Q    Back when you were at the MCC in jail, November 2002, is

3    I believe the time when you decided you were going to

4    cooperate, correct?

5    A    Yes.

6    Q    Did you inform your lawyers at the time of your

7    intentions?

8    A    No.

9    Q    You didn't tell Craig Gillen that you were going to

10   cooperate with the government?

11   A    He was the one that brought me in later on.

12   Q    When you say later on, when was that?

13   A    In early '97.

14   Q    Had you made a decision much before early November 2002

15   to cooperate with the government?

16   A    No.  It was early November, around the same time.

17   Q    And you did not tell your lawyer Eric Franz, correct?

18   A    No, he didn't know nothing.

19   Q    Is there a reason you decided not to tell Eric Franz of

20   your intentions?  He was your lawyer; is that correct?

21   A    That's correct.

22   Q    Is there any reason why you didn't tell him of your

23   intentions?

24   A    Yes.  He had association, like I said, with other

25   members of organized crime representing them and I didn't

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

Case 1:10-cr-00800-JBW Document 476 Filed 06/08/12 Page 159 of 254

DiLeonardo - Cross/Mazurek

1   want to put Eric in that kind of position where he could ruin

2   his career.

3   Q    Passing written messages and oral messages to other

4   members of the Gambino crime family wouldn't be putting him

5   in jeopardy for his career that you were concerned about?

6   A    He could have refused me.

7   Q    Do you recall a time, sir, when one of your criminal

8   associates, Frank Fappiano, was under indictment?

9   A    Which indictment?

10  Q    The indictment when you thought that John Farisi might

11  be cooperating against Mr. Fappiano?

12  A    Yes.

13  Q    What indictment was that?

14  A    I believe that was a drug indictment.

15  Q    And you had a lawyer provide information to you about

16  the fact that Farisi might be cooperating, correct?

17  A    Yes.

18  Q    That lawyer wasn't Joe Corozzo, Jr., was it?

19  A    No.

20  Q    That was an attorney named Joe Benfante?

21  A    That's correct.

22  Q    Joe Benfante is one of the lawyers that you used in

23  Brooklyn for information in cases?

24  A    Not me directly.  He was closer with other guys.

25  Q    Who?

FREDERICK R. GUERINO, C.S.R.     OFFICIAL COURT REPORTER

Case 1:06-cr-00600-JBW Document 416-76 Filed 06/04/09 Page 80 of 254

DiLeonardo - Cross/Mazurek

1   A     Georgie DeCicco and just about all of the old timers.

2   Q     The old timers meaning members of the Gambino crime

3   family; is that correct?

4   A     And other families.

5   Q     Did you ever make payments to Joe Benfante on behalf of

6   other people in the family?

7   A     No, I don't believe I did.

8   Q     Did you ever direct anyone to make payments on behalf of

9   Joe Benfante?

10  A     There came a time when the kid Farisi got arrested and

11  made a request of my brother-in-law. He was with my

12  brother-in-law Frankie to help this kid out with lawyers or

13  any other bills that he needed.

14  Q     And that was a $25,000 payment, benefactor payment, that

15  you arranged to Farisi's attorney Mr. Benfante; is that

16  correct?

17  A     Yes.

18  Q     And so when you were concerned that John Farisi might be

19  cooperating against your fellow crew member Frank Fappiano,

20  you contacted Joe Benfante; is that correct?

21  A     No.  I believe he contacted -- I'm not sure, but he

22  contacted somebody with us.  Might be it was Huck or Georgie.

23  I'm not sure how it came out.

24  Q     You had a meeting with him; is that correct?

25  A     Yes.

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

Case 1:06-cr-00550-BGE Document 448376 Filed 06/04/09 Page 160 of 254

DiLeonardo - Cross/Mazurek

1   Q   Where he informed you, Mr. Carbonaro, Mr. Garafola, and

2   maybe others that John Farisi was cooperating; is that

3   correct?

4   A   Yes.

5   Q   Now, going back again to November 2002, the time that

6   you decided to cooperate.

7       You had Eric Franz submit a bail application to Judge

8   Casey in the Southern District, correct?

9   A   Yes.

10  Q   And that was a bail application to request bail because

11  your mother was very ill, possibly dying, so that you could

12  be released on bail to be with your mother, in fact, she was

13  dying?

14  A   Yes, she was dying.

15  Q   It was a request based on compassion, a very close

16  family member, in fact, your mother?

17  A   Correct.

18  Q   But that was a lie?

19  A   No, she was drying.

20  Q   The reason why you were requesting bail?

21  A   Yes.

22  Q   It was a fabrication which you and the government

23  concocted so you could go out and cooperate and potentially

24  get people on tape, correct?

25  A   It was an agreement.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1   Q   And your lawyer Eric Franz was not part of that?

2   A   Absolutely not.

3   Q   Craig Gillen was aware of that, correct?

4   A   Yes.

5   Q   And, as far as you know, Craig Gillen never told Eric

6   Franz it was a ruse the reason you were actually making a

7   bail application to Judge Casey, correct?

8   A   Absolutely.

9   Q   You eventually do get out on bail, correct?

10   A   Yes.

11   Q   And you attempted -- one of the targets that you

12   determined you would attempt to get, wired up and get a

13   record on tape, is Joseph Corozzo, Jr.'s father; is that

14   correct?

15   A   Yes.  He was the consiglieri.

16   Q   That never happened?

17   A   No.

18   Q   Never happened because shortly after your release on

19   bail you attempted suicide, correct?

20   A   No, I think it was towards the latter part of bail

21   window.  I believe I had like a day or two left on my bail.

22   Q   Well, the day or two left on your bail also happened to

23   be the same time when you took an overdose of sleeping pills,

24   correct?

25   A   That's what I'm saying, yes.

Case 1:06-cr-00600-BJ-E Document 484-76 Filed 06/04/09 Page 162 of 254

DiLeonardo - Cross/Mazurek

1   Q    And part of the reason why you took this overdose of

2   sleeping pills is you did not want to go back to prison,

3   correct?

4   A    No, I was frought with guilt for what I was going to do

5   with everybody.  I wasn't going back to prison.  I was going

6   to a safe house.

7   Q    So you thought?

8   A    That's I was told.

9   Q    Did you tape anybody while out on bail?

10  A    Yes.  I had to wear a device, no matter where I went.  I

11  couldn't shut it off.  When I walked out the door, I had it

12  on.  When I came back, they would turn it off, the agents.

13  Q    But you were never to get one of your targets, Mr.

14  Corozzo, Sr.; is that correct?

15  A    That's correct.

16  Q    And there came a time, again, two days or so before your

17  bail was to expire you took the overdose of sleeping pills?

18  A    That's correct.

19  Q    And you woke up and you found yourself at a hospital,

20  correct?

21  A    Yes.

22  Q    And then from there you were taken to the MCC?

23  A    That's correct.

24  Q    And at the MCC at this time you weren't placed in

25  general population; is that correct?

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

Case 1:06-cv-00670-CKK-AK Document 416-6 Filed 06/04/09 Page 163 of 254

DiLeonardo - Cross/Mazurek

1    A    Yes.

2    Q    You were placed on a suicide observation watch?

3    A    Yes.

4    Q    Is that on the second or third floor of the MCC?

5    A    10-South.

6    Q    10-South is an administrative detention holding

7    facility?

8    A    You are being kind.  It is the super max terrorist

9    holding cell.

10   Q    You are saying that when the MCC believes someone is a

11   risk to themselves as a suicide, they are brought to the most

12   horrible maximum security place in the facility?

13   A    They have two cameras there and put somebody outside

14   your door to watch you 24/7.

15   Q    Did you ever have visits of psychiatric doctors from the

16   MCC, when you were returned after your so-called suicide

17   attempt?

18   A    Yes.  They would come back there, like four or five guys

19   up there, and they visited every guy up there, that was one

20   of them.

21   Q    You didn't learn, in fact, where the MCC has a facility

22   where they would hold people that are potential suicide

23   threats, other than 10-South?

24   A    Yes, I learned of that later on that there was one on

25   another floor.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:06-cv-00760-BJR Document 43-6 Filed 06/04/09 Page 165 of 254

DiLeonardo - Cross/Mazurek

1   Q    They didn't take you there; is that what your testimony

2   is?

3   A    No, I didn't go there.

4   Q    How did you learn about that facility on the second

5   floor for potential suicide victims?

6   A    When I got to the population on the third floor,

7   somebody told me that.

8   Q    None of the psychiatric staff at the MCC told you that

9   they have a place where they put suicide risk inmates?

10  A    No.

11  Q    During the many meetings you had on 10-South with them?

12  A    I didn't have many meetings with them.  Their meeting

13  would be a knock on the door, how are you doing, keep it

14  moving, maybe to have a little conversation with you, and

15  that would be it.

16  Q    Did you ever request to have the meeting with the

17  psychiatric staff at the MCC after your so-called suicide

18  attempt?

19  A    Yes, I asked for them to come up.  I had nobody to talk

20  to.

21  Q    Did you speak with them?

22  A    Yes.

23  Q    Other than the knocking on the door?

24  A    Yes, when I asked them to come up.

25  Q    Where did you meet with them?

Case 1:06-cv-00760-BIE Document 48-6 Filed 06/04/09 Page 165 of 254

DiLeonardo - Cross/Mazurek

1    A    10-South, through the door.

2         MS. HORMOZI:  Objection, Judge, relevance.

3         THE COURT:  I will allow it.

4    BY MR. MAZUREK:

5    Q    Through the door?

6    A    That's correct.

7    Q    They never said, we are going to take you to a facility

8    where we will speak to you to see what your concerns are?

9    A    No.

10   Q    Did they ever give you medication?

11   A    No.  Dramamine, I believe it was Dramamine to sleep for

12   two days, and that was it.  I couldn't sleep.

13   Q    You were never taken to the facility on the second floor

14   that specifically was suited for people who are potential

15   suicide risks?

16   A    No.

17   Q    How long were you in this 10-South facility?

18   A    I believe for six months.

19   Q    Did you still have suicidal thoughts at this time?

20   A    No.

21   Q    That all ended after the one attempt, what was it,

22   December of '02?

23   A    Yes, when I started to come around and I started to

24   realize what I did.

25   Q    So for the six months that you were in 10-South, you

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:06-cr-00600-BMC Document 436-7 Filed 06/04/09 Page 166 of 254

DiLeonardo - Cross/Mazurek

1   never were put on the second floor medical section, correct?

2      MS. HORMOZI:  Asked and answered, Judge.

3      THE COURT:  I will allow it.

4   A   No.

5   Q   And you were held in the super max segregation cell at

6   the MCC on 10-South during that entire period?

7   A   That's correct.

8   Q   Were you, during that period of time, during those six

9   months, were you communicating with your friends in the

10   government?

11   A   My friends in the government?

12      MS. HORMOZI:  Objection to form.

13      THE COURT:  Sustained.

14   BY MR. MAZUREK:

15   Q   Were you ever talking with any of the agents of the

16   government that you had previously been attempting to

17   cooperate with?

18   A   Yes, I believe one time in January I went up to the

19   office.

20   Q   And that would be after approximately a month in the

21   super max 10-South Unit; is that correct?

22   A   And there was another time in December.

23   Q   Even prior to that?

24   A   Yes.  Yes, there was.

25   Q   Who did you see in December from the government?

Case 1:06-cr-00600-BMC Document 436-76 Filed 06/04/09 Page 167 of 254

DiLeonardo - Cross/Mazurek

1   A    From the government Mr. Hillebrecht and my lawyer.

2   Q    You went with your lawyer, Mr. Gillen?

3   A    Yes.

4   Q    And at that time did you continue your cooperation

5   sessions with the government?

6   A    No.  It was just a session to see if I would cooperate.

7   I don't believe there was any debriefings.  Only in January

8   there was a debriefing.

9   Q    So there was no hiatus in time when you weren't sure

10  whether you were going to cooperate again while at 10-South

11  in the MCC?

12  A    Yes.  I think my being unsure was from December, when I

13  got in, I believe till the beginning of March, when I finally

14  made up my mind.

15  Q    But even during this so called unsure period, you at

16  least had one proffer session in January?

17  A    Right.

18  Q    So while you were unsure, that didn't stop you

19  continuing down the path of cooperation?

20  A    Like I said, it was a start and stop.

21  Q    I'm sorry?

22  A    A start and a stop.

23  Q    Well, there were times during January of 2003 that you

24  solicited the advice of other lawyers; is that correct?

25  A    Yes.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:06-cr-00600-BGE Document 43-76 Filed 06/04/09 Page 168 of 254

DiLeonardo - Cross/Mazurek

1  Q    And you solicited advice because you were in a bad spot;

2  is that correct?

3  A    Yeah, I just wanted to see what my options were.

4  Q    Your options in your criminal case?

5  A    In my criminal case, sure.

6  Q    Meaning whether you could do anything besides cooperate

7  at that point, given everything that had transpired before?

8  A    Yes.

9  Q    One of the lawyers that you asked to come visi. you was

10  a lawyer by the name of Diarmuid White; is that correct?

11  A    Yes.

12  Q    And you asked Diarmuid White to come visit with you and

13  he did; is that correct?

14  A    Yes.

15  Q    Because he was one lawyer you had heard of within your

16  past life as a career criminal?

17  A    No.  He was, as a matter of fact, part of our joint

18  defense team in that case, and I got to grow to respect him

19  at that time.

20  Q    He was representing a codefendant in the same case that

21  you were indicted?

22  A    Actually, he was representing all of us at that time as

23  a legal analyst, and he knew the lawyers pretty well and was

24  trying to figure out the Pinkerton law.

25  Q    Were you paying Mr. White at that time?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:06-cr-00550-JG Document 436-76 Filed 06/04/09 Page 169 of 254

DiLeonardo - Cross/Mazurek

1   A    We were going to chip in.

2   Q    Who is we?

3   A    The defense team.

4   Q    The defense team?

5   A    Yes.

6   Q    Is that the defendants on the indictment?

7   A    Yes.

8   Q    You were going to make payments to Diarmuid White?

9   A    That's correct.

10  Q    Were you going to make payments to other lawyers that

11  were on this so called defense team?

12  A    We were thinking about getting some other lawyers, but

13  we stood with Dairmuid White at that time.

14  Q    Had you contributed to payments to other codefendants in

15  this case, to any other lawyer, in the June 2002 indictment?

16  A    No.

17  Q    When he came -- when Mr. White came to visit you, did

18  you inform him that you were cooperating with the government?

19  A    The whole world knew I was cooperating.

20  Q    And you sought his advice with respect to whether you

21  should continue to cooperate?

22  A    I don't think I asked him that.  I'm not sure if I asked

23  him that.

24  Q    Why did you ask him to visit you?

25  A    I wanted just to see what my options were and I didn't

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

Case 1:06-cr-00760-BMC Document 436-7 Filed 06/04/09 Page 170 of 254

DiLeonardo - Cross/Mazurek

1    get into too much with him.  I think we talked about general

2    things, not specifics of the case at all at that point.

3    Q    One of the reasons you asked him to come and see you is

4    because you respected him as an attorney; is that correct?

5    A    Correct.

6    Q    During that same month you also solicited and asked for

7    Joseph Corozzo Jr. to come and visit you; is that correct?

8    A    Right.

9    Q    And at that point the entire world knew you were

10   cooperating, right?

11   A    Yes.

12   Q    And, sir, you already testified that you consider Joseph

13   Corozzo, Jr. as house counsel to this Gambino family,

14   correct?

15   A    Yes.

16   Q    Is it your testimony today that you asked Mr. Corozzo,

17   Jr. to come and see you in January of 2003, after the whole

18   world knew that you were cooperating, as house counsel of the

19   Gambino crime family?

20   A    Yes.

21   Q    And for what purpose would you be asking Mr. Corozzo,

22   Jr. to come visit you at that time, when you were already

23   cooperating with the government, if you believed he was house

24   counsel?

25   A    Again, I wasn't cooperating with the government.

FREDERICK R. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

Case 1:06-cv-00600-BGE Document 183-76 Filed 06/04/09 Page 10 of 254

DiLeonardo - Cross/Mazurek

1  Q    You had cooperated with the government?

2  A    No, I had not cooperated fully with the government.

There were starts and stops at that point and I wasn't sure.

I finally made a clear decision the beginning of March, but

before that I was unclear.  I was very confused.

6  Q    Let me ask you something, sir:  You had a long history

prior to that of being involved in organized crime; is that

correct?

9  A    Right.

10  Q    And you understand that the rules of organized crime

were that anyone who said anything against a fellow member of

organized crime is excommunicated from that enterprise,

correct?

14  A    That's correct.

15  Q    That's about the worst thing you can do?

16  A    Right, a hundred percent.

17  Q    In fact, you were concerned about Craig DePalma

testifying in a grand jury in a prior case of yours; is that

correct?

20  A    That's correct.

21  Q    And if he had, he was eliminated from your mind as

anyone that you could respect or trust?

23  A    That's correct.

24  Q    In fact, he was someone who deserved to be hurt under

the code of the enterprise?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:06-cr-00760-BMC Document 416-376 Filed 06/04/09 Page 172 of 254

DiLeonardo - Cross/Mazurek

1  A   The code, not my code.

2  Q   The code of the enterprise; is that correct?

3  A   Right.

4  Q   Now, at that time in January of 2003, you had attended

5  numerous proffer sessions with the government, correct?

6  A   That was March on when I finally made up my mind.

7  Q   You attended meetings with the government starting in

8  November 2002, correct?

9  A   Right.

10  Q   You agreed to be released on the street to wear a body

11  wire to tape other members of organized crime, correct?

12  A   Correct.

13  Q   Do you think that is something that the code would

14  permit you to speak against members of organized crime after

15  you had done that?

16  A   At this point it wasn't the code of the Gambino family.

17  This was for me trying to stand up for me to see what my

18  options were.

19  Q   That's why you --

20       THE COURT:  Excuse me.  Excuse me.  Let him finish.

21       Finish.

22  A   It wasn't me going back to the life.  I knew I could

23  never go back to the life.  If I ever went back into the

24  streets, I would be assassinated.  It was about me trying to

25  get my inner feelings that led me to this.  What I believed

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Cross/Mazurek

1  in was La Cosa Nostra.  It was for me not to be on the stand

2  or to be in this chair, like here today, counselor, whether

3  it would be Corozzo or Gotti or anybody else.  This is what I

4  was lamenting about and fighting throughout these days.  I

5  was very confused.

6  Q    That's the reason you called Joseph Corozzo, Jr.; is

7  that correct?

8  A    I wanted to hear from everybody at that point.  I wanted

9  every opinion to try to get a clear-cut --

10  Q    But, sir, you didn't ask for anybody.  You asked for

11  Joseph Corozzo Jr. as one of the few people who had come to

12  visit you in January, correct?

13  A    There was another lawyer my wife now Madeline got,

14  Washor.  Michael Washor came to see me.  She was out there.

15  She wanted to see Brafman and other lawyers.  They were out

16  there looking for other lawyers.  Corozzo wasn't the only

17  option out there.

18  Q    I'm sorry?

19  A    Joseph Corozzo wasn't the only option.  My wife was

20  looking for other attorneys at that time.

21  Q    I understand.  But one of the people that you, yourself,

22  solicited to come visit you during this hour of dire need, as

23  you described it, was Joseph Corozzo, Jr.; is that correct?

24  A    That's correct.

25  Q    That's because you understood Joseph Corozzo, Jr. was a

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

117

DiLeonardo - Cross/Mazurek

1    good lawyer; is that correct?

2    A    I wanted his opinion what was going on in the street.

3    Q    It wasn't about the code, isn't that what you just

4    testified to?

5    A    It wasn't about the code.  It was trying to get my head

6    together.

7    Q    It was that you wanted advice from someone you could

8    trust, correct?

9    A    Once I cooperated, I don't know if I could trust him.  I

10   just wanted to get the pulse of what was going on.

11   Q    You called the house counsel of the Gambino family?

12   A    Yes.

13   Q    You called him to get a conscientious lawyer's viewpoint

14   of what your real possibilities were at that stage of your

15   criminal case; is that correct?

16   A    That's one of them, sure.  Like I got Dairmuid White and

17   other lawyers.

18   Q    Now, the first time that you mentioned Joseph Corozzo

19   Jr. at any of your debriefing sessions with the government

20   was in approximately March of 2003; is that right?

21   A    That's when I say they started up again, yes.

22   Q    You didn't mention it during this period of time that

23   you went in, you didn't mention Joseph Corozzo, Jr. during

24   the period of time you went in November of 2002 or January

25   2003?

DiLeonardo - Cross/Mazurek

1   A    No.  They were just touching on subjects and I didn't

2   really get into the details at that time.

3   Q    Yes or no, did you speak about Joseph Corozzo, Jr. in

4   your sessions?

5   A    No, I don't believe so.

6   Q    Did the government ask you about Joseph Corozzo in your

7   sessions in November 2002 or January 2003?

8   A    No, I don't believe so.

9   Q    Did they ask you about your Atlanta case in your early

10  sessions 2002?

11  A    They might have.  When I said I was guilty in that case,

12  they might have.

13  Q    Did they ask about lawyers who may have been assisting

14  members you or other members of the Gambino family in those

15  sessions in November of 2002 or January 2003?

16  A    No.

17  Q    As of the best of your memory, they didn't ask about

18  lawyers at all during that time of period?

19  A    No.  Like I said, it was short of the heavy stuff.

20  Q    Regardless how short it was, that's not one of the

21  questions?

22  A    That's correct, counsel.

23  Q    The only time, your testimony is, that you paid Joseph

24  Corozzo, Jr. to represent you in a case was with respect to a

25  meeting that you requested with Craig DePalma?

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Case 1:06-cv-00760-BGE Document 48-6 Filed 06/24/08 Page 176 of 254

DiLeonardo - Cross/Mazurek

1   A    That's correct.

2   Q    Were there any communications that you had with Joseph

3   Corozzo with respect to that meeting with respect to your

4   representation on the Craig DePalma interview that you

5   haven't already discussed today?

6   A    I'm not clear on that question.

7   Q    Are there any communications that you have not testified

8   about with respect to your hiring Joseph Corozzo, Jr. with

9   respect to the Craig DePalma interview?

10  A    I believe that's it.

11  Q    Did you, yourself, ever ask Joseph Corozzo, Jr. to pass

12  messages during the time that were you in custody in the

13  Southern District case, June of 2002 onward?

14  A    Not in that case.  Not in that case.

15  Q    When you were in custody?

16  A    No.

17       MR. MAZUREK:  May I have a moment, your Honor?

18       (Pause)

19  BY MR. MAZUREK:

20  Q    Are you aware of any cases where Joseph Corozzo, Jr. was

21  forced to represent any defendant in a criminal case?

22       MS. HORMOZI:  Objection to form?

23          THE COURT:  I don't understand it.

24  BY MR. MAZUREK:

25  Q    Are there any cases of any individuals who had to retain

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

DiLeonardo - Redirect/Hormozi

1   Mr. Corozzo on an instruction by the enterprise?

2   A    Not that I recall, no.

3   Q    Are there any specific occasions where you know that

4   Mr. Corozzo, Jr. received payments from a third party to

5   represent an individual in a criminal case

6   A    Not that I remember right now.

7        MR. MAZUREK:  No further questions.

8        THE COURT:  Be very brief, please.

9        MS. HORMOZI:  Yes, Your Honor.

10  REDIRECT EXAMINATION

11  BY MS. HORMOZI:

12  Q    Good afternoon, Mr. DiLeonardo.

13       Just to clarify, did you have other reasons you wanted

14  Joseph Corozzo to see Craig DePalma, other than keeping Eric

15  Franz away from him?

16  A    Yes.  Once he shows up to Craig, he knows who his father

17  is, and especially who his uncle is, and they would bolster

18  him up.

19  Q    Can you just explain why you wanted Mr. Corozzo to visit

20  you while you put him on your prisoner list in the period

21  prior to your cooperation with the Southern District or while

22  you were in prison at the MCC?

23  A    At the time I was very confused.  I didn't know what I

24  wanted to do.  Prior to that, after my suicide attempts and

25  being locked in that cell, it was rough, and, like I said, I

Case 1:08-cr-00076-BMC Document 484-76 Filed 06/04/09 Page 178 of 254

DiLeonardo - Redirect/Hormozi

1   was distraught, confused, very down.  I was having a lot of

2   guilt about people I was going to hurt in the street that I

3   loved, and I wanted to see what my options were.  I wouldn't

4   talk to anybody at that time.

5   Q    You mentioned earlier that at Foxwoods during that

6   meeting you personally didn't talk about your business in

7   front of other people, aside from Frankie Fappiano and John

8   Gotti, Jr.

9       Was Gambino family business spoken about during business

10  dinner that you know of?

11  A    Yes.  At the table were John, me and Lou Bruge (ph) were

12  talking about the Connecticut stuff very loosely.  Not in

13  great detail but loosely, it was discussed.

14  Q    Lastly, to clarify some of the questions regarding Peter

15  Gotti, Jr., when were you meeting Peter Gotti, Jr., because I

16  believe there was confusion about that.

17      You met Peter Gotti, Sr. on a weekly basis around 2000;

18  is that correct?

19  A    Before my arrest in Atlanta?

20  Q    Prior to your arrest.

21      When were you arrested in Atlanta?

22  A    September 2000.

23  Q    Prior to September 2000, you're meeting with Peter

24  Gotti, Sr. on a regular basis?

25  A    Right.

FREDERICK R. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

```
1    Q    Were you also meeting with Peter Gotti, Jr., prior to

2    your arrest?

3    A    Yes, that was in the spring of 2000.

4    Q    Okay.

5         What was the purpose for those types of meetings?

6    A    Junior wanted to have his brother Peter stay a little

7    close to me at that time and requested that Peter would see

8    me about once a week.

9    Q    Where was John Gotti, Jr. at that time?

10   A    He was in Raybrook Prison.

11        MS. HORMOZI:  No other questions.

12        THE COURT:  Thank you very much.

13        MR. MAZUREK:  One question, your Honor.

14        THE COURT:  No, you have had enough.

15        Order immediate copy.

16        Do you want time to submit an additional brief?  The

17   matter has been fully briefed.

18        MS. HORMOZI:  Judge, at this time we would just like

19   to show two small portions of recordings that occurred at

20   Springfield Prison.

21        THE COURT:  All right.

22        MS. HORMOZI:  That we provided to the defense.  They

23   are very short.

24        MR. MAZUREK:  Your Honor, what is the relevance of

25   this?
```

2591

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,  :  05-CR-425 (JBW)

   -against-  :  U.S. Courthouse
                        Brooklyn, New York

DOMINICK PIZZONIA and
ALFRED DICONGILIO,  :

       Defendant.  :  TRANSCRIPT OF TRIAL
                            April 30, 2007
- - - - - - - - - - - - - X  9:30 a.m.

BEFORE:
     HONORABLE JACK B. WEINSTEIN, U.S.D.J.
        And a jury

APPEARANCES:

For the Government:  ROSLYNN R. MAUSKOPF
                    United States Attorney
                    One Pierrepont Plaza
                    Brooklyn, New York  11201

                    By:  JOEY LIPTON
                         PAIGE PETERSEN
                         Assistant U.S. Attorneys

For the Defendant:  JOSEPH COROZZO, ESQ.
                    For Deft. Pizzonia

                    HARRY C. BATCHELDER, ESQ.
                    For Deft. DiCongilio

Court Reporter:  Holly Driscoll, CSR
                    Official Court Reporter
                    225 Cadman Plaza East
                    Brooklyn, New York  11201
                    (718) 613-2274

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

1          (The following takes place out of the presence of

2     the jury.)

3          THE COURT:  Yes, I'll be happy to hear any motions.

4          MR. BATCHELDER:  Your Honor, I have a brief

5     application, if I may.  The government provided to us a video

6     which is on your list as Government's Exhibit 180.  This video

7     purports to be a homemade video made what I guess is in the

8     early sixties of the sister's christening, it is an after

9     christening party I think at which time Mr. Ruggiano was

10    perhaps eight years old.  Now, I'm not unaware of what you're

11    allowed to bring in on RICO but I don't believe either

12    Mr. Pizzonia or Mr. DiCongilio is at that party and this is so

13    remote from the times charged in the indictment concerning the

14    events or anything else.  I'm asking the Court to review that

15    video, 180, it is not terribly long, and I'm objecting to it

16    on the basis of relevance.  It just seems a little -- no, I

17    shouldn't qualify when I make an objection.  I think it is

18    over the line.

19         THE COURT:  Thank you.

20         What is the government's view?

21         MR. LIPTON:  Judge, this is a video that we intend

22    to play through Anthony Ruggiano.  It was his sister's

23    christening from 1960.  It was at his father's house, Fat Andy

24    Ruggiano.  Mr. DiCongilio was there.  Tony Lee Guerrieri was

25    there.  Mikey Gal Guerrieri was there.

1          THE COURT:  What was DiCongilio's age at that time?

2          MR. LIPTON:  What was his age, it was 1960, Judge, I

3   believe he's in his late seventies now.

4          THE COURT:  So, he was an adult.

5          MR. LIPTON:  He was an adult, they were all adults

6   and these are three individuals who were involved in one of

7   the murders that's the predicate in this case, it shows

8   association.

9          THE COURT:  You can show it to show association.

10  Objection overruled.

11         MR. BATCHELDER:  Thank you, Your Honor.

12         THE COURT:  What else?

13         MR. LIPTON:  Judge, the government filed a couple of

14  motions.  A private investigator contacted the ex-wife of one

15  of the government witnesses, Thomas Morea.  The government had

16  notified of this, the witness that Your Honor had indicated --

17  the government had made a protective order and Your Honor

18  granted it in part in the beginning but as trial approached,

19  Your Honor indicated the government should turn over the name

20  so that defense counsel have that in advance of jury

21  selection.

22         The government did that and the government indicated

23  to defense counsel that Mr. Morea was represented by counsel

24  and I gave them, gave defense counsel her name and they

25  indicated that if they wanted to talk to him, they would

Case 1:08-cr-00076-JBW Document 436 Filed 08/10/09 Page 183 of 254

1    contact her.  We learned on Friday that a private investigator

2    to the defense had contacted Mr. Morea's ex-wife and that he

3    had asked to try to get in contact with Mr. Morea, had asked

4    her, the ex-wife, to get in touch with Mr. Morea and asked

5    her, the ex-wife, to provide the phone number for Mr. Morea

6    and the private investigator indicated that he had gone to a

7    prior address for Mr. Morea before he was relocated and I

8    believe that's improper contact with a represented party that

9    defense counsel know about.

10            This comes on the heels of another witness that the

11   defense is calling who contacted a government witness who is

12   also represented.  If Your Honor remembers, that was a

13   witness, Albert Maione, and defense counsel indicated that

14   they had no knowledge of that contact.  We believe that a tape

15   was made of that meeting and we'd asked for that tape and Your

16   Honor provided an order to that effect.  We haven't received

17   the tape.  That's by way of background.

18            It is the government's request that defense counsel

19   be admonished that they should not be contacting represented

20   parties.  They know how to properly go about doing that.  We

21   provided the information and we ask Your Honor to so admonish

22   them.

23            MR. COROZZO:  Your Honor, we have not contacted any

24   witnesses improperly.

25            THE COURT:  Well, have you indicated to an

1    investigator any of these names?

2          MR. COROZZO:  Your Honor, there are investigators

3    who are not working for my office who are aware of Mr. Morea.

4    I have --

5          THE COURT:  Well, who are they working for?

6          MR. COROZZO:  I'd rather not say, I don't want to

7    prejudice anyone.

8          THE COURT:  Well, you have to say.  I want to know

9    what's happening here.

10         MR. COROZZO:  Your Honor, there's witnesses who have

11   or potential targets who have been contacted by the

12   government.

13         THE COURT:  Say that again.

14         MR. COROZZO:  Potential targets have been contacted

15   by the government and threatened with arrest.  One is a person

16   by the name of Thomas DeSousa who is represented by Steven

17   Zissou and Elizabeth Macedonia.  Mr. Zissou and Ms. Macedonia

18   and I have been working together at times and trying to do

19   research on Mr. Morea and my private investigator, Lawrence

20   Frost, has not gone out and done anything on Mr. Morea.

21         THE COURT:  Well, have you indicated to any of these

22   people that this person may be the subject of inquiry at this

23   trial?

24         MR. COROZZO:  We have, yes, Your Honor.

25         THE COURT:  Why did you do that?

1       MR. COROZZO:  Because they already were aware of it

2  through the government and we were trying to just pool

3  resources, Your Honor, in an effort to --

4       THE COURT:  I don't think that's an appropriate

5  response.

6       Don't give any more of these witness names to the

7  defendants.  If you have it, give it to them the night before.

8       MR. COROZZO:  Again, Your Honor, my understanding is

9  this was a check on the background of Mr. Morea and no contact

10 of Mr. Morea directly.  We were just trying to find anything

11 we can about the witness and we're just trying to do some due

12 diligence.

13      THE COURT:  Do you understand, the government, my

14 order on this?

15      MR. LIPTON:  I do, Your Honor.

16      THE COURT:  There's nothing I can do about what's

17 happened.

18      MR. COROZZO:  Also, Your Honor, in reference to the

19 tape, I did inquire of Mr. Albert Maione whether there was a

20 tape of his meeting with Dennis Fitzharris and I was informed

21 that there was not.

22      THE COURT:  Okay.  I accept that.  What's next?

23      MR. LIPTON:  Your Honor, the government had filed a

24 motion yesterday regarding tape recordings and transcripts

25 that the government believes defense counsel, specifically

1   Mr. Pizzonia, had intended to introduce.  One of the
2   predicates in this case involves a bookmaking charge that
3   arose from a 1994-1995 Title 3 investigation from the Queens
4   District Attorney's Office, it's been the subject of some
5   discussion with Your Honor already, and the government is
6   intending to introduce some tapes that are co-conspirator
7   conversations relating to that gambling predicate.
8           Defense counsel on Friday sent over transcripts of
9   other conversations all including Mr. Ruggiano, Anthony
10  Ruggiano, who is going to be one of the witnesses today.  The
11  government filed a motion seeking to preclude those tapes
12  because under 802(d) the tapes do not constitute
13  co-conspirator statements when they're introduced by the
14  defendant and the case law is very clear on that.
15          THE COURT:  Well, are they contradictory of what
16  he's saying on the witness stand?
17          MR. LIPTON:  What we've said, Your Honor, is
18  obviously if it is impeachment material, that's fair game.
19  They'd have to show --
20          THE COURT:  I can't rule on it without seeing the
21  transcripts or hearing his testimony.
22          MR. COROZZO:  And, Your Honor, I don't know the
23  admissibility of them until I hear the testimony, I was just
24  being fair to the government by turning over the transcripts a
25  few days before the testimony.

1        THE COURT:  All right.  Before the cross-examination

2  if you want to introduce it, I'll have to look at them and

3  see.  I imagine they may come in as contradictory prior

4  statements.

5        MR. LIPTON:  Oh, yes, if it is contradictory prior

6  statements, that's obviously fair game for impeachment.  I

7  thought my -- it was my understanding, maybe wrongly, they

8  were going to be introduced for their truth and that's what we

9  really object to.

10        THE COURT:  Well, I can't rule on it until I have

11  further information.

12        What do we having this morning now?

13        MR. LIPTON:  Judge, two issues; we are supposed to

14  be having the conflict hearing relating to Anthony Ruggiano

15  and Your Honor indicated that we were going to do that first

16  thing and the witness who is on cross-examination, Peter

17  Zuccaro, I was told by the Marshals there was a little bit of

18  a mix-up.

19        THE COURT:  Well, is Ruggiano ready?

20        MR. LIPTON:  I believe he is here, yes.

21        THE COURT:  Bring him in.

22        MR. COROZZO:  Your Honor, my understanding is I will

23  be precluded from asking the questions at this time?

24        Will I be permitted or precluded from asking

25  questions of Mr. Ruggiano?

1          THE COURT:  Well, we're going to ask a very short

2     question, were you his counsel.

3          MR. COROZZO:  Fine, Your Honor.

4          THE COURT:  That's all I want to know.

5          MR. LIPTON:  Your Honor, there is a little bit of

6     background that I think Your Honor needs to know about the

7     relationship between Mr. Ruggiano and Mr. Corozzo and it won't

8     be very long but I think that will need to be.

9          THE COURT:  All right, take five minutes.  It's six

10    minutes to ten, I have a jury waiting.

11          See if we have a full jury.

12          MR. LIPTON:  I'm not sure that Mr. Zuccaro is here

13    because of that mix-up, so the witness on cross now is being

14    brought over I was informed when I got here first thing this

15    morning by the marshals.

16          THE COURT:  What have you got ready for me?

17          MR. LIPTON:  Mr. Ruggiano.

18          THE COURT:  All right, let's get him in here.

19          MR. LIPTON:  He's coming, Judge.

20          (Pause.)

21          THE COURT:  Do we have the main witness here?  It is

22    10 o'clock.

23          MR. LIPTON:  I believe Mr. Ruggiano is in the

24    building, the agents are supposed to be bringing him up and

25    Mr. Zuccaro, the marshals -- I don't know if he's here yet.

Case 1:03-cr-00900-JBW Document 427-2 Filed 08/30/08 Page 189 of 254

1      THE COURT:  Let's check.  I don't want to sit

2  around, I've got a lot of things to do here in this case.

3      (Pause.)

4

5      (Witness enters courtroom and takes the stand.)

6      (Witness sworn by the clerk.)

7  A N T H O N Y    R U G G I A N O, having been first duly

8  sworn was examined and testified out of the presence of the

9  jury as follows:

10      THE CLERK:  Please state your name.

11      THE WITNESS:  Anthony Ruggiano, Jr.

12      THE CLERK:  Be seated.

13  DIRECT EXAMINATION

14  BY MR. LIPTON:

15  Q    Good morning.

16  A    Good morning.

17  Q    How old are you, sir?

18  A    Fifty-three.

19  Q    Where did you grow up --

20      THE COURT:  No, I don't want any of this.  Just ask

21  him the question I'm interested in, who represented him in

22  that case and what are the circumstances.

23      MR. LIPTON:  Yes, Judge, that was going to be the

24  next question.

25  Q    Turning your attention to December 1995, did you get

A. Ruggiano - direct - Lipton                    2601

1    arrested on a bookmaking case?

2    A    Yes.

3    Q    That was in Queens County?

4    A    Yes.

5    Q    Were other people arrested with you?

6    A    Yes.

7    Q    Who ran the bookmaking operation?

8    A    Ronald Ferrari and Frankie Gitto.

9    Q    Who appeared for you at your arraignment?

10   A    Joseph.

11   Q    When you say "Joseph," who is that?

12   A    Joseph Corozzo.

13   Q    Is that the attorney?

14   A    Yes.

15   Q    Did he appear for other defendants?

16   A    Yes.

17   Q    Did you get bail?

18   A    Yes.

19   Q    What was your bail?

20   A    100,000.

21   Q    Who negotiated it?

22   A    Joseph.

23   Q    Did the other defendants make bail?

24   A    Yes.

25   Q    After you were bailed out was there an initial

A. Ruggiano - direct - Lipton                    2602

1    co-defendant's meeting?

2    A    Yes.

3    Q    Where was that?

4    A    In Joseph's office on Madison Avenue.

5    Q    When you say "Joseph," is it Joseph Corozzo?

6    A    Joseph Corozzo.

7    Q    Were most of the defendants there at that meeting?

8    A    Yes.

9    Q    Which attorneys were there?

10   A    Just him.

11   Q    When you say "him," that's Joseph Corozzo?

12   A    Yes.

13   Q    Did Mr. Corozzo discuss the cost of representation?

14   A    Yes.

15   Q    What did he say?

16   A    He said it would cost 100,000 for his law firm and it

17   would be extra money for Mr. Pollak to do the pretrial

18   motions.

19   Q    That's John Pollak?

20   A    Yes.

21   Q    Was the $100,000 eventually paid?

22   A    Yes.

23   Q    By who?

24   A    By Ronnie and Frankie.

25   Q    That's Ronnie Ferrari?

Case 1:30-cr-00576-UBER-D Document 14-27-2 Filed 08/30/09 Page 192 of 254

1  A    Yes.

2  Q    And Frankie Gitto?

3  A    Yes.

4  Q    Did they split it?

5  A    Yes.

6  Q    Who was that money paid to?

7  A    Joseph.

8  Q    Who did that money cover?

9  A    It covered all of us, me -- well, not all of us, some

10 people used their own attorneys.  It covered me, Mikey Gal,

11 Ronnie, Frankie, this other guy Mike and his son, a few --

12 most of us.

13 Q    Did other attorneys also come in on the case?

14 A    A few guys from Brooklyn brought in another attorney and

15 then later on another attorney came in for Mr. Ferrari, for

16 Ronnie.

17 Q    Did other attorneys come in the case besides those

18 attorneys that represented that were representing --

19 A    Yeah, well, Joseph said he was going to split it up

20 because he couldn't defend all of us so technically we had,

21 you know, other attorneys came in.

22 Q    Which attorney did you get?

23 A    Hoffman, Jeffrey Hoffman.

24 Q    Did you hire him?

25 A    No.

Case 1:03-cr-00929-NGG Document 1427-2 Filed 08/10/18 Page 40 of 53 PageID #: 254

1  Q    Did you or your family contact him to represent you?

2  A    No.

3  Q    Was John Pollak his partner?

4  A    I believe so, yes.

5  Q    Did you hire John Pollak?

6  A    No, I didn't.

7  Q    Did you or your family -- either you or your family pay

8  either Pollak or Hoffman any money?

9  A    No.

10 Q    Where was Pollak and Hoffman's offices?

11 A    The same place, Madison Avenue.

12 Q    Same place as who?

13 A    Joseph.

14 Q    Now, during the time the case went on were there other

15 co-defendant meetings held?

16 A    Yes.

17 Q    Did you attend with other defendants?

18 A    Yes.

19 Q    Did Joseph Corozzo attend with other attorneys?

20 A    No, he was by himself.

21 Q    Do you remember those meetings, did you talk about the

22 case?

23 A    Yes.

24 Q    Did other defendants talk about the case?

25 A    Yes.

Case 1:03-cr-00706-JBW Document 427-2 Filed 03/30/09 Page 45 of 55 PageID #: 254

A. Ruggiano - direct - Lipton                    2605

1    Q    And was strategy discussed?

2    A    Yeah, we talked about the tapes, what to listen for.

3    Yeah, strategy was discussed.

4    Q    Did you believe what you were saying was confidential and

5    private?

6    A    Yeah.

7    Q    Was anybody running those meetings?

8    A    Yes.

9    Q    Who was that?

10   A    Joseph.

11   Q    How many meetings do you think you had like that where

12   you attended?

13   A    That I attended, three or four maybe.

14   Q    And did anyone lead the other matters in the case?

15   A    Yes.

16   Q    Who was that?

17   A    Joseph.

18   Q    And I think you said John Pollak did the pretrial

19   motions?

20   A    Yes.

21   Q    Was that his main duty?

22   A    Yes.

23   Q    How many times did you meet with Hoffman, Jeffrey Hoffman

24   alone?

25   A    Once.

Case 1:08-cr-00076-UBR/ERD Document 4-2 of 2 Filed 03/10/08 Page 195 of 254

A. Ruggiano - direct - Lipton                    2606

1   Q    Where was that?

2   A    In his office.

3   Q    How long do you approximate?

4   A    How long was the meeting?

5   Q    Yeah?

6   A    Fifteen minutes.

7   Q    How many times did you meet with Pollak alone?

8   A    Never.

9   Q    Did you ever meet with him in court?

10  A    Once.

11  Q    When was that?

12  A    The day I got sentenced.

13  Q    What was your reaction when you saw him in court that

14  day?

15  A    I was surprised he was there.  I said -- I asked him what

16  he was doing there.

17  Q    Why did you ask him what he was doing there?

18  A    Because he was only hired to do the motions.

19  Q    What did Pollak say to you?

20  A    He said, what do you think I'm going to let you get

21  sentenced by yourself, so I said thanks.

22  Q    Now, did you ever talk to Hoffman or Pollak on the

23  telephone?

24  A    I never spoke to Pollak on the telephone.  I may have

25  spoke to Jeffrey once maybe but I never spoke to Pollak.

1   Q    That's Jeffrey Hoffman?

2   A    Yes.

3   Q    Who did you direct your questions to about the case?

4   A    Joseph.

5   Q    Why did you do that?

6   A    Because he was in charge of the case as far as I was

7   concerned.

8   Q    What was your relationship with him?

9   A    We were friends.

10  Q    When you asked your questions, did Mr. Corozzo answer

11  your questions about the case?

12  A    Yes.

13  Q    Did he ever tell you to go talk to Hoffman or Pollak?

14  A    No.

15  Q    Did he ever refuse to answer your questions?

16  A    No.

17  Q    Did you eventually decide to take a plea?

18  A    Yes.

19  Q    Did everyone else in the case take pleas?

20  A    Yes.

21  Q    Who told you about the plea offer made by the state?

22  A    Joseph.

23  Q    Do you remember what the initial offer was?

24  A    Yes.

25  Q    What was that?

```
                    A. Ruggiano - direct - Lipton              2608

 1    A     Three to six.

 2    Q     Do you remember where you were when you heard about that

 3    offer?

 4    A     I was in St. Louis.

 5    Q     What was in St. Louis at that time?

 6    A     I was at a convention, a Narcotics Anonymous convention.

 7    Q     And you spoke to Mr. Corozzo from St. Louis?

 8    A     Yes.

 9    Q     What did he tell you?

10    A     He told me that they offered me three to six but if Mikey

11    Gal took a year and five years probation, they would knock it

12    down to two to four.

13    Q     Mikey Gal Guerrieri, was he one of your co-defendants?

14    A     Yes.

15    Q     Did you consult with Pollak or Hoffman after you spoke to

16    Mr. Corozzo?

17    A     No.

18    Q     Eventually did you talk to Mikey Gal Guerrieri?

19    A     Yes.

20    Q     Did he agree to take the one year?

21    A     Yes.

22    Q     And did you agree to take the two to four after that?

23    A     Yes.

24    Q     Was Pollak or Hoffman involved in that decision?

25    A     No.
```

A. Ruggiano - direct - Lipton                          2609

1    Q    Did you ultimately get a sentence of two to four years?

2    A    Yes.

3    Q    Let me turn your attention to December of 1996.  While

4    you were serving your sentence on that case did you get

5    charged with new crimes?

6    A    Yes.

7    Q    That was in the Southern District of Florida?

8    A    Yes.

9    Q    What were you charged with there?

10   A    RICO for extortion.

11   Q    That was RICO conspiracy?

12   A    Yes.

13   Q    When you first got charged, what attorney did you

14   contact?

15   A    I contacted Linda Sheffield.

16   Q    Did you retain Linda Sheffield?

17   A    No.

18   Q    Early on did she tell you about a plea deal that she

19   tried to negotiate for you?

20   A    Yes.

21   Q    What did she tell you?

22   A    She told me that she could have got me eight years.

23   Q    Were you contemplating taking the eight years?

24   A    Yeah.

25   Q    Ms. Sheffield advise you to take it?

1   A     Yes.

2   Q     And did she discuss the plea deal with other attorneys in

3   that case?

4   A     Yes.

5   Q     With whom?

6   A     Joseph Corozzo.

7   Q     Who did Joseph Corozzo represent in that case?

8   A     His uncle, Nicky.

9   Q     Nicky Corozzo?

10  A     Yes.

11  Q     What did Ms. Sheffield tell you about the discussion with

12  Mr. Corozzo?

13  A     She said that he told her to mind her business, that we

14  weren't taking pleas.

15  Q     Did you end up taking the offer that Ms. Sheffield told

16  you about?

17  A     No.

18  Q     Why not?

19  A     Because his uncle and they didn't want me to take the

20  plea, they said nobody was taking pleas and that was it so I

21  didn't take it.  I was told not to take it, that they weren't

22  going to negotiate any pleas.

23  Q     Did you retain an attorney?

24  A     Yes.

25  Q     Who was that?

A. Ruggiano - direct - Lipton                    2611

1   A    Paul McKenna.

2   Q    Besides Nicky Corozzo and yourself, were there other

3   co-defendants?

4   A    Yes.

5   Q    Were you incarcerated or out on bail?

6   A    I was incarcerated.

7   Q    Were the other co-defendants incarcerated?

8   A    We were all incarcerated except Lenny, he was out for a

9   while.

10  Q    That's Lenny DiMaria?

11  A    Yes.

12  Q    Ultimately did he get incarcerated?

13  A    Yes.

14  Q    Were you all housed in the same prison?

15  A    Yes.

16  Q    Did you have co-defendant meetings in the prison?

17  A    Yes.

18  Q    Did you attend with other defendants?

19  A    Yes.

20  Q    And did Joseph Corozzo attend with other attorneys?

21  A    Yes.

22  Q    In that case did you talk about the case and strategy?

23  A    Yes.

24  Q    And did you believe what you were saying was confidential

25  and private?

A. Ruggiano - direct - Lipton                     2612

```
1   A    Yes.

2   Q    And eventually did you discuss how the case was going to

3   be resolved?

4   A    Yes.

5   Q    How was that?

6   A    We were going to take a universal plea.

7   Q    Did everyone take a plea?

8   A    Yes  -- not everyone, two of us didn't.

9   Q    Two didn't because they cooperated?

10  A    Yes.

11  Q    Everyone else took a universal or global plea?

12  A    Yes.

13  Q    Were you sentenced in January 1998?

14  A    Yes.

15  Q    Before you were sentenced was there a co-defendants's

16  meeting?

17  A    Yeah.

18  Q    Were other defendants there?

19  A    Yeah.

20  Q    Were some of the attorneys there?

21  A    Yeah.

22  Q    Which attorneys?

23  A    Joseph was there, Paul McKenna was there, Sid's lawyer

24  was there, I think his name is Rubino, Frank Rubino, something

25  like that.  I forget his name.
```

Case 1:03-cr-00929-JBW Document 1427-2 Filed 08/10/07 Page 202 of 254

1    Q    And was sentencing discussed at that meeting?

2    A    Yeah.

3    Q    Was the Bureau of Prisons drug treatment program

4    discussed?

5    A    Yes.

6    Q    Who took part in those discussions?

7    A    All of us that were there, Joseph, me, Paul, Sid,

8    Ralphie, Lenny, Sal.

9    Q    So, the defendants and the attorneys took part in the

10   discussions?

11   A    Uh-huh.

12   Q    What was discussed?

13   A    That we were going to take pleas and we were all going to

14   try to get the drug program recommended at our sentencing.

15   Q    And did you discuss what you had to do to get the drug

16   program?

17   A    Yes.

18   Q    What was that?

19   A    We had to say that we were using drugs and alcohol.

20   Q    And did any of the attorneys that were in those

21   discussions tell you not to say that?

22   A    No.

23   Q    Did you have a drug problem at the time?

24   A    No.

25   Q    Did you have a drug problem in the past?

Case 1:03-cr-00929-JBW Document 427-4 Filed 08/21/08 Page 203 of 254

1  A    Yes.

2  Q    Were you addicted to certain drugs?

3  A    Yes.

4  Q    And when was the last time you took any drugs before you

5  had those discussions?

6  A    January 12, 1989.

7  Q    And had you participated in Narcotics Anonymous?

8  A    Yes.

9  Q    To your understanding, did Joseph Corozzo know that?

10  A    Yes.

11  Q    How do you know?

12  A    Because he knew me, you know, we had a relationship.  He

13  knew me intimately.

14  Q    And did Joseph Corozzo tell you not to lie to the judge?

15  A    No.

16  Q    Did you get sentenced?

17  A    Yes.

18  Q    At sentencing did your attorney tell the judge that you

19  had a drug problem?

20  A    Yes.

21  Q    Did the Court recommend the program?

22  A    Yes, they did.

23  Q    Did you ultimately get it once you got incarcerated?

24  A    No.

25  Q    Let me turn your attention to the mid 90's, do you know

A. Ruggiano - direct - Lipton                2615

1    an individual named Steve Lichtman?

2    A    Yes.

3    Q    Did you commit crimes with him?

4    A    Yes.

5    Q    Briefly, what crimes?

6    A    Vending, gambling.

7    Q    That's vending machines?

8    A    Right.

9    Q    Illegal joker poker and the like?

10   A    Yes.

11   Q    Did he retain Mr. Corozzo to represent him in the case?

12   A    Well, he retained Mr. Corozzo on a criminal case, I don't

13   remember if it was for him or for someone else.

14   Q    Once the case got resolved did Mr. Lichtman owe

15   Mr. Corozzo money?

16   A    Yes.

17   Q    After that did you get a message from Ronnie Trucchio?

18   A    Yes.

19   Q    What was the message?

20   A    He sent word for me to come and meet him in Fudruckers.

21   Q    Is that a restaurant?

22   A    Yeah, it was a bar-restaurant.

23   Q    Did you go to Fudruckers?

24   A    Yes.

25   Q    Who was there when you got there?

A. Ruggiano - direct - Lipton                    2616

1   A    Him and Joseph.

2   Q    Ronnie Trucchio and Joseph Corozzo?

3   A    Yes.

4   Q    What was Ronnie Trucchio's rank at the time in the

5   Gambino Family?

6   A    He was a soldier.

7   Q    Did you know that Mr. Corozzo was going to be there?

8   A    No.

9   Q    What did Mr. Trucchio say to you?

10  A    When I walked in he said that -- we sat down and he told

11  me that Stevie owed Joseph money.

12  Q    That's Steven Lichtman --

13  A    Yeah.

14  Q    -- and Joseph Corozzo?

15  A    Yes.

16  Q    What did you say to Ronnie in response?

17  A    I said, so, why didn't Joseph get in touch with him, what

18  does he need you for.

19  Q    What did you say to Mr. Corozzo?

20  A    I said, what are you sitting me down for, like what's

21  going on, you know, you're a lawyer, what are you bringing --

22  why is Ronnie sending for me for.

23  Q    What did Mr. Corozzo say to you?

24  A    He said he was one of us.

25  Q    What did you understand that to mean?

A. Ruggiano - direct - Lipton                    2617

1   A    That one of us in the street, you know, a street guy.

2   Q    What did you say to him?

3   A    I said, no, you're not, you're a lawyer.  He said, no,

4   I'm one of yous (sic).

5   Q    What did you tell Mr. Trucchio and Mr. Corozzo about the

6   money from Stevie Lichtman?

7   A    I said I'll go to speak to Stevie and I'll get back to

8   yous (sic).

9   Q    Did you do that?

10  A    Yes.

11  Q    What did Mr. Lichtman say?

12  A    He said he could give him 500 a week.

13  Q    Did you contact Mr. Corozzo after learning that?

14  A    Yes.

15  Q    What did Mr. Corozzo say?

16  A    He said fine.  He asked me if I could drop it off in the

17  club to Dominick, so I said yeah.

18  Q    When you say drop it off at the club, what club?

19  A    Cafe Liberty.

20       THE COURT:  Who is Dominick?  I don't understand.

21  Q    Who is Dominick?

22  A    Dominick Pizzonia.

23  Q    That's the club that Dominick Pizzonia was running at the

24  time?

25  A    Yeah.

Case 1:08-cr-00076-JBW Document 14-27 Filed 03/10/08 Page 207 of 254

1   Q    Did you ever meet Mr. Corozzo at Cafe Liberty?

2   A    Yeah.

3   Q    What did Mr. Corozzo say to you?

4   A    That it would be fine, if I could drop it off at the club

5   every week and I said yeah.

6   Q    Did you drop off money at the club every week?

7   A    Yes.

8   Q    Was that cash or check?

9   A    Cash.

10  Q    How many weeks did you drop off cash?

11  A    Three or four weeks.

12  Q    Did that money go to Mr. Corozzo?

13  A    Yeah.

14  Q    Who did you drop the money off to in the club before it

15  went to Mr. Corozzo?

16  A    I gave it to Dominick.

17  Q    That's Dominick Pizzonia?

18  A    Yes.

19  Q    Do you recall dropping off a last payment?

20  A    Yes.

21  Q    Who did you give that to?

22  A    I gave it to Dominick.

23  Q    Where?

24  A    In the kitchen of the club, he was cooking.

25  Q    That's Cafe Liberty?

Case 1:03-cr-00636-JBW Document 4270 Filed 03/30/18 Page 208 of 254

1   A    Yes.

2   Q    Was anybody else there when you dropped off the money?

3   A    Freddy was there.

4   Q    When you say "Freddy," who is that?

5   A    Freddy DiCongilio.

6   Q    And did Mr. Corozzo speak to you after you dropped off

7   that money?

8   A    Mr. Corozzo, no.

9   Q    Did somebody contact you about the money a couple of

10  weeks later?

11  A    A couple of days later.

12  Q    A couple of days later?

13  A    Uh-huh.

14  Q    Who contacted you and what did they say?

15  A    That it was never paid -- oh, excuse me, Joseph did

16  contact me and told me that it wasn't -- that he never got the

17  last payment and then I went back to the club.

18  Q    So, how many days after you dropped off the payment were

19  you contacted by Mr. Corozzo?

20  A    Maybe four, five days later.

21  Q    What did he say to you?

22  A    He said that he didn't get the last $500.

23  Q    What did you do in response?

24  A    I went to the club.

25  Q    Did you talk to anybody there?

Case 1:03-cr-00929-NGG Document 427-2 Filed 03/10/08 Page 209 of 254

1   A    I spoke to Dominick.

2   Q    What did you say to him and what did he say to you?

3   A    I said what happened with the money, I gave you the money

4   for Joseph, he never got it and he told me I never gave it to

5   him.

6   Q    What was the tone of that discussion?

7   A    Very loud.

8   Q    What did he go on to say?

9   A    He started calling me names and, you know, yelling at me

10  that I was full of shit and, you know, I never gave him the

11  money and I said, yes, I did, you stuck it in your back

12  pocket.  Then I asked Freddy, I said, Freddy, you saw me give

13  him the money.  Freddy just put his head down and made out I

14  wasn't talking to him and then I just left.

15  Q    Did anything happen a few days later after that

16  discussion?

17  A    Yes.

18  Q    What happened?

19  A    They sent for me to come to the club to see Dominick.

20  Q    Did you go to the club?

21  A    Yes.

22  Q    What happened when you went to the club?

23  A    He took me outside, he apologized, he said Johnny Beano

24  came, he gave the money to Johnny Beano and Johnny Beano

25  thought it was for Joseph's father, Jo Jo, it was just a

1    mix-up and he realized it was the 500 I had given him for

2    Joseph so he apologized to me.

3    Q    Now, where did that discussion take place?

4    A    Outside the club.

5    Q    After that was it resolved?

6    A    Yes.

7    Q    What effect did that incident have on your relationship

8    with Dominick Pizzonia?

9    A    It started -- it was not a good -- not good, not good.

10             THE COURT:  Excuse me, stop.  Is the other witness

11    here?

12             MS. PETERSEN:  Your Honor, the witness is not here

13    yet.  There was a mix-up where the witness is being held.  The

14    marshals are here, they can explain.

15             THE COURT:  I don't want any explanation, I just

16    want the witness.  When will he be here?

17             MS. PETERSEN:  Their current estimate is it could be

18    about an hour.

19             THE COURT:  Tell the jurors there's a -- we can't

20    get a witness in until about 11:15, if they want to go for a

21    walk they can.

22             Proceed.

23    Q    In the past have you contacted Mr. Corozzo when you've

24    been approached by law enforcement?

25    A    Yes.

Case 1:03-cr-00929-NGG Document 427-2 Filed 03/30/09 Page 211 of 254

1  Q    Was that both when you were in prison and when you were

2  out of prison?

3  A    Yes.

4  Q    How many times were you approached by law enforcement

5  while you were in prison?

6  A    Twice.

7  Q    When was the first time?

8  A    A few weeks after my father passed away.

9  Q    When was that?

10 A    March of '99.

11 Q    What law enforcement agency approached you?

12 A    The FBI.

13 Q    What did they say was the purpose of approaching you?

14 A    That if I could help them, that they had information that

15 I had information about unsolved homicides.

16 Q    Did you agree --

17            THE COURT:  Excuse me, how does this reflect on the

18 issue before me now?

19            MR. LIPTON:  Because, Your Honor, he contacts

20 Mr. Corozzo in relation to this.

21            THE COURT:  Oh, okay.

22 Q    Did you agree to help the FBI?

23 A    No.

24 Q    What did you do as a result of being approached?

25 A    I called Joseph up.

Case 1:03-cr-00929-NGG Document 1427-2 Filed 03/30/18 Page 212 of 254

1  Q    Why did you call him up?

2  A    To let him know that the FBI came to see me so he could

3  tell, you know, so he knew and his uncle would know and his

4  father would know so nobody would think I was doing anything

5  wrong.

6  Q    When was the second time you were approached?

7  A    When Tony Pep and Freddy got arrested in Florida.

8  Q    Was that around 1999?

9  A    No, it was after that.

10 Q    What law enforcement agencies approached you there?

11 A    An FBI agent came up to see me and a U.S. Attorney from

12 Florida, they flew up from Florida.

13 Q    That was while you were in prison still?

14 A    Yes.

15 Q    What did they say was the purpose of approaching you for

16 that time?

17 A    They asked me if I was willing to cooperate against Tony

18 Pep and Freddy, that they were willing to help me.

19 Q    Did you agree to help them?

20 A    No.

21 Q    What did you do as a result?

22 A    I called up Joseph.

23 Q    Why did you call him that night?

24 A    Because that's what I did, just for the same reason, so

25 he knew what was going on and nobody would think I was doing

Case 1:03-cr-00760-UWE-RD Document 4-27-2 Filed 08/30/08 Page 213 of 254

1  anything and so everybody knew what was going on.

2  Q    Did Mr. Corozzo ever come to visit you in prison?

3  A    Yes.

4  Q    Where were you housed?

5  A    Schyulkill.

6  Q    Who did he come to see when he came to visit you?

7  A    He came to see Greg DiPalma, Anthony Pipolla and myself.

8  Q    Did he see you in prison?

9  A    Yes.

10 Q    Did you ever mail anything to Mr. Corozzo while you were

11 in prison?

12 A    Yeah, I mailed him some paperwork and I mailed him some

13 personal photos.

14 Q    Who were the personal photos of?

15 A    Of me, my father, his father, his uncle, Lenny, his

16 mother.

17 Q    Is that one of the photographs that you gave to the

18 government in this case?

19 A    Yes.

20 Q    When you got out of prison from the Florida case was your

21 brother contacted by the FBI?

22 A    Yes.

23 Q    What's your brother's name?

24 A    Albert.

25 Q    What did you do once your brother was contacted?

A. Ruggiano - direct - Lipton                          2625

1    A    I got in touch with Joseph.

2    Q    After that was Albert Ruggiano subpoenaed to the grand

3    jury?

4    A    Him and his wife were both subpoenaed.

5    Q    Did they tell you about that?

6    A    Excuse me?

7    Q    Did they tell you about that?

8    A    Yes.

9    Q    What did you do?

10   A    I contacted Joseph.

11   Q    Did Mr. Corozzo recommend an attorney for your brother

12   and his wife?

13   A    Yes.

14   Q    Who was that?

15   A    Laura Hoffmeir -- I can't pronounce her last name.

16   Q    Did you and your brother and his -- did you and your

17   brother meet with that attorney and Mr. Corozzo?

18   A    Yes.

19   Q    Now, after Mr. Pizzonia got indicted in this case but

20   before you got indicted did you help Mr. Corozzo with Dominick

21   Pizzonia's defense?

22   A    Yes.

23   Q    Did Mr. Corozzo call you and ask you questions about

24   potential witnesses?

25   A    Yes.

Case 1:03-cr-00364-UBE/RD Document 14-27-2 Filed 02/04/09 Page 215 of 254

A. Ruggiano - direct - Lipton                    2626

1   Q    Did he call and ask you to contact potential witnesses?

2   A    Not till after I got indicted.

3   Q    After you got indicted did he call and ask you to get in

4   contact with witnesses?

5   A    Yes.

6   Q    Who was that?

7   A    A fellow named John, Baby John.

8   Q    Baby John?

9   A    Yeah.

10  Q    What did he ask you to do?

11  A    If he could see him because he needed to speak to his

12  brother, he wanted to speak to his brother.

13  Q    Were you told what the purpose of getting in touch with

14  him was?

15  A    Yeah, we wanted to get information about Peter Zuccaro.

16  Q    And how were you supposed to do that?

17  A    To meet with him, we were -- we contacted his brother,

18  John came to see us and then Joseph was supposed to go meet

19  him and his brother at his place where he worked in the

20  airport.

21  Q    Do you know if Mr. Corozzo met them?

22  A    He met with Baby John, I don't know if he ever met with

23  the brother.

24  Q    Was there anybody else that Mr. Corozzo asked you to get

25  in touch with?

A. Ruggiano - direct - Lipton                    2627

1   A    Yeah, Ralphie and his brother.

2   Q    Who is Ralphie and his brother?

3   A    I forget their last name, some guy Ralphie, he used to

4   hang around with us.

5   Q    What was the purpose, to your understanding, of why

6   Mr. Corozzo wanted to get in touch with them?

7   A    We heard that his brother was cooperating with the

8   government, he was Peter Zuccaro's co-defendant, we wanted

9   information.

10  Q    Do you know if Mr. Corozzo ever talked to that

11  individual?

12  A    No.

13  Q    Did Mr. Corozzo ever ask you for photographs?

14  A    Yes.

15  Q    Of what?

16  A    Of parties that my brother-in-law attended with my

17  sister.

18  Q    That's your brother-in-law, Frankie Boccia?

19  A    Yes.

20  Q    Did he tell why you?

21  A    Yeah, for trial, for defense to show how we got along,

22  that we had a good relationship, you know, that he was always

23  happy, you know, stuff like that.

24  Q    Did you get those photographs?

25  A    I brought him picture albums that he looked through, yes.

Case 1:03-cr-00930-URB/ERD Document 1427-2 Filed 08/30/08 Page 38 of 254

```
1   Q    And you indicated that after you got indicted in this
2   case or before you got indicted, rather, before were you
3   contacted by the FBI?
4   A    Yes.
5   Q    And what did you do after being contacted by the FBI?
6   A    I went to see Joseph.
7   Q    And did you discuss representation with him?
8   A    Yes.
9   Q    What was that discussion?
10  A    Well, he said he couldn't if I got -- I figured, I
11  thought I was going to get indicted in the future and he said
12  he couldn't represent me because he already was representing
13  Dominick so I told him I would retain Anthony Lombardino in
14  the beginning and he said that's fine, you know, if we go to
15  trial, you know, I rather you use somebody else than
16  Mr. Lombardino.  And I said, fine, you know, I have no money.
17  He said, we'll cross that bridge when we come to it, something
18  to that effect.
19  Q    And did you tell Mr. Corozzo anything with regard to the
20  murder of your brother-in-law?
21  A    Yes.
22  Q    What did you tell him?
23  A    I told him that I was the last person with him, I picked
24  him up at his house.
25  Q    Once you got arrested did you in fact retain
```

1    Mr. Lombardino?

2    A    Yes.

3    Q    Did he come to see you when you were housed at the MDC?

4    A    Yes.

5    Q    Who was he with?

6    A    Joseph.

7    Q    Early on did you discuss trying to get a plea in this

8    case?

9    A    Yeah.

10   Q    What did you discuss with Mr. Corozzo?

11   A    I told him that if they offered me ten years right now,

12   I'd take it.

13   Q    What did Mr. Corozzo say to you?

14   A    He said, boy, you love to go to jail.

15   Q    What else did he say?

16   A    He says we're not taking no pleas, we're going to go to

17   trial, they have no case.

18   Q    Did Mr. Corozzo make any comments about the government,

19   how they felt about your family?

20   A    Yes.

21   Q    What did he say?

22   A    He said they hated me.

23   Q    Did he say anything about your father?

24   A    He said if they could dig him up from the ground and

25   resurrect him, they'd reindict him.

Case 1:03-cr-00696-JBW Document 427-2 Filed 03/20/08 Page 219 of 254

A. Ruggiano - cross - Corozzo                2630

1          MR. LIPTON:  Thank you, sir.  Nothing further, Your

2    Honor.

3          THE COURT:  Cross.

4          MR. COROZZO:  May I, Your Honor?

5          THE COURT:  Yes.

6          MR. LIPTON:  I thought we addressed this, the whole

7    point of not having Mr. Corozzo cross him at trial.

8          THE COURT:  On this issue, yes.  I can't prevent the

9    cross on this issue but the question of whether he can cross

10   during the trial is another one.

11   CROSS-EXAMINATION

12   BY MR. COROZZO:

13   Q    When you discussed with Joseph Corozzo before you get

14   indicted last seeing Frankie Geeky Boccia, you told Joseph

15   Corozzo, did you not, that you dropped him off somewhere and

16   you never saw him again, right?

17   A    I told him I was the last person with him.

18   Q    You told Mr. Corozzo you were not involved in his murder,

19   correct?

20          THE COURT:  No, I don't want this.

21          MR. COROZZO:  Well, Your Honor, it goes to this --

22   I'll ask it --

23          THE COURT:  Why don't you direct your

24   cross-examination to the issue before us which is whether you

25   are in fact this witness' attorney.

Case 1:03-cr-00929-JBW Document 427-2 Filed 03/30/09 Page 220 of 254

1          MR. COROZZO:   Fine, Your Honor.

2    Q    Drawing your attention to the 1995 case, isn't it a fact

3    that Jeffrey Hoffman negotiated that plea for you?

4    A    No.

5    Q    Wasn't it a fact that when there was a -- originally a

6    global plea where everyone was given a certain set of numbers

7    and your numbers were three to six and you sent Jeffrey

8    Hoffman back to renegotiate?

9    A    Never.

10   Q    Wasn't it Jeffrey Hoffman who is the one that suggested

11   to Jerry Brave, the Assistant District Attorney in that case,

12   that if Mikey Gal Guerrieri, who was offered probation, would

13   take some time, that your deal would be less?

14   A    Not to my knowledge.   First I ever heard of that is right

15   now.

16   Q    And you never had a conversation with Mr. Hoffman about

17   that?

18   A    Never.

19   Q    You never had any conversations with Mr. Hoffman about

20   the offers in your case?

21   A    I had a 15 minute discussion with Mr. Hoffman in his

22   office by accident.

23   Q    Is it your testimony that Mr. Hoffman never appeared in

24   court for you?

25   A    I don't ever remember him appearing in court for me.

A. Ruggiano - cross - Corozzo                    2632

1   Q    How many times did you appear in court from your initial

2   arraignment till your sentence?

3   A    Maybe six times.

4   Q    You always had an attorney there, correct?

5   A    Yeah, you.

6   Q    How many times?

7   A    Every time I was there except the last time, except when

8   Pollak showed up at my sentencing.

9   Q    So, I represented you on your plea, that's your

10  testimony, right?

11  A    You negotiated the plea, yes.

12  Q    I represented you in court, according to your testimony,

13  on your plea, right, because Hoffman -- Pollak only showed up

14  one time at the sentence?

15  A    Pollak showed up when I got sentenced.

16  Q    So, at your plea -- you're saying that Joseph Corozzo

17  represented you at your plea?

18  A    I got the plea the day of my sentence.

19  Q    What about the day of your plea, sir?

20  A    I pleaded guilty the same day I got sentenced.  There was

21  no day of my plea, I don't know what you're talking about.

22  Q    It is your testimony that you pled guilty the same day of

23  your sentence?

24  A    Yes, I did.

25  Q    Was Joseph Corozzo even there?

A. Ruggiano - cross - Corozzo          2633

1   A    Yes, he was.

2   Q    Okay.  And all the prior appearances, it is your

3   testimony that either Jeff Hoffman or John Pollak appeared for

4   you in court?

5   A    Pollak appeared for me once in court and I don't remember

6   Jeffrey ever being there.

7   Q    My question is prior to the date that you said you took

8   your plea and were sentenced on the same day, it is your

9   testimony that Jeff Hoffman nor John Pollak ever appeared for

10  you before that day, correct?

11  A    Pollak never did, Jeffrey may have did once, I don't

12  remember if he ever came.

13  Q    So, you don't recall if you were represented by Joseph

14  Corozzo or other attorneys?

15  A    I was represented by you as far as I was concerned.

16  Q    Okay.  When you went to the offices of 260 Madison

17  Avenue, who did you arrive at the offices with when you went

18  the three or four times?

19  A    Ronnie Ferrari.

20  Q    Did you ever come by yourself?

21  A    For that case, I don't remember coming by myself.

22  Q    And it is your testimony that when you were indicted in

23  the Southern District of Florida, the original attorney was

24  Linda Sheffield, correct?

25  A    No, she was never my -- she was the first attorney I

Case 1:08-cr-00076-BVB ERD Document 247-2 Filed 03/30/09 Page 223 of 254

1    contacted.

2    Q    And how did you  -- was she recommended by someone?

3    A    No, I was friends with her, I knew her through my father.

4    Q    And it is your testimony that Joseph Corozzo told her to

5    stay off the case, correct?

6    A    Told her to mind her business.

7    Q    And not get involved in the case, correct?

8    A    Correct.

9    Q    And then there comes a point in time when you're indicted

10   on that case?

11   A    I was already indicted.

12   Q    Who represented you at arraignment?

13   A    Some court appointed attorney, I don't know, I was taken

14   there by the marshals.

15   Q    Did you meet with Joseph Corozzo at that time?

16   A    Not at my arraignment, no.

17   Q    How far after did you meet with Joseph Corozzo?

18   A    I don't know, I think I met with you maybe a week later

19   you came down, I don't remember, not too long after I got down

20   to Florida.

21   Q    And who was your attorney on that case?

22   A    Paul McKenna.

23   Q    And how did you get Mr. McKenna?

24   A    We knew him, I knew him.

25   Q    When you say "we" --

Case 1:03-cr-00929-JBW Document 1270 Filed 08/07/08 Page 224 of 254

1    A    Me and my father knew him.

2    Q    He had represented your father in the past, correct?

3    A    Yes, he was -- he worked for the attorney that did

4    represent my father.

5    Q    And had Linda Sheffield ever represented your father in

6    the past?

7    A    Yes, she did.

8    Q    Had Hoffman and Pollak ever represented your father in

9    the past?

10   A    Pollak did motions for my father, yes.

11   Q    Did Joseph Corozzo have anything to do with you retaining

12   Paul McKenna?

13   A    No.

14   Q    And you've testified that Hoffman and Pollak was paid by

15   Joseph Corozzo for the 1995 gambling case, correct?

16   A    Yeah.

17   Q    And who told you that?

18   A    Ronnie gave you the money so I don't know, I didn't give

19   anybody any money.

20   Q    Did you see Ronald Ferrari give me money for John Pollak

21   and Jeff Hoffman?

22   A    No, he told me that he had to give you -- he was giving

23   you 50,000, him and Frankie were giving you 50,000 each to pay

24   the attorneys.

25   Q    And it is your testimony that that's all you know about

A. Ruggiano - cross - Corozzo                    2636

1  it, you don't know if they paid Hoffman and Pollak directly or

2  they paid Corozzo?

3  A     He never gave -- he paid Pollak for pretrial motions.

4  Q     Who paid Hoffman and Pollak for pretrial motions?

5  A     Frankie and Ronnie.

6  Q     Who paid Hoffman and Pollak to represent you at your plea

7  and sentencing?

8  A     Nobody paid them, they were paid -- we gave you $100,000,

9  I don't know what you did with the money.

10  Q     When you say "we gave you," who are you talking about?

11  A     Ronnie and Frankie gave you $100,000, what you did with

12  it was no bearing on me.  I had -- you know, they were in

13  charge of that, it was their response.

14  Q     How much did Ronnie and Frankie give Hoffman and Pollak?

15  A     I have no idea.

16  Q     Didn't you just say 50,000?

17  A     They gave you 50,000 each, they never gave Hoffman and

18  Pollak ten cents.

19  Q     As far as your understanding?

20  A     As far as I know, yes.

21  Q     As far as what you were told, right?

22  A     Yes.

23  Q     Now, when you're in jail and you're contacted by the FBI,

24  you call Joseph Corozzo?

25  A     Yes.

Case 1:03-cr-00929-NGG Document 427-2 Filed 08/30/08 Page 226 of 254

1    Q    And prior to that you let the other inmates in the jail

2    know that you were contacted by the FBI, correct?

3    A    When I came off the visit, yeah, sure.

4    Q    You let everybody, the people closest to you in the jail

5    know so that they would not suspect you were doing anything

6    wrong, correct?

7    A    Yeah, well, they knew it was FBI because the visiting

8    room was closed, it was on a Tuesday or Wednesday so they knew

9    it wasn't a regular visit.

10   Q    And when you called Joseph Corozzo, you understood those

11   calls to be monitored recordings, correct?

12   A    Sure.

13   Q    And you reported to Joseph Corozzo -- did you direct him

14   to do something with the information you were giving him?

15   A    No.

16   Q    You just told him that the FBI was there, correct?

17   A    Yes, and what they questioned me about.

18   Q    And no further direction, correct?

19   A    No.  Say hello to your father, how's your uncle, you

20   know, nothing, that's about it.

21   Q    And when your brother Albert is contacted by the FBI, do

22   you go to Joseph Corozzo and try to obtain representation?

23   A    Yes.

24   Q    What were you told?

25   A    That you couldn't do it because you represented Dominick.

2638

1   Q    And you were told the same thing when you were indicted

2   also, correct?

3   A    When I was contacted by the FBI.

4        MR. COROZZO:  Your Honor, I have no further

5   questions.

6        THE COURT:  All right.  I'll hear argument.

7        You can step out.  Take the witness out please.

8        (Witness steps down.)

9        THE COURT: Yes.

10       MR. LIPTON:  Yes, Judge.  It is the government's

11  position that because of the attorney-client relationship

12  through the joint defense agreement that was part of the

13  1994-95 Queens County gambling case and also for the Southern

14  District of Florida case that there is an issue with regard to

15  the witness having conveyed certain confidences in those

16  discussions, in those meetings that Mr. Corozzo has.  And the

17  law is pretty clear that if those conversations divulge

18  confidential communications, that if it is the one attorney,

19  even if he's not representing the defendant, if it's in the

20  context of the joint defense agreement, that that qualifies as

21  confidential communications to the other defendants' attorneys

22  who are present.

23       There's a long standing relationship between the

24  witness and Mr. Corozzo, their families, the Ruggianos and the

25  Corozzos.  Mr. Corozzo -- Mr. Ruggiano confided and trusted in

Case 1:03-cr-00929-NGG Document 247-2 Filed 03/04/08 Page 228 of 254

1   Mr. Corozzo.  He is the person that he would go to whenever he

2   got into legal trouble from the 1994 case on, after he was

3   charged with new crimes in the Southern District of Florida

4   case and then every time he was contacted by law enforcement

5   thereafter up until he cooperated in this case it was

6   Mr. Corozzo who he trusted and it was Mr. Corozzo who he went

7   to to get information and advice and even when Mr. Hoffman was

8   his attorney of record in the bookmaking case, he still went

9   to Mr. Corozzo to ask questions about the case because that's

10  who he trusted and that's who he looked to to get his

11  information.  There's no question that Mr. Hoffman was

12  probably attorney of record but it was Mr. Corozzo, as

13  Mr. Ruggiano testified, who was the one who provided the

14  information about the case.  I think the long-standing

15  relationship between Mr. Corozzo and the witness, the

16  attorney-client relationship that was forged because of the

17  joint defense meetings create a problem if he's going to

18  testify at this trial not only because there's those

19  confidences that were conveyed but also because there is an

20  unsworn witness problem with a number of the things that are

21  going to come up in this trial.

22          Mr. Corozzo was told and it was discussed with him

23  with this witness about issues relating to the bookmaking

24  case, about issues relating to stuff that may come up in the

25  Florida case and just by way of example, it's already come up

1  with one witness, Mr. Vitale where it came out that Mr. Vitale

2  lied to, before he began cooperating, to his sentencing judge

3  about having a drug or alcohol problem so he could get the BOP

4  drug treatment program.  That's something that -- that

5  happened in this case with Mr. Ruggiano when he was in the

6  Florida case and it was amongst the defendants and defendants'

7  attorneys that those discussions took place that Mr. Ruggiano

8  was going to convey that to the judge.  His drug history will

9  be a fairly large issue I believe in this case.  It was

10  shortly before the murder of Frankie Boccia back in 1988 that

11  Mr. Ruggiano finally went into a drug rehabilitation center

12  and got clean.  He's now been clean for 18 years, he's

13  regularly going to Narcotics Anonymous meetings and we are

14  going to bring out that he in fact lied to the judge in

15  Florida despite the fact that he's been clean all these years,

16  that he wanted to try to get the time off his sentence and

17  that was done amongst Mr. Corozzo and his attorney and he's

18  going to know that that's going to be an issue that is going

19  to be brought out and, Your Honor, for all those reasons we

20  think it is, especially based on Your Honor's recommendation

21  with the prior witness that there wasn't a conflict here that

22  required disqualification and once Mr. Ruggiano began

23  cooperating, the way the government presented it to Your Honor

24  was we understand Your Honor's position on the

25  disqualification issue and we weren't going to address it

1   again because it had been pretty clear how Your Honor felt

2   about that but as a stopgap measure and a way to safeguard not

3   only the witness but the government in not having Mr. Corozzo

4   cross-examine this witness unfairly with information that he

5   had conveyed to him and that being unfair to the government,

6   we just ask that he be precluded from cross-examining this

7   witness, this one witness and we think that's the appropriate

8   remedy in this case, Your Honor.

9          MR. COROZZO:   Your Honor, this witness has not

10  conveyed any unfair information to me, has not conveyed any

11  information that could be used on cross-examination.

12         First, I'd like to quote from his sentencing

13  minutes, what his attorney said at the time, it is on page

14  seven of Exhibit AR-1.  In addressing the Court in asking for

15  a recommendation for the BOP substance abuse policy, Mr. Paul

16  McKenna, who I had never met prior to that case, Your Honor,

17  stated in reference to Mr. Ruggiano:  He has had a serious

18  drug history, he has been placed in in-house narcotics

19  treatment centers before, he has had a serious cocaine

20  addiction, a serious drug addiction for quite a while.

21         Your Honor, it's truthful.  The government is trying

22  to twist that around to suggest that there was some plot

23  amongst multiple defense attorneys, at least three according

24  to Mr. Ruggiano, and multiple defendants to lie to a judge but

25  what Mr. McKenna said was accurate, Your Honor.  If I had

1    time, I'd bring Mr. McKenna in.  I could get Mr. Frank Rubino

2    who was another attorney on the case who I never met prior to

3    that case and I'm sure they would affirm the same information.

4            As far as Ms. Sheffield, I would like to call

5    Ms. Sheffield if the Court is considering that statement that

6    she was told to stay off the case.  I have known Linda

7    Sheffield for some time, she practices in this district, her

8    home district is in Georgia, the District of Georgia, and

9    specifically, Your Honor, state sentencing procedures, on his

10   1995 case he was sentenced to upstate time between two to four

11   years in jail, he was not -- he didn't plead and was sentenced

12   on the same exact date.  If I can go to the record and if I

13   can get Mr. Hoffman here, it will clarify how many times

14   Hoffman and Pollak appeared.  According to Mr. Pollak, his

15   testimony, they were paid directly from the clients, they were

16   not paid from any funds that were given to me.  I could call

17   Mr. Hoffman for those purposes also.

18           Your Honor, the bottom line is there was nothing

19   ever imported to me that was intended to be privileged, that

20   was privileged or that can be used against this witness.

21           The other -- the last issue is this witness

22   testifies that he informed me while I'm preparing for this

23   trial that he was the last person to see Frank Boccia, dropped

24   him off at a pay phone, the same thing that I believe

25   Mr. Zuccaro said he had told the family around that time.  If

1    his -- if his testimony under oath now is that he was involved

2    in the murder, he saw the murder, he didn't tell me that, Your

3    Honor, and that's clear; again, no information that can be

4    used against him, nothing that was intended to be privileged.

5    The three or four meetings pursuant to the 1995 case which

6    Mr. Pollak already testified to and this witness alludes to

7    was for listening to tapes.  On those types of cases instead

8    of hiring lawyers to listen to tapes, the co-defendants were

9    listening to tapes.  That was done -- the tapes were in

10   Mr. Pollak's office, it was done in our joint conference room

11   and there was interaction during that time, nothing

12   privileged, listen to the tapes, take notes for us of what's

13   on the tapes.  That's the sum and substance of it all, Your

14   Honor.  With time I could get the Queens record and I could

15   get the other attorneys to verify.

16            THE COURT:  It is a difficult problem, it has been

17   from the very first because of counsel's natural history and

18   natural familial associations with criminals in these gangs,

19   for witnesses such as this to believe that counsel was

20   conducting their defense and the defense of others under the

21   direction and with the concurrence of counsel's relatives who

22   were concededly, by these witnesses at least, high officials

23   in these gangs.

24            Counsel is an admitted member of the bar.  A

25   presumption of bona fides accompanies such a qualification.

2644

1   The Court believes the witness' statement that he thought that

2   counsel was in fact his attorney and his representative and

3   could properly receive confidential communications which would

4   be protected as a result of that relationship over a long

5   period of time.  There's no doubt that this could be an

6   awkward cross-examination as it has in the case of another

7   witness who responded to a question from the cross-examiner

8   and held back at the last moment from addressing him in a

9   personal way as somebody he had associated with in various

10  meetings and public celebrations.

11          The difficulty is that I can't disqualify counsel at

12  this moment in the trial and I don't think there's very much

13  to be gained by having another attorney actually doing the

14  cross-examination because if that cross-examination is to be

15  effective, counsel will have to in effect direct it by feeding

16  questions because of counsel's comprehensive and skillful

17  knowledge of all of the details of the case.

18          Should I require another attorney to come in now,

19  the jury, which is very sensitive and sophisticated, will

20  immediately gather a connection between the witness and

21  counsel and, therefore, between counsel and his attorney --

22  his present client and that will affect their assessment of

23  credibility.

24          I direct counsel not to ask questions such as this

25  on his cross-examination, didn't you tell me the following,

2645

1    wasn't I there when you said such and such.  Beyond that, I

2    don't see practically what could be done.

3        If the government wishes to bring any of this

4    material to the attention of the disciplinary committee, it's

5    free to do so.  The matter has arisen in the Southern District

6    in a formal way, as I understand it, before a Southern

7    District judge.  The primary function of the Court at this

8    stage of the proceeding is to see that these two defendants

9    and the government receive an absolutely impartial trial and

10   for the Court to intervene as the government requests would in

11   effect be for the Court to place its thumb on the scale and

12   affect the possible outcome.

13       (So, weighing all the dangers and the facts, the

14   government's motion is denied.

15       Is there anything further?

16       MR. LIPTON:  Not at this time Your Honor, no.

17       THE COURT:  Where is your witness?

18       MR. BATCHELDER:  May I stand, sir?

19       THE COURT:  Yes.

20       MR. LIPTON:  The Marshals said that they were going

21   to be coming in as soon as they got him.  I just -- we haven't

22   seen him.  I apologize, I just think it was a --

23       THE COURT:  All right.  Tell the jury we're still

24   waiting please.  And let me know immediately so I can convene

25   the Court.  We simply have to go forward with this case, it's

Case 1:03-cr-00074-RBW Document 427-2 Filed 03/20/18 Page 235 of 254

2646

1   becoming a burden to the jury.  I'm perfectly willing to work

2   six days a week but the jury cannot work over the weekend, or

3   at least so they inform me.

4                  (Time noted:  10:55 a.m.)

5                  (Recess taken.)

6

7

8                  (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

for some time from his work as a cab driver in Guyana (*id.* at 6, 16, 20), the Court concludes that there is no basis on which to suppress the out-of-court identification by this witness, nor to preclude the witness from identifying the defendants at the time of trial.

Accordingly, this Court respectfully recommends that defendants James and Mallay's motions to suppress the photograph identification of this witness be denied.

### E.  *Documents Submitted for In Camera Review*

On October 12, 2005, this Court issued a Report and Recommendation relating to various discovery motions filed by defendants in this action, including a motion seeking to require the government to disclose certain information relating to a potential government witness, Camuldeen Allie.  The defendants argued that they had a good faith basis for believing that the government was withholding certain *Brady* and *Giglio* material that should be disclosed relating to Mr. Allie's role in the murder of Vernon Peter and statements that Mr. Allie may have made that would exculpate the defendants.  In the Report issued by this Court on October 12, 2005, this Court Ordered the government to produce copies of its files relating to Mr. Allie for *in camera* review.

Having now reviewed the files and videotape submitted by the government, the Court hereby Orders the government to produce the Order, dated May 20, 1994, issued by a Justice of the Supreme Court, County of Queens, to the Department of Correction, New York City, to convey Camuldeen Allie to the custody of Riker's Island Mental Health Center Admissions Unit.  Further, the Court relies on the government's representation in its letter of October 24, 2005 to defendants' counsel that it has produced to counsel the psychi-

atric reports for Camuldeen Allie dated December 20, 1993, May 9, 1994, and July 20, 1994.  Finally, the Court awaits delivery of an unredacted copy of one document from the government.  The Court will issue a decision regarding the production of this document upon its receipt.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

November 10, 2005.



---

**UNITED STATES of America,**

v.

**Dominick PIZZONIA, Defendant.**

**No. 05–CR–425 (JBW).**

United States District Court,
E.D. New York.

Feb. 14, 2006.

**Background:**  Defendant was charged with participating in a racketeering conspiracy predicated on murder, extortion, and loan-sharking. Government moved to disqualify defendant's attorney.

Case 1:08-cr-00054-JBW-RER Document 4366 Filed 08/19/19 Page 237 of 254

**Holdings:** The District Court, Weinstein, Senior District Judge, held that:

(1) defense counsel's cross-examination of government witness, for whom he had formerly acted as an investigator, would not interfere with trial or make it appear unfair, as would warrant disqualification of counsel on basis of conflict of interest;

(2) defense counsel's cross-examination of cooperating witness who had been a co-defendant of a former client would not be limited under the "common interest" rule, as would warrant disqualification of counsel on basis of conflict of interest;

(3) defense counsel's simultaneous representation of unindicted co-conspirators in the murders of which defendant was accused did not give rise to a conflict of interest that would warrant disqualification of counsel;

(4) fact that defense counsel's father and uncle were members of same organized crime family that defendant was alleged to be a member of did not warrant disqualification;

(5) defendant validly waived conflict stemming from criminal investigation of his counsel; and

(6) defense counsel was not acting as "house counsel" to organized crime family, as would warrant counsel's disqualification.

Motion denied.

**1. Criminal Law ⟳641.5(.5), 641.10(1)**

The Sixth Amendment right to an attorney includes both the right to counsel of one's own choosing, and the right to an attorney unimpaired by conflicts of interest. U.S.C.A. Const.Amend. 6.

**2. Criminal Law ⟳641.5(7), 641.10(1)**

When a defendant seeks to be represented by an attorney with divided loyalties, the right to counsel of choice conflicts with the right to an attorney of undivided loyalty collide, and the choice as to which right is to take precedence must generally be left to the defendant and not be dictated by the government. U.S.C.A. Const. Amend. 6.

**3. Criminal Law ⟳641.5(.5), 641.10(1)**

The presumption in favor of a defendant's choice of counsel may be rebutted by a showing of either actual conflict or serious potential for conflict. U.S.C.A. Const.Amend. 6.

**4. Criminal Law ⟳641.5(7)**

Once a court is apprised of the possibility of a conflict of interest, it must determine whether the defendant can waive the right to a conflict-free attorney. U.S.C.A. Const.Amend. 6.

**5. Criminal Law ⟳641.5(.5)**

A conflict is either potential or actual; a "potential conflict" arises if the interests of the defendant could place the attorney under inconsistent duties in the future, an "actual conflict" arises when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client. U.S.C.A. Const.Amend. 6.

See publication Words and Phrases for other judicial constructions and definitions.

**6. Criminal Law ⟳641.5(7)**

If counsel suffers from only a potential conflict or an insignificant actual conflict, defendant may waive the right to conflict-free counsel. U.S.C.A. Const. Amend. 6.

Case 1:08-cr-00040-GBL Document 426 Filed 08/40/09 Page 232 of 254

**7. Criminal Law ⟞641.5(7)**

If a conflict of interest can be waived, a hearing is conducted to determine whether defendant's waiver is knowing and intelligent.   U.S.C.A. Const.Amend. 6.

**8. Criminal Law ⟞641.5(7)**

If the attorney suffers from an actual conflict so severe that it impedes effective assistance, counsel should be disqualified notwithstanding defendant's desire to waive the conflict of interest.   U.S.C.A. Const.Amend. 6; Restatement (Third), The Law Governing Lawyers § 122(2).

**9. Criminal Law ⟞641.5(.5)**

For purposes of deciding motion to disqualify defense attorney on conflict of interest grounds, multiple conflicts of interest are considered together rather than in isolation.

**10. Criminal Law ⟞641.5(7)**

The court retains discretion to reject a criminal defendant's waiver of defense counsel's conflict of interest in order to protect the integrity of the judicial proceedings and the public's interest in ensuring a just verdict.

**11. Criminal Law ⟞633(1)**

Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.

**12. Criminal Law ⟞699**

Trial judges must apply their independent judgment to ensure that attorneys appearing before them follow the relevant codes of professional conduct.

**13. Criminal Law ⟞641.5(7)**

District Courts have substantial latitude in refusing or accepting a criminal defendant's waiver of defense counsel's conflict of interest.

**14. Criminal Law ⟞641.5(.5)**

An attorney's former representation of a government witness on a substantially related matter can create the potential for serious conflict of interest warranting disqualification, since the attorney may be limited in impeaching a former client or attacking his credibility on summation without becoming an unsworn witness; absent a waiver from the former client, the attorney may not inquire into privileged matters, and this restriction may impair his ability to cross-examine the witness fully.

**15. Attorney and Client ⟞21**

A client who is represented by an attorney on one matter may not inhibit that attorney's freedom in all future, unrelated matters.

**16. Attorney and Client ⟞21**

An attorney is barred from making an argument or cross-examining a former client in a way that could affect the client adversely in a present proceeding.

**17. Attorney and Client ⟞32(13)**

Under the "common interest" rule, counsel's duty of confidentiality extends to a co-defendant of a former client where counsel for both undertook a joint defense.

**18. Attorney and Client ⟞21**

A serious conflict warranting disqualification may arise if the attorney is potentially in a position to use privileged information obtained during prior representation of the former client.

**19. Criminal Law ⟞641.5(.5)**

Cross-examination of a former client will not always lead to disqualification of a criminal defendant's attorney on basis of conflict of interest.

Case 1:08-cr-00076-JBW Document 1426 Filed 06/30/09 Page 239 of 254

**20. Attorney and Client ⟺32(13)**

Not every brief relationship between an attorney and a layman involves the exchange of confidential communications, for purposes of the duty of confidentiality.

**21. Criminal Law ⟺641.5(.5)**

Limited representation of a government witness unrelated to representation of the defendant is not likely to present a disabling conflict of interest that would warrant disqualification of defendant's attorney.

**22. Attorney and Client ⟺21.20**

The burden of establishing that an attorney-client relationship existed between the attorney and the former client is on the party seeking disqualification.

**23. Attorney and Client ⟺21**

Since only the client and the attorney know what confidential communications occurred, the view of the former client is an important factor in deciding whether disqualification is necessary to protect confidential communications.

**24. Criminal Law ⟺641.5(7)**

Absent institutional interests in the integrity of judicial proceedings, and subject to the attorney-client privilege of the former client, a criminal defendant may waive an attorney's conflict arising from prior representation of a trial witness.

**25. Criminal Law ⟺641.5(.5)**

Defense counsel's cross-examination of government witness, who had not waived any attorney-client privilege arising from his earlier communications with defense counsel, would not interfere with trial or make it appear unfair, as would warrant disqualification of counsel on basis of conflict of interest, where counsel acted as an investigator for witness, not as his attorney, defendant's and witness's interests were not legally adverse to each oth-er, and counsel need not have recourse to attorney-client confidences to conduct effective cross-examination of witness.

**26. Criminal Law ⟺641.5(.5)**

Defense counsel's cross-examination of cooperating witness who had been a co-defendant of a former client would not be limited under the "common interest" rule, as would warrant disqualification of counsel on basis of conflict of interest, where alleged communications between cooperating witness, defense counsel, and counsel's former client would affect defense counsel's ability to cross-examine cooperating witness.

**27. Criminal Law ⟺641.5(3)**

Simultaneous representation of a defendant and an unindicted co-conspirator may constitute a conflict of interest if, had there been a joint trial, counsel would have been forced to take contradictory positions in defending both.

**28. Criminal Law ⟺641.5(3)**

Simultaneous representation of an unindicted co-conspirator does not necessarily create an "inherent conflict" limiting a defendant's ability to enter plea negotiations; defense counsel could insist that the defendant's agreement with the government provide that the government could not use the plea as evidence in the trial of his other client.

**29. Criminal Law ⟺641.5(.5)**

Since the duties of loyalty and confidentiality remain in force after the attorney-client relationship has ended, prior representation of an unindicted co-conspirator raises concerns similar to simultaneous representation of an unindicted co-conspirator; if the link between the successive representations or the risk of divulging the former client's confidences is sufficiently attenuated, a conflict does not necessarily arise simply because an attor-

ney previously represented a possible co-conspirator or a potential witness.

### 30. Attorney and Client ⟜32(13)

A partner in a law firm is vicariously bound by the duties of loyalty and confidentiality that his partners owe to their clients. Restatement (Third), The Law Governing Lawyers § 123(1).

### 31. Attorney and Client ⟜21.15

Due to the vicarious obligations of partners, a showing that two attorneys are partners or represent themselves to the world at large as partners, and whose interests overlap in the acceptance of clients and in the sharing of fees is sufficient to ground a conflict of interest claim, assuming that there is proof that the clients' interests may have been in conflict.

### 32. Criminal Law ⟜641.5(3)

Defense counsel's simultaneous representation of unindicted co-conspirators in the murders of which racketeering conspiracy defendant was accused did not give rise to a conflict of interest that would warrant disqualification of counsel, although defendant did possibly reduce the number of defense strategies by continuing to retain defense counsel.

### 33. Criminal Law ⟜641.5(.5, 7)

Allegations that counsel has engaged in criminal activity related to the charges for which the client is on trial create an unwaivable conflict of interest; if the allegations are true, an attorney cannot freely advise the client whether to cooperate, or whether to take the stand at trial, for fear that the client could reveal information implicating the attorney, and if the allegations are false, the attorney cannot examine the government witness regarding the allegations against the attorney without in effect becoming an unsworn witness.

### 34. Criminal Law ⟜641.5(7)

Whether a conflict arising from allegations that defense counsel is generally involved in crime is waivable depends on the connection between the attorney's alleged criminal activity and the charges on which defendant is tried.

### 35. Criminal Law ⟜641.5(.5, 7)

An unwaivable conflict does not arise any time a court learns that a defense attorney may have committed a crime; the attorney's alleged criminal activity must be sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised.

### 36. Criminal Law ⟜641.5(7)

If defense counsel is allegedly involved in crimes that are not substantially related to the charges against the defendant, waiver of the right to a conflict-free attorney is permitted. U.S.C.A. Const. Amend. 6.

### 37. Criminal Law ⟜641.5(.5)

Disqualification of defense counsel based on conflict of interest was not warranted, on ground that defense counsel's father and uncle were members of same organized crime family that racketeering conspiracy defendant was alleged to be a member of, that defense counsel's father desired to have counsel inducted into the family, and that defense counsel had represented well over a score of clients accused of participating in organized crime, where there was no reason that any testimony about defense counsel's alleged criminal associations would be relevant at defendant's trial.

### 38. Criminal Law ⟜641.5(.5)

When counsel is the target of a criminal investigation by the same office that is prosecuting his client, a conflict may be present even without a nexus between the

Case 1:08-cr-00076-JBW Document 436 Filed 08/20/08 Page 241 of 254

attorney's alleged conduct and the charges against his client.

**39. Criminal Law ⇐641.5(.5, 7)**

If the activity for which an attorney is under criminal investigation is substantially related to the charges against the defendant, disqualification is necessary, notwithstanding defendant's waiver.

**40. Criminal Law ⇐641.5(7)**

In the absence of a strong connection between the activity for which defense counsel is investigated and defendant's charges, defendant may generally waive a conflict stemming from a criminal investigation of his attorney.

**41. Criminal Law ⇐641.5(.5, 7)**

Criminal investigations against counsel for defendant charged with participating in a racketeering conspiracy, which related to counsel's alleged obstruction of justice and witness tampering in another criminal prosecution, and the alleged use of attorneys to pass messages for organized crime family, did not bear a strong connection to murder, extortion, and loan-sharking charges against defendant, and, thus, defendant validly waived conflict stemming from criminal investigation of counsel.

**42. Criminal Law ⇐641.5(.5, 7)**

An attorney's loyalties to third parties, including his natural family members, may create a potential conflict of interest if the interests of those other individuals are adverse to those of his client; such a conflict is waivable. Restatement (Third), The Law Governing Lawyers § 125.

**43. Criminal Law ⇐641.5(.5)**

In racketeering prosecutions, a conflict of interest arises if counsel acts as "house counsel" for an organized crime family for two reasons: (1) the attorney's loyalties may be divided between the client and the payor, and (2) the government may use evidence that the attorney acts as "house counsel" to establish the existence of a criminal enterprise, and evidence tending to incriminate the attorney would prejudice the defendant. Restatement (Third), The Law Governing Lawyers § 134(1).

**44. Criminal Law ⇐641.5(.5)**

Defense counsel was not acting as "house counsel" to organized crime family, as would warrant counsel's disqualification in racketeering prosecution against alleged member of crime family, where there was no evidence that counsel was being paid by third parties other than defendant's wife and children for his representation, nor was there any reason to believe that members of organized crime were attempting to limit a good faith and aggressive defense.

———

United States Attorneys Office, Eastern District of New York, Brooklyn, NY, by Winston Y. Chan, Mitra Hormozi, Joseph Lipton, Deborah Sue Mayer, for the United States.

Rubinstein & Corozzo LLP, New York City, by Joseph R. Corozzo, Jr., for Defendant.

Law Offices of Gerald L. Shargel, New York City, by Henry Mazurek, for Defense Counsel.

## AMENDED MEMORANDUM AND ORDER ON DISQUALIFICATION MOTION

JACK B. WEINSTEIN, Senior District Judge.

**174**     **415 FEDERAL SUPPLEMENT, 2d SERIES**

<u>Table of Contents</u>

   I.  Facts ................................................................... 174

  II.  Sixth Amendment ....................................................... 175

 III.  Defense Counsel's Prior Representation of Government Witness ............... 177
       A.  Law ............................................................... 177
       B.  Application of Law to Facts ........................................ 179
           1.  Michael DiLeonardo .............................................. 179
           2.  Primo Cassarino ................................................. 180

 IV.  Defense Counsel's Current and Prior Representation of Unindicted
      Co–Conspirator ....................................................... 180
       A.  Law ............................................................... 180
       B.  Application of Law to Facts ........................................ 181

  V.  Defense Counsel's Alleged Role as Co–Conspirator ........................... 182
       A.  Law ............................................................... 182
       B.  Application of Law to Facts ........................................ 182

 VI.  Criminal Investigation of Defense Counsel ................................. 183
       A.  Law ............................................................... 183
       B.  Application of Law to Facts ........................................ 184

VII.  Defense Counsel's Natural and Alleged Criminal Family Loyalties ............. 184
       A.  Law ............................................................... 184
       B.  Application of Law to Facts ........................................ 185

VIII.  Conclusion ............................................................. 186

Dominick Pizzonia is accused of participating in a racketeering conspiracy involving the Gambino organized crime family. Three murders, extortion and loan-sharking are charged as predicate acts. Citing multiple conflicts of interest, the government has moved for the disqualification of his attorney, Joseph R. Corozzo, Jr. ("defense counsel"). After an evidentiary hearing, the motion is denied. *See United States v. Curcio,* 680 F.2d 881 (2d Cir. 1982) (hearing on motion to disqualify).

**I. Facts**

The government has alleged eight conflicts of interest between defendant and defense counsel: 1) defense counsel's prior representation of government witness Michael DiLeonardo; 2) defense counsel's prior representation of a co-defendant of government witness Primo Cassarino; 3) defense counsel's current representation of Ronald Trucchio, one of defendant's unindicted co-conspirators in what are referred to as "the Uva murders"; 4) defense counsel's prior representation of John Setaro, an unindicted co-conspirator in both the Uva murders and one of the loan-sharking acts; 5) two ongoing investigations of defense counsel by the United States Attorney; 6) defense counsel's position as associate of the Gambino crime family and unindicted co-conspirator; 7) defense counsel's loyalties to his father and uncle, both high-ranking members of the Gambino family; and 8) defense counsel's position as "house counsel" to the Gambino family. Based on somewhat similar allegations, defense counsel was recently disqualified in another case involving the Gambino family. *See U.S. v. Yannotti,* 358 F.Supp.2d 289 (S.D.N.Y.2004).

At the *Curcio* hearing the government presented the testimony of Michael DiLeo-

nardo, a former officer of the Gambino crime family and a key cooperating witness in the instant case who claimed to have retained defense counsel in a prior prosecution. To avoid a possible conflict between defense counsel and his alleged former client, the court ordered that an independent attorney conduct cross-examination of the witness. DiLeonardo testified about his legal and social relationship with defense counsel and defense counsel's continuing relationship with members of the Gambino crime family, including John Gotti, Jr. His testimony was credible and uncontradicted.

The government also submitted two audio-video recordings of defense counsel consulting with John Gotti, Sr.—the late head of the Gambino family—on fairly intimate terms at the United States Medical Center for Prisoners in Springfield, Missouri. The recordings are the subject of another memorandum and order. *See* Amended Mem. & Order on Release of Video Recordings of February 14, 2006.

Defense counsel is an able attorney with considerable experience defending persons accused of participating in organized crime. *See* Gov't Mem. 18–19 (identifying 32 alleged organized crime members and associates represented by defense counsel in the Southern and Eastern Districts of New York). He denies any link to crime warranting disqualification. Defendant has known him from childhood and has great confidence in his skill and devotion. Defendant's natural family strongly concurs.

The evidence submitted by the parties supports the following findings of fact:

1. John Gotti, Jr. assisted defense counsel financially when defense counsel was attending law school.

2. After defense counsel was admitted to practice in New York, John Gotti, Jr. made fairly "regular" payments to him for legal advice and representation on criminal matters.

3. Defense counsel's father and uncle were, and are, members and officers of the Gambino crime family.

4. During a trip to Foxwoods Casino in Connecticut in 1994, defense counsel and members of the Gambino crime family dined together; some "business matters," presumably related to gambling, were discussed.

5. While DiLeonardo—a key government witness in the instant case— was being prosecuted on federal extortion charges in Atlanta, Georgia, he was represented by attorneys at trial, but not by present defense counsel. In March or April of 2001, he asked defense counsel to interview Craig DePalma, a Gambino family member, to determine if DePalma would testify against DiLeonardo. DePalma's name appeared on a government witness list for the Atlanta trial. DiLeonardo tendered a check for one thousand dollars for legal fees to defense counsel. Defense counsel never cashed the check and was not acting as an attorney when making the inquiry about DePalma's intentions. He never acted as DiLeonardo's attorney. He did report back to DiLeonardo that DePalma presented no danger in the Atlanta trial.

6. Funds to retain defense counsel in this prosecution were supplied only by defendant and his family.

## II. Sixth Amendment

[1, 2] "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to an attorney includes both the right to counsel

of one's own choosing, *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988), and the right to an attorney unimpaired by conflicts of interest. *United States v. Perez,* 325 F.3d 115, 125 (2d Cir.2003). When a defendant seeks to be represented by an attorney with divided loyalties, these rights collide. If they do, "the choice as to which right is to take precedence must generally be left to the defendant and not be dictated by the government." *Id.*

**[3, 4]** The presumption in favor of a defendant's choice of counsel may be rebutted by a showing of either actual conflict or serious potential for conflict. *Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700; *United States v. Jones,* 381 F.3d 114, 119 (2d Cir.2004) (citing *United States v. Locascio,* 6 F.3d 924, 931 (2d Cir.1993)). Once a court is apprised of the possibility of a problem, it must determine whether the defendant can waive the right to a conflict-free attorney. *Perez,* 325 F.3d at 125 (*citing United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994)); *Jones,* 381 F.3d at 119.

A serious problem arises when "there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person." Restatement (Third) of the Law Governing Lawyers § 121 (2000) ("Restatement").

**[5, 6]** A conflict is either potential or actual. A potential conflict arises if "the interests of the defendant could place the attorney under inconsistent duties in the future." *Jones* at 119 (emphasis and citation omitted). An actual conflict arises when the attorney's and the defendant's interests "diverge with respect to a material factual or legal issue or a course of action, or when the attorney's representa-

tion of the defendant is impaired by loyalty owed to a prior client." *Jones,* 381 F.3d at 119 (internal quotation marks and citations omitted). If counsel suffers from only a potential conflict or an insignificant actual conflict, defendant may waive the right to conflict-free counsel. *Perez* at 125; *Levy,* 25 F.3d at 153.

**[7]** If a conflict is waivable, a *Curcio* hearing is conducted to determine whether defendant's waiver is knowing and intelligent. *Perez* at 127; *Levy,* 25 F.3d at 153. *See also* Restatement § 122(1) ("Informed consent [to waive a conflict] requires that the client or former client have reasonably adequate information about the material risks of such representation . . . ."). Such a hearing was conducted in the present case with defense counsel represented by an independent attorney.

**[8]** If the attorney suffers from an actual conflict so severe that it impedes effective assistance, counsel should be disqualified notwithstanding defendant's desire to waive. *Perez* at 125; *Jones,* 381 F.3d at 119. *See also* Restatement § 122(2) ("Notwithstanding the informed consent of each affected client or former client, a lawyer may not represent a client if: (a) the representation is prohibited by law; (b) one client will assert a claim against the other in the same litigation; or (c) in the circumstances, it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients."). The category of cases presenting unwaivable conflicts is "very narrow." *Perez* at 126 (noting that unwaivable conflicts have typically involved situations where the defense is "permeated" by counsel's interest in not being implicated in defendant's crime or in securing a large retainer by an adverse party).

Case 1:03-cr-00929-NGG Document 427-6 Filed 03/10/09 Page 46 of 254

**[9]** Multiple conflicts of interest are considered together rather than in isolation. *Levy* at 157 ("Even if we could overlook any one ground of conflict, the myriad connections between [counsel, defendant and co-defendant] oblige us to consider [counsel's] conflicts together."); *Yannotti*, 358 F.Supp.2d at 291–92.

**[10–12]** The court retains discretion to reject a waiver in order to protect the integrity of the judicial proceedings and the public's interest in ensuring a just verdict. *Perez* at 125; *Locascio*, 6 F.3d at 931. "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160, 108 S.Ct. at 1698. Trial judges must apply their independent judgment to ensure that attorneys appearing before them follow the relevant codes of professional conduct. *See id.* (applying the ABA Model Code of Professional Responsibility and ABA Model Rules of Professional Conduct). This rule supports a "legitimate wish" that the court's "judgments remain intact on appeal." *Wheat*, 486 U.S. at 161, 108 S.Ct. at 1698.

**[13]** Nevertheless, district courts have "substantial latitude" in refusing or accepting waivers. "[T]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict" in the pre-trial context. 486 U.S. at 162–3, 108 S.Ct. at 1699.

## III. Defense Counsel's Prior Representation of Government Witness

### A. Law

**[14]** An attorney's former representation of a government witness on a substantially related matter can create the potential for serious conflict of interest warranting disqualification since the attorney may be limited in impeaching a former client or attacking his credibility on summation without becoming an unsworn witness. *See Ciak v. United States*, 59 F.3d 296, 304–05 (2d Cir.1995), abrogated on other grounds by *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); *United States v. Iorizzo*, 786 F.2d 52, 57 (2d Cir.1986). Absent a waiver from the former client, the attorney may not inquire into privileged matters; this restriction may impair his ability to cross-examine the witness fully. *See United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir.1995); *Ciak*, 59 F.3d at 305; *United States v. James*, 708 F.2d 40, 45–46 (2d Cir.1983). *Cf. United States v. Lussier*, 71 F.3d 456, 462 (2d Cir.1995) (attorney's conflict was significantly diminished and waivable where the attorney was free to cross-examine a former client who had waived the attorney-client privilege).

**[15]** A matter is substantially related to an earlier matter if:

(1) the current matter involves the work the lawyer performed for the former client; or

(2) there is a substantial risk that representation of the present client will involve the use of information acquired in the course of representing the former client, unless that information has become generally known.

Restatement § 132. This prohibition is not monolithic. A client who is represented by an attorney on one matter may not inhibit that attorney's freedom in all future, unrelated matters. "The scope of a client's interests is normally determined by the scope of work that the lawyer undertook in the former representation." Restatement § 132 cmt. e.

**[16, 17]** An attorney is barred from making an argument or cross-examining a

former client in a way that could affect the client adversely in a present proceeding. *United States v. Rahman*, 861 F.Supp. 266, 277 (S.D.N.Y.1994) (disqualifying firm that had previously represented four codefendants who might possibly testify). Under the "common interest" rule, the duty of confidentiality also extends to a co-defendant of a former client where counsel for both undertook a joint defense. *See United States v. Schwimmer*, 892 F.2d 237, 243–44 (2d Cir.1989).

[18–20] A serious conflict warranting disqualification may arise if the attorney is "potentially in a position to use privileged information obtained during prior representation" of the former client. *United States v. Cunningham*, 672 F.2d 1064, 1072 (2d Cir.1982). *See also Belmontes v. Brown*, 414 F.3d 1094, 1118 (9th Cir.2005) ("Conflicts of interest based on successive representation may arise if the current and former cases are substantially related, if the attorney reveals privileged communications of the former client, or if the attorney otherwise divides his loyalties."). Cross-examination of a former client will not always lead to disqualification on this ground. Not every brief relationship between an attorney and a layman involves the exchange of confidential communications. *See* Restatement § 132 cmt. h ("The specific tasks in which a lawyer was engaged might make the access to confidential client information insignificant. The lawyer bears the burden of persuasion as to that issue and as to the absence of opportunity to acquire confidential information. When such a burden has been met, the lawyer is not precluded from proceeding adversely to the former client.").

The majority of cases that have found a conflict of interest arising from prior representation of a witness involve substantially related representations, where the danger of divided loyalties or revealing client confidences is at a maximum. *See Malpiedi*, 62 F.3d at 467 (counsel represented government witness during the grand jury proceedings in the same case); *Ciak*, 59 F.3d at 304 (in criminal prosecution, counsel sought to impeach a key government witness who was former client in forfeiture case stemming from same prosecution); *James*, 708 F.2d at 43 (counsel's former representation of alleged head of narcotics organization was substantially related to representation of defendants where the defense's theory of entrapment was likely to elicit facts about defendants' relationship with the former client); *United States v. Moscony*, 927 F.2d 742, 747 (3d Cir.1991) (counsel represented three government witnesses during the grand jury investigation in the same case); *U.S. v. Falzone*, 766 F.Supp. 1265, 1275 (W.D.N.Y.1991) (counsel's former eleven-year-long representation of government witness was substantially related to representation of defendant where it was possible that the witness acquired information about defendants' loan-sharking enterprise during his own criminal activity). *But see United States, ex rel. Stewart, on Behalf of Tineo v. Kelly*, 870 F.2d 854, 857 (2d Cir.1989) (trial court had discretion to reject defendant's waiver when defense counsel had previously represented key government witness in unrelated matter); *Falzone* at 1275 (expressing doubt that substantial relationship is required).

[21] Limited representation of a government witness unrelated to representation of the defendant is not likely to present a disabling conflict. *See United States v. Paone*, 782 F.2d 386, 393 (2d Cir.1986) (holding that defendant was not denied effective assistance of counsel because the district court refused to disqualify his counsel who, ten years prior to trial, aided

Case 1:10-cr-00657-JBW Document 14-27 Filed 06/13/09 Page 247 of 254

a government witness in applying for bail on unrelated charges).

**[22, 23]** The burden of establishing that an attorney-client relationship existed between the attorney and the former client is on the party seeking disqualification. *Falzone,* 766 F.Supp. at 1272 (citing *Schwimmer,* 892 F.2d at 244). An attorney-client relationship arises when:

(1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either

(a) the lawyer manifests to the person consent to do so; or

(b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relied on the lawyer to provide the services . . . .

Restatement § 14. Since "only the client and the attorney know what confidential communications occurred," the view of the the former client is an important factor in deciding whether disqualification is necessary. *James,* 708 F.2d at 46. *See also Malpiedi,* 62 F.3d at 467–68 (counsel prohibited by lower court from cross-examining a government witness who believed counsel was her lawyer during grand jury proceeding, even if counsel believed he was never her lawyer).

**[24]** Absent institutional interests in the integrity of judicial proceedings, and subject to the attorney-client privilege of the former client, a defendant may waive an attorney's conflict arising from prior representation of a trial witness. *Perez,* 325 F.3d at 127; *Lussier,* 71 F.3d at 462.

## B. Application of Law to Facts

### 1. Michael DiLeonardo

**[25]** For the purposes of defendant's trial, government witness DiLeonardo has not waived any attorney-client privilege arising from his communications with defense counsel.

Defense counsel acted as an investigator for DiLeonardo, but not as his attorney, by interviewing a potential witness in DiLeonardo's Atlanta extortion prosecution. Defense counsel's work for DiLeonardo was brief, unpaid and done out of past friendship. He interviewed only one potential witness on DiLeonardo's behalf and reported back that the witness would not testify adversely to DiLeonardo.

The present prosecution concerns loan-sharking and murders in the Eastern District of New York. It is not related to defense counsel's interview of DePalma in DiLeonardo's Atlanta extortion trial. Defense counsel's cross-examination of DiLeonardo will have no adverse effect upon the witness, who is already cooperating with the government. Defendant's and DiLeonardo's interests are not legally adverse to each other. DiLeonardo did not believe that defense counsel was his attorney. At the hearing, DiLeonardo testified: "I didn't have any legal proceedings with [defense counsel] that way [i.e., appearing in court or filing motions]. His job for me was being a courier of messages." T. of Feb. 6, 2006 Hearing at 25:14–15 ("T.").

While pertinent at the disqualification hearing, DiLeonardo's testimony about counsel's alleged involvement with the Gambino crime family would not be relevant at trial. No harm is likely to inure to defendant from it.

DiLeonardo's testimony about the murders charged to defendant here *would* be relevant and injurious to defendant. To effectively represent defendant, counsel would have to attack his former friend on cross-examination. Counsel need not have recourse to attorney-client confidences to conduct effective cross-examination of DiLeonardo. The material for effective cross-examination is well-known. DiLeo-

nardo's extensive criminal history and motives for acting as a cooperating witness were explored at the hearing and are matters of public record. If counsel does not use confidential communications between himself and DiLeonardo on cross-examination—and it is highly unlikely that he would need to—no ethical standard will be breached. Mere friendship of the superficial kind between defense counsel and DiLeonardo is not a basis for disqualification. *Cf. infra*, VII. Counsel's cross-examination of DiLeonardo will not interfere with the trial or make it appear unfair.

### *2. Primo Cassarino*

**[26]** The government plans to elicit the testimony at trial of Primo Cassarino, a cooperating witness and former co-defendant of Richard V. Gotti, a past client of defense counsel. If Gotti and Cassarino undertook a joint defense, and defense counsel was privy to confidential communications, defense counsel would be limited in his cross-examination of Cassarino under the "common interest" rule. *See Schwimmer*, 892 F.2d at 243–44.

The government's unsupported allegations that, prior to trial in the earlier case, Cassarino, Gotti, defense counsel and others "participated in joint defense meetings, during which [defense counsel] undoubtedly received confidential communications by Cassarino," Gov't Letter of Nov. 16, 2005 at 1, are insufficient to support a finding of conflict. The government has not indicated how any of the alleged communications would affect defense counsel's ability to cross-examine Cassarino. The threat allegedly made by a member of the Gambino family at one of the meetings—that any defendant taking a plea would be killed—while disturbing, is not tied by the government to defense counsel. It is irrelevant to defense counsel's ability to adequately

represent his client in the present prosecution.

## IV. Defense Counsel's Current and Prior Representation of an Unindicted Co-Conspirator

### A. Law

**[27]** Simultaneous representation of a defendant and an unindicted co-conspirator may constitute a conflict of interest if, had there been a joint trial, counsel would have been forced to take contradictory positions in defending both. *See United States v. Friedman*, 854 F.2d 535, 574 (2d Cir.1988) (no conflict arose from counsel's simultaneous representation of defendant on racketeering charges and an unindicted co-conspirator in view of latter's "marginal relevance to [the] case, let alone to [defendant's] guilt"); *United States v. Stantini*, 85 F.3d 9, 15–19 (2d Cir.1996) (habeas petitioner convicted of conspiracy and substantive murder charges not denied effective assistance of counsel when his attorney simultaneously represented an unindicted co-conspirator in a related racketeering prosecution in which the same murder was charged as a predicate act).

**[28]** Simultaneous representation of an unindicted co-conspirator does not necessarily create an "inherent conflict" limiting a defendant's ability to enter plea negotiations. Defense counsel could insist that the defendant's agreement with the government provide that the government could not use the plea as evidence in the trial of his other client. *Stantini* at 17. Emphasizing the role of a co-conspirator or placing him at the scene of the murder may not benefit a defendant. Rather, it may validate the account of the government's witnesses. *Id. But see United States v. Christakis*, 238 F.3d 1164, 1169 (9th Cir.2001) (counsel's interest in protecting another client from being implicat-

ed in a conspiracy conflicted with defendant's interest in exchanging information inculpating the co-conspirator to obtain a reduced sentence); *United States v. Allen*, 831 F.2d 1487, 1496–97 (9th Cir.1987) (counsel labored under actual conflict of interest where defendant's interest in showing that he was not a principal in a drug conspiracy would have implicated unindicted bosses of the operation who had ongoing attorney-client relationship with counsel and bankrolled the defense for defendant and his sixteen co-defendants). Multiple representation conflicts have generally been held to be waivable. *Perez*, 325 F.3d at 127; *Fulton*, 5 F.3d at 613.

[29] Since the duties of loyalty and confidentiality remain in force after the attorney-client relationship has ended, *Yannotti*, 358 F.Supp.2d at 295, prior representation of an unindicted co-conspirator raises concerns similar to simultaneous representation of an unindicted co-conspirator. If the link between the successive representations or the risk of divulging former client's confidences is sufficiently attenuated, a conflict does not necessarily arise "simply because an attorney previously represented a possible co-conspirator or a potential witness." *Frazier v. Kelly*, 112 F.Supp.2d 253, 258 (W.D.N.Y.1999) (counsel had no actual or potential conflict where member of counsel's law firm had previously represented an unindicted co-conspirator who was not expected to testify). *See also Millio v. Barkley*, 48 F.Supp.2d 259, 267–68 (W.D.N.Y.1999) (counsel who represented defendant at a *Wade* hearing did not have a conflict of interest due to counsel's prior representation of a co-conspirator in unrelated court appearance where co-conspirator was not expected to testify).

[30, 31] A partner in a law firm is vicariously bound by the duties of loyalty and confidentiality that his partners owe to

their clients. *See* Restatement § 123(1) (conflicts of one lawyer are imputed to other lawyers who "are associated with that lawyer in rendering legal services to others through a law partnership, professional corporation, sole proprietorship, or similar association"). Due to the vicarious obligations of partners, "a showing that two attorneys are partners or represent themselves to the world at large as partners, and whose interests overlap in the acceptance of clients and in the sharing of fees is sufficient to ground a conflict of interest claim, assuming that there is proof that the clients' interests may have been in conflict." *United States v. Jiang*, 140 F.3d 124, 127 (2d Cir.1998) (internal quotation marks and citation omitted). *See also United States v. Blount*, 291 F.3d 201, 211 (2d Cir.2002) ("A conflict-of-interest claim may . . . be grounded in the fact that two lawyers from the same firm represent two codefendants, even in unrelated proceedings.").

**B. Application of Law to Facts**

[32] Defense counsel and his firm have represented, and currently represent, Ronald Trucchio and John Setaro on matters unrelated to defendant's prosecution. Both men are allegedly unindicted coconspirators in the murders of which defendant is accused. Trucchio and Setaro themselves are not expected to testify. The government has indicated that it will introduce testimony by two cooperating witnesses, Frank Lino and Sal Romano, that will implicate defendant and these two men in the charged murders. The government contends that counsel cannot adequately represent defendant—by pursuing a plea bargain and cooperation agreement, vigorously cross-examining the government witnesses, or shifting the blame to the purported co-conspirators—without violating his continuing duty of loyalty to these other clients.

Case 1:03-cr-00055-UWE-RDC Document 14-27-6-41-Filed 16-03-12/17/08 Page 250 of 254

Defendant does possibly reduce the number of defense strategies by continuing to retain defense counsel. The court so apprised him. Nevertheless, he insists on asserting his Sixth Amendment right to counsel of his own choosing. *See Perez,* 325 F.3d at 127 (permitting waiver even where defendant may have to "abandon a particular defense or line of questioning").

## V. Defense Counsel's Alleged Role as a Co–Conspirator

### A. Law

[33] Allegations that counsel has engaged in criminal activity related to the charges for which the client is on trial create an unwaivable conflict of interest. *See United States v. Williams,* 372 F.3d 96, 105 (2d Cir.2004) (finding unwaivable conflict of interest where counsel unlawfully exchanged firearms with defendant indicted for using firearms in furtherance of his criminal activities); *Fulton,* 5 F.3d at 609–10 (habeas petitioner convicted on heroin charges was denied effective assistance of counsel where a government witness alleged that counsel received part of the heroin linked to defendant, and was involved in heroin trafficking). If the allegations are true, an attorney cannot freely advise the client whether to cooperate, or whether to take the stand at trial, for fear that the client could reveal information implicating the attorney. *Fulton* at 610. If the allegations are false, the attorney cannot examine the government witness regarding the allegations against the attorney without in effect becoming an unsworn witness. *Id.*

[34, 35] Whether a conflict arising from allegations that defense counsel is generally involved in crime is waivable depends on the connection between the attorney's alleged criminal activity and the charges on which defendant is tried. *See Fulton* at 611. An unwaivable conflict

does not arise "any time a court learns that an attorney may have committed a crime; the attorney's alleged criminal activity must be sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised." *Id. See also United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984) (defendant could not waive a conflict where, unbeknownst to him, his counsel allegedly engaged in criminal activities similar to the charges against defendant with a possible co-conspirator of defendant). It is unclear whether a defendant's knowledge of the attorney's criminal conduct permits waiver of a "related-crime" conflict. *Williams,* 372 F.3d at 105.

[36] If defense counsel is allegedly involved in crimes that are not substantially related to the charges against the defendant, waiver is permitted. *See Fulton,* 5 F.3d at 611; *United States v. Ramos,* 350 F.Supp.2d 413, 421–22 (S.D.N.Y.2004) (defendant could waive conflict stemming from counsel's investigation and indictment for accepting payments from a client appointed under the Criminal Justice Act and lying to the court about the payments); *United States v. Gambino,* 838 F.Supp. 749, 755 (S.D.N.Y.1993) (counsel's alleged involvement in tax evasion and obstruction of justice was not sufficiently related to defendant's racketeering charges to constitute a violation of the right to counsel). *Cf. Levy,* 25 F.3d at 156–57, 158–59 (petitioner was denied effective assistance of counsel where the attorney was prosecuted on unrelated criminal charges and was alleged to have a role in the flight of co-defendant because petitioner did not have an opportunity to make a knowing waiver).

### B. Application of Law to Facts

The government alleges that defense counsel and defendant are both partici-

Case 1:03-cr-00406-JBW Document 426-8 Filed 03/10/08 Page 1 of 5 PageID #: 254

pants in the same racketeering enterprise, namely, the Gambino crime family. In support of this allegation, the government offers transcripts of two taped conversations among Gambino family members and defense counsel's extensive representation of persons alleged to be participants in organized crime.

[37]    The taped conversations relate to defense counsel's father's desire to have defense counsel inducted into the Gambino family. It is undisputed that defense counsel's father and uncle are members of the family; this is not a ground for disqualification. *See infra*, VII. The transcripts do not support the government's argument. To the contrary, they reveal that the Gambino members are bemused at the father's request. "I can't get over it. I really can't. . . . The guy's a legitimate [expletive] lawyer. . . . If your son is a professional guy, a lawyer, you want to make [i.e., induct] him?" Gov't Mem. 15. Many a father has attempted to drag his son into the family business against the son's will.

That defense counsel has represented well over a score of clients accused of participating in organized crime cannot serve as a basis for a finding that he himself is a member of organized crime. The courts do not impute to criminal defense lawyers—even those who have developed a specialized clientele—the alleged crimes of their clients.

There is no reason that any testimony about defense counsel's alleged criminal associations would be relevant at defendant's trial.

## VI.   Criminal Investigation of Defense Counsel

### A.   Law

[38]    Investigation of counsel's possible involvement in crime includes, but is not exhausted by, the concerns that arise when a defendant's attorney is allegedly involved in the crimes of his client. *See supra*, V. When counsel is the target of a criminal investigation by the same office that is prosecuting his client, he "may, consciously or otherwise, seek the goodwill of the office for his own benefit" and his attempt to do so "may not always be in the best interest of [his] client." *Armienti v. United States*, 234 F.3d 820, 825 (2d Cir.2000). Therefore, a conflict may be present even without a nexus between the attorney's alleged conduct and the charges against his client. *See Levy*, 25 F.3d at 156 (attorney's prosecution on unrelated charges by the same office presented a conflict of interest because the attorney "may have believed he had an interest in tempering his defense of [the defendant] in order to curry favor with the prosecution"); *United States v. Ramos*, 350 F.Supp.2d at 420 (noting that the Court of Appeals for the Second Circuit "has never wavered from considering the lawyer's position as a target of criminal investigation while representing a criminal defendant a situation of conflict of loyalties analogous to representation of multiple clients").

[39]    If the activity for which the attorney is investigated is substantially related to the charges against the defendant, disqualification is necessary, notwithstanding defendant's waiver. *See supra*, V. See also *Jones*, 381 F.3d at 120 (upholding a district court decision to disqualify an attorney for defendant charged in narcotics trafficking conspiracy based on a possible grand jury investigation that the attorney passed information from defendant to another client suspected of distributing narcotics).

[40]    In the absence of a strong connection between the activity for which counsel

is investigated and defendant's charges, defendant may generally waive a conflict stemming from a criminal investigation of his attorney. *See, e.g., Levy,* 25 F.3d at 157 n. 8 (permitting waiver where the attorney was under investigation for unrelated crimes and allegedly had a role in codefendant's flight); *United States v. Aiello,* 900 F.2d 528, 531–32 (2d Cir.1990) (permitting waiver where the attorney was investigated in a different district for unrelated conduct); *Ramos,* 350 F.Supp.2d at 422 (a defendant can make a knowing waiver of conflict arising from counsel's investigation and indictment on unrelated charges); *Gambino,* 838 F.Supp. at 754–55 (same).

**B.   Application of Law to Facts**

**[41]**  The government has notified defense counsel that he is the subject of two criminal investigations.  One relates to defense counsel's alleged obstruction of justice and witness tampering in another criminal prosecution in this district.  The other concerns the alleged use of attorneys to pass messages for the Gambino crime family.  Defense counsel denies any misconduct and contends that the investigations, one of which has been pending since 1996, are wholly manufactured.

Neither of the investigations bears a strong connection to the charges at issue in this trial—murder, loan-sharking and extortion.  It is not critical that both this prosecution and the investigations involve the same organized crime family.  *See Levy,* 25 F.3d at 157 n. 8 (waiver permitted where allegations against attorney concerned "completely different substantive crime and [were] factually and temporally distinct from [defendant's] alleged criminal acts," even though attorney was alleged to have helped co-defendant flee justice). Defendant has chosen to waive these conflicts.

**VII.  Defense Counsel's Natural and Alleged Criminal Family Loyalties**

**A.   Law**

**[42]**  An attorney's loyalties to third parties, including his natural family members, may create a potential conflict of interest if the interests of those other individuals are adverse to those of his client. Such a conflict is waivable.  *See* Restatement § 125 ("*Unless the affected client consents* . . . a lawyer may not represent a client if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's financial or other personal interests." (emphasis supplied)).

In *Yannotti,* the court held that present defense counsel's loyalties to his uncle and father, alleged high-ranking members of the Gambino family, gave rise to an actual conflict of interest between counsel and his client.  *Yannotti,* 358 F.Supp.2d at 292. Crucial to the court's holding was the government's representation that multiple witnesses would testify at trial that defendant acted under the direct supervision of defense counsel's uncle during the time relevant to the indictment.  *Id.* The court's holding rested on two grounds.  First, the government's repeated references during the course of trial to counsel's uncle could "simultaneously discredit [counsel] and reinforce in the jurors' minds the notion that [defendant] himself is a bad actor."  *Id.* Second, while the prospect of life imprisonment gave defendant an incentive to cooperate with the government, counsel would not be likely to advise him to cooperate or take the stand for fear that he might provide information damaging to defense counsel's uncle or father.  *Id.* The court observed that, considered alone, this conflict could have been waived.  *Id.* In combination with defense counsel's alleged involvement in a shooting that would be the subject of testimony at trial and his prior

Case 1:08-cv-00674-JBW-RLM Document 14-27-6 Filed 03/14/09 Page 253 of 254

representation of a "material" witness, it required disqualification. *See id.* at 295 (describing the witness' testimony as "direct and important").

**[43]** In racketeering prosecutions, a conflict of interest arises if counsel acts as "house counsel" for an organized crime family for two reasons: first, the attorney's loyalties may be divided between the client and the payor. *See* Restatement § 134(1) ("A lawyer may not represent a client if someone other than the client will wholly or partly compensate the lawyer for the representation, unless the client consents . . . and knows of the circumstances and conditions of the payment."). Second, the government may use evidence that the attorney acts as "house counsel" to establish the existence of a criminal enterprise. Evidence tending to incriminate the attorney would prejudice the defendant. *See Locascio,* 6 F.3d at 932–33.

Evidence that counsel receives benefactor payments for the representation of others, including defendant, establishes that counsel acts as a "house counsel." *See id.* In *Locascio,* the court found that a telephone conversation in which the defendant complained to his attorney about incurring legal fees for the representation of others, and the testimony of another witness that he did not pay for that attorney's legal services presumably because defendant had paid for them, sufficiently established that counsel acted as house counsel to the Gambino crime family. *Id.* at 933. Testimony merely describing counsel as "house counsel" does not sufficiently show that counsel's loyalties are split between the defendant and the payor, in the absence of evidence that the attorney is paid to represent defendant or that defendant is compelled to retain the particular attorney. *See Yannotti,* 358 F.Supp.2d at 297 (refusing to rely on "house counsel" allegation in disqualifying counsel and noting that the

government did not proffer evidence that counsel was paid by John Gotti, Jr. to represent defendant or others, nor that defendant was compelled to retain counsel).

## B. Application of Law to Facts

**[44]** The facts show a disturbing pattern of a continuing relationship with the Gambino family and commitment to the welfare of the criminal family's members. There is no indication, however, that defense counsel is being paid by third parties other than defendant's wife and children for his representation, nor is there any reason to believe that members of organized crime are attempting to limit a good faith and aggressive defense.

It would be inappropriate to burden an attorney's career with the background of his relatives. The court takes judicial notice—having tried many of these crime family cases and being aware of ethnic considerations in the area of Brooklyn where counsel was brought up—that in some natural families, some members become lawyers and effective law enforcement personnel, and others become members of the mob. We do not punish a man on account of his relatives. Family status ceased to determine permissible occupation in this country in 1776.

The fact that a criminal helped pay for the education of a bright young man does not require the conclusion that that young man will follow the dictates of his former sponsor. Alexander Hamilton's sponsors in the Caribbean exercised no control over his subsequent history. *Compare* Richard Brookhiser, Alexander Hamilton, American 19–20 (Hamilton's education funded by merchant who traded in slaves) *with id.* at 175–6 (Hamilton co-founded Society for Manumission of Slaves, which successfully

pushed to make slavery illegal in New York).

### VIII.   Conclusion

The alleged potential conflicts are serious. The court has warned defendant on numerous occasions of the risks of continuing with defense counsel. It has offered him an independent appointed attorney to advise him on the matter. Since defendant is reportedly illiterate, the court ordered that a person be provided at government expense to read defense counsel's and the government's motion papers to him. *See* Order of November 14, 2005. Thereafter, the court heard testimony from defendant, his wife and their children, each of whom made clear a desire to proceed with present defense counsel. Defendant has repeatedly stated on the record that he has known defense counsel since the latter was a child, and trusts him. Defendant's wife and son testified that *they* approached defense counsel about representing defendant; he was not imposed by a third party. Should defendant be convicted, any future collateral attack claiming ineffective assistance of counsel because of these conflicts would have little basis.

Public perception may be offended by this representation. The courts are concerned that the perception of the public not be adverse lest the legal system lose public trust. Our system of law depends upon the public, and other governmental agencies, following judicial judgments by force of habit and out of respect. The courts themselves have no direct power of enforcement: they can do nothing without the aid of the executive and legislative branches, and public goodwill.

Public perception, however, may not control reality and the law. In this case, the fundamental deciding factor is defendant's Sixth Amendment right to have counsel of his own choosing. Given that right, the motion to disqualify is denied.

SO ORDERED.



---

**Editor's Note:** The opinion of the United States District Court, E.D. New York, in *United States v. Pizzonia*, published in the advance sheet at this citation, 415 F.Supp.2d 186, was withdrawn from the bound volume because opinion was clarified on reconsideration. For opinion on reconsideration see 2006 WL 870962.

---