UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA

       -against-                                          Ind. No. 11 Cr. 30 (S-4)(KAM)

ANGELO SPATA,

       *Defendant.*

------------------------------------------------------------X

## REPLY SENTENCING MEMORANDUM
## ON BEHALF OF ANGELO SPATA

                                            SARITA KEDIA
                                            SARITA KEDIA LAW OFFICES, P.C.
                                            5 East 22nd Street, Suite 7B
                                            New York, New York 10010
                                            (212) 681-0202
                                            skedia@kedialaw.com

                                            *Attorney for Angelo Spata*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA

      -against-                                    Ind. No. 11 Cr. 30 (S-4)(KAM)

ANGELO SPATA,

      *Defendant.*

-------------------------------------------------------------X

## REPLY SENTENCING MEMORANDUM
## ON BEHALF OF ANGELO SPATA

      We respectfully submit this memorandum in further support of Angelo Spata's plea for a non-custodial sentence. For the reasons stated below, together with those in our original submission, we respectfully submit that in this case a non-custodial sentence is "sufficient, but not greater than necessary."

### A MINOR ROLE ADJUSTMENT IS WARRANTED

      The parties agree that the Guidelines range contained in the Plea Agreement – 15-21 months before a minor role adjustment – is correct. The government disagrees, however, that Mr. Spata should be awarded a 2-point minor role reduction, as it contends that, while he was only an associate, he "held more power within the Colombo crime family than other associates in the family." Govt. Ltr. at 7. The government offers no proof for this assertion, other than to say

that he is "the son-in-law of the boss of the Colombo crime family, Carmine Persico, and the brother-in-law of the acting boss, Alphonse Persico." Id.[1]

The government also maintains that a minor role adjustment is not applicable because Mr. Spata was proposed for induction into the family in August of 2010. See id. at 8.[2] While it offers no support for this assertion, it notably references, earlier in its submission, information provided by a cooperating witness, Anthony Russo. Although Russo's information actually conflicts with the government's claim, the government omits the contradictory part. Compare Govt. Ltr. at 4, 4 n.1 with Debriefing Report of Anthony Russo, Ex. B (not filed electronically). Indeed, Russo informed the government that, after several discussions in 2010, it was decided that an induction ceremony would take place in late 2010 (the recordings show that it was to take place in December) wherein four associates would be inducted as members of the Colombo family. Id. Mr. Spata was *not* one of the four. Id.[3] According to Russo, a day or two before the induction ceremony was to take place, a high-ranking Colombo member told Russo that Mr. Spata would also be inducted and directed another member to find Mr. Spata to tell him to be available on the day of the ceremony. Id. Russo reported that no one was able to find Mr. Spata. Id. Critically, the assumption was that *Mr. Spata hid from everyone because he thought he was going to be killed.* Id. This information inarguably belies the government's argument that Mr.

---

[1] In its effort to elevate Mr. Spata's status to a "more power[ful]" associate, the government disingenuously refers to his brother-in-law Alphonse Persico as "acting boss." Indeed, the government maintained in its sentencing submission to this Court that Andrew Russo was the "acting boss" during the relevant time period. See Relevant Pages from Govt. Sent. Mem. in Andrew Russo, Ex. A; see also Ind. at ¶ 12 (referring to Andrew Russo as "street boss").

[2] While the government continually cites the Presentence Report ("PSR") as a basis for its statements, it is the government that provided the Probation Office with this information for inclusion in the PSR. Undoubtedly, the Probation Office has no independent knowledge or source of information through which it determined the veracity of the government's claims.

[3] Nothing in this debriefing report suggests that Mr. Spata was proposed for membership in August 2010. To the extent that the government has information that Mr. Spata was proposed *and rejected*, this is hardly demonstrative of his "power," especially in light of his subsequent actions.

Spata was powerful. Indeed, not only was Mr. Spata unaware that he might be proposed, he viewed himself, as did others, as someone who was *so unnecessary* to the enterprise that he might be eliminated.[4]

Moreover, recordings secretly made by cooperating witnesses demonstrate that other Colombo members and associates likewise viewed Mr. Spata as an inconsequential participant – indeed, one who not only had no authority but was simply an annoyance to them.[5] To be sure, they depict a very different portrait than that which the government attempts to portray. For instance, Anthony Russo is heard stating in an August 12, 2009, recording that "he don't listen to this f[ ]ing kid [Angelo]." In a September 21, 2009, recording, Russo and McLaughlin are heard complaining that "little Angelo" is a "nightmare" and a "jerkoff," with Russo boasting that he "pulled [Angelo's] ear from behind" and McLaughlin saying that Angelo "ran away from" him. On June 25, 2010, Russo is heard saying that everyone hates little Angelo.

The government's claim that Mr. Spata engaged in activity such as providing loanshark money to McLaughlin is likewise contrary to information contained in these secretly intercepted recordings.[6] To be sure, the recordings show that Mr. Spata was incessantly harassed by Russo

---

[4] Additionally contradicting the government's claim is a recording in which Anthony Russo tells Thomas McLaughlin that Mr. Spata is worried because the Gambinos are starting to abuse him and thus suggests that Russo spread a rumor to the Gambinos that he is being proposed for membership into the Colombo family. Russo, however, refuses to do so because Spata is not in fact being proposed.

[5] Several cooperating witnesses, including Thomas McLaughlin (who continued to commit crimes after he became a cooperating witness), secretly recorded conversations with various Colombo members and associates. Between February 2008 and January 2011, these cooperators made some 529 recordings. The government identifies Mr. Spata as having been overheard on only six of these recordings (although we do not hear his voice on two of those six), and a review of them reveals nothing of substance pertaining to Mr. Spata. They largely involve McLaughlin and others, including Anthony Russo (who was not yet cooperating at the time these recordings were made), showing up at Mr. Spata's place of business or a feast where he worked to demand money or other assistance. Mr. Spata is rarely heard and is not heard saying anything significant.

[6] None of the hundreds of McLaughlin (CW-1) recordings corroborate the government's contention that Alphonse Persico sent a message through Mr. Spata to Joseph Savarese, in which "Persico authorized Spata to lend CW-1 [McLaughlin] a sum of money to launch an illegal loansharking business." Govt. Ltr. at 7 n.2. Although a recording made by "CW-2" – Peter Tagliavia, a cooperating witness related to McLaughlin – suggests that Savarese gave

3

and McLaughlin and that he did what he could to avoid these individuals. In numerous recordings – some of which we discuss below – Russo and McLaughlin are heard boasting about attempts to extort Mr. Spata and complaining about Mr. Spata's refusal to do various things for them, such as helping them get a booth at one of the feasts where Mr. Spata worked or providing them with loanshark money.

For instance, in an August 31, 2009, recording, Russo is heard stating that he just left the 18th Avenue Feast where he saw Mr. Spata, and McLaughlin complains that Mr. Spata never followed through in helping him get a booth at the Feast. On October 23, 2009, Russo advises McLaughlin to ask Mr. Spata for loanshark money, to which McLaughlin again responds: "He runs away from me. I don't know how to get in touch with him." In a November 25, 2009, recording, McLaughlin is similarly heard complaining that Mr. Spata never returns his telephone calls. On January 4, 2010, Russo tells McLaughlin that he told Angelo that he could not keep saying that he would give McLaughlin money and then not doing it. On February 24, 2010, Russo and McLaughlin again discuss their continued pursuit of money from Mr. Spata, venting that Angelo "makes us look like … fool[s]" by claiming that he would capitulate to their demands for money and then failing to follow through. Indeed, McLaughlin says that he would like to "choke little Angelo and snap his windpipe." In a May 5, 2010, recording, McLaughlin and Russo discuss extorting Mr. Spata by "grab[bing]" him and forcing him to "go partners" in his business. In June of 2010, Russo and McLaughlin continue discussing getting booths at the feasts from Mr. Spata. McLaughlin also asks Joseph Savarese if he can assist McLaughlin in acquiring the booths, but Savarese says that Mr. Spata is unwilling to help them. In August

---

Tagliavia money to give to McLaughlin, the recording does not corroborate the assertion that the money came from Mr. Spata or that a letter was sent to Mr. Spata by Mr. Persico. A transcript of the relevant, audible portion of the recording is annexed hereto. See Ex. C. Moreover, a sentencing submission made by Savarese states that it was his own money that he lent to these cooperating witnesses. See Ex. D.

4

2010, McLaughlin says: "Half of us [Colombo guys] want to beat him [Angelo] up," and Russo tells McLaughlin he wants nothing to do with "this kid Angelo." A week later, Russo says he will "kick Angelo in his balls and send him from here to Hong Kong." Later that month, Russo and McLaughlin are heard continuing to complain about Mr. Spata, with Russo saying he was "taking" money from Angelo and that he had "yelled at" and "snapped out" on Angelo. McLaughlin responds: "If this little Angelo lies to you this week and doesn't give you the money…I am gonna punch him in the face." In late September 2010, the two are heard again venting about Mr. Spata, calling him insulting names because he had not given them money. In late November 2010, McLaughlin refers to Angelo as "a little weasel." On December 17, 2010, Russo says he hates Angelo and wants to kill him and calls Mr. Spata ugly names.

These recordings are not indicative of an associate who wields more power than others. Rather, they more aptly portray Mr. Spata as the victim of repeated harassment and attempted extortion by McLaughlin and Russo and, at a minimum, an associate with limited, if any, sway. Indeed, it appears that Mr. Spata is constantly bullied by other Colombo members and associates because of his diminutive size, rather than highly regarded because of his familial relations.

In support of its argument that a minor role adjustment is not warranted, the government cites the Second Circuit's decision in United States v. Beckford, No. 12 CR 3548, 2013 U.S.App.LEXIS 20760 (2d Cir. Oct. 15, 2013), wherein the court upheld the district court's denial of a minor role adjustment. Beckford is inapposite.

In Beckford, the defendant Malachi Burris was convicted of being involved in a fraud ring operating in Brooklyn which defrauded AT&T and T-Mobile customers out of thousands of wireless devices worth millions of dollars. See Govt. Sent. Mem. at 1, Ex. E. The defendant pled guilty – without any plea agreement – after jury selection but before opening statements. Id.

5

According to the government, "[f]rom approximately 2005 through 2009, the defendant was a 'runner' for his brother, Samuel Burris. Together, the defendant, Samuel Burris, and Courtney Beckford comprised the 'Burris working group.' … They fraudulently ordered their own wireless devices and collected these wireless devices from a set of FedEx drivers they recruited and paid." Id. at 3. The loss amount for which Burris was responsible was more than half a million dollars. Id. at 6.

In regard to his relative participation, the district court made numerous particularized findings that Burris jointly undertook the entirety of the conspiracy's activity from October 2005 until its termination. See 2013 U.S.App. LEXIS 20760, at 4. Specifically, the district court concluded that Burris had engaged in the following:

> (1) Burris picked up fraudulently obtained wireless devices from Rudolph, a co-conspirator who was a FedEx courier, for approximately two months in 2005; (2) Burris would call Rudolph telling her the addresses that would appear on the packages with fraudulently obtained devices so that she would know which ones to set aside; (3) in early 2007, Burris again picked up wireless devices from Rudolph; (4) in 2007, Rudolph introduced Burris to FedEx courier McLean, and Burris told McLean that he would put McLean in contact with Samuel Burris; (5) thereafter, Burris occasionally accompanied co-conspirator Courtney Beckford to pick up packages from McLean; (6) in September, 2008, when Burris asked Beckford whether he "got the rest of the things," Beckford responded that he "got three," including a "Pearl," and AT&T records showed that three phones, including a Blackberry Pearl, App'x at 228, had been sent to Beckford's address; (7) later that month, Burris traveled to Jamaica with Beckford and Samuel Burris, and fraudulently obtained wireless devices were discovered in the luggage of both Burris brothers, while Beckford had in his luggage a list of email addresses, many of which had been provided to AT&T or T-Mobile customer services representatives so that co-conspirators could receive emails with tracking information for the fraudulently ordered phones; [and] (8) in October, 2008, Burris and Beckford discussed the number of phones being ordered by Samuel

> Burris and Samuel Burris's difficulty reaching one of the FedEx couriers.

Id. at 5-6. Moreover, records discovered at Beckford's home referred to 150 wireless devices and referred to eight of those devices as attributable to Burris. Id. at 6.

Given Burris' involvement, it was clear that, although he may have been less culpable than the organization's head, he was significantly more culpable than the FedEx drivers who received minor role adjustments. Id. at 8. Indeed, Burris was directly at the center of the relative culpability scale. And, notably, while the district court did not grant a minor role adjustment, it nevertheless awarded Burris a below-guidelines sentence of 24 months, despite attributing to him $569,681 in "real loss." Id. at 1-2.

By comparison, Mr. Spata's role in the Colombo organization was inarguably minor. Not only was he far from the organization's center, it is clear that numerous members of the enterprise thought of him and treated him as a trivial confederate, one who could be abused, or even dispensed with, at their whim. For these reasons, as well as those stated in our initial memorandum, we respectfully submit that a minor role adjustment is appropriate for Mr. Spata. While he may not have been a "minimal" participant – and thus deserving of a 4-point role reduction – he was certainly substantially less culpable then numerous others involved in the enterprise.

## THE OFFENSE CONDUCT

We do not dispute the government's characterization of the offense conduct to which Mr. Spata pled guilty. See Govt. Ltr. at 2-3. We note, however, that the government's evidence shows that any money given to Mr. Spata from the joker-poker machines was then distributed by him to various incarcerated members' commissary accounts. See PSR at ¶ 20. Therefore, as

7

stated in our original submission, Mr. Spata himself did not benefit financially from his conduct in any significant way.

## ADDITIONAL CONDUCT

With respect to additional conduct alleged by the government that is not addressed above, we maintain that Mr. Spata did not commit these crimes. And despite the hundreds of recordings made by cooperators during its investigation, the government has provided no proof whatsoever that Mr. Spata did so. Indeed, much of the alleged conduct is undermined by the government's recordings and other evidence it collected, as discussed above. The government concedes that this alleged conduct does not affect Mr. Spata's Guidelines calculations. To the extent that the Court believes any of it to be critical or determinative of the sentence that should be imposed on Mr. Spata, we will, most respectfully, address it further at the Court's direction.

## A NON-CUSTODIAL SENTENCE IS WARRANTED

Whether or not the Court finds applicable a minor role adjustment, we respectfully submit that, in light of Mr. Spata's personal history and circumstances, a non-custodial sentence is warranted here. As detailed in our original submission, Mr. Spata's wife and three children, as well as elderly parents, are dependent on him for financial and emotional support. Angelo's father is inarguably unwell, and, as noted in one physician's letter, Angelo is his ill father's "sole care giver and takes care of all his medical needs" and "home needs." See Ex. F.[7]

Although, as the government notes, Mrs. Spata is employed as a school teacher, her income is insufficient to pay the mortgage on their home and other living expenses of herself and

---

[7] The government remarks that the health of Mr. Spata's father should have no impact on sentencing, as he was "well enough" to be "considered" for induction into the Colombo family and to have visited Angelo's father-in-law Carmine Persico in prison. Id. at 12. But the only evidence regarding Mr. Spata Sr. being "considered" for induction revolved around his being harassed by the Gambinos a few years ago, at a time when he too was working at the feasts. Apparently, there was some discussion about what could be done to help that situation, but ultimately the idea was rejected and thereafter Mr. Spata Sr. fell too ill to work and retired. And Mr. Spata Sr. only visited his son's father-in-law on a couple of occasions, the last of which was well before his most recent heart problems, which have caused his on-and-off hospitalization over the last year and the need for a heart transplant. See Ex. F.

8

their three children.  Mr. Spata earns the majority of the family income, and both spouses' incomes are necessary for their survival.  As set forth in our initial submission, if Mr. Spata were incarcerated and unable to work, his business, for which he solely is responsible, would surely collapse.  He would also be unable to retain the rental property from which he derives a modest income, as he alone manages and maintains the property.  Therefore, it is not simply that the family would be less "comfort[able]" if Mr. Spata were incarcerated, as the government suggests (see Govt. Ltr. at 10), it is that Mr. Spata would lose his business and his family's financial situation would be seriously compromised.  Moreover, if Mr. Spata were unavailable to assist with caring for their children, Mrs. Spata's ability to work would be greatly hampered.

      The government does not dispute that Mr. Spata has made numerous significant charitable contributions throughout the years, but it argues that he should not be given an advantage because of his munificence.  See id.  But, of course, Mr. Spata's charitable acts, kindness and generosity should be considered by the Court.  Indeed, § 3553(a)(1) dictates that the Court should consider the defendant's history and characteristics. See also United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996) (upholding district court's downward departure based on, inter alia, defendant's "charitable and civic good deeds."); United States v. Greene, 249 F.Supp.2d 262, 265 (S.D.N.Y. 2003) (granting downward departure based on defendant's "charitable works" which included adopting two children with troubled backgrounds).

      While the government attempts to paint the Spatas as wealthy – and therefore someone whose philanthropy is less significant – this is simply not the case.  Although they own their residence and a commercial building (both of which have increased significantly over time in market value), they hold mortgages on both, and their net monthly cash flow is insignificant.  Indeed, they have little disposable income.  Nevertheless, his entire adult life, Mr. Spata has

9

devoted substantial time and donated significant resources and services to his community purely out of altruism, as described in the numerous letters submitted on his behalf.

Sean O'Connor, a retired New York City Police Lieutenant, has known Mr. Spata for approximately seven years and has witnessed "Mr. Spata donating his time" and "the great work that Mr. Spata does for the community." Ltr. of Sean O' Connor, Ex. G.[8] In describing one instance of Mr. Spata's altruistic nature, Mr. O'Connor writes: "I have observed Mr. Spata allowing multi-ethnic community children without the necessary fund[]s/means to take part in rides at no expense because it brought some happiness to them." Id. Similarly, Jennifer Tortorici, the Director of Operations for Luna Park, an amusement park in Coney Island, praises Mr. Spata's selfless generosity. Ms. Tortorici, who has worked with Mr. Spata on community events since 2010, describes Mr. Spata as "an eager contributor and supporter towards the betterment of [his] community" – one who goes "above and beyond" and "volunteer[s] his personal time and support." Ltr. of Jennifer Tortorici, Ex. H. This remarkable trait, we respectfully submit, should most certainly be considered by the Court.

Finally, the government's citation to United States v. Uvino, 07 CR 725 (JBW), in support of its application for a within-guidelines sentence, is inapt. Indeed, the circumstances of Mr. Spata's case are infinitely different that those in Uvino. Uvino was a "captain" in the Colombo family and "the leader of a crew that ran a substantial betting enterprise." Uvino v. United States, 2011 U.S. Dist. LEXIS 56483 (E.D.N.Y. May 24, 2011). He had gambling interests in New York, Connecticut, and Nevada, which included illegal poker and bookmaking operations. Id. at *2. In the course of running this enterprise, one of the gambling establishments controlled by Uvino was robbed. Id. Following this robbery, Uvino and his associates sought out the men they believed to be responsible. Id. After luring to a meeting two

---

[8] The character letters annexed hereto were received by counsel after our initial submission.

young men they suspected had been involved in the robbery, Uvino and his associates beat them. Id. During the course of the thrashing, Uvino hit at least one of the men with a steel chair. Id. at *2-3. The men required medical attention. Id. at *3. An oral tape of the lambasting was played at trial. Id. Audible was Uvino striking one man, who screamed and pleaded for mercy. Id.

It was these facts – that Uvino "exercised clear leadership over his criminal group" and "terrorized others" – as well as the fact that Uvino would "almost certainly return to criminal activities on behalf of the mob," given his induction and rank, that led Judge Weinstein to conclude that "[i]ncapacitation is required since specific deterrence is unlikely." United States v. Uvino, 2009 U.S. Dist. LEXIS 66488, at *9 (E.D.N.Y. July 28, 2009).

Not only does Mr. Spata's conduct bear no resemblance to that of Uvino, Mr. Spata is not an inducted member of the Mafia. Indeed, the recordings depict Mr. Spata as one who is most often attempting to separate himself from others who want to involve him in criminal activity.

Accordingly, for the reasons discussed above and in our initial submission, we respectfully submit that a non-custodial, slightly below-Guidelines sentence is justified here.

## THE APPLICABLE GUIDELINES FINE RANGE

The government argues that a fine should be imposed upon Mr. Spata, but misstates the applicable fine range as $7,500 to $75,000. See Govt. Ltr. at 12. As noted in our objections to the Probation Report, the applicable fine range is $3,000 to $30,000 if a minor role reduction is granted and $4,000 to $40,000 if it is not. While we agree that a modest fine would be within Mr. Spata's means if he were given a non-custodial sentence and able to work, Mr. Spata would not be able to afford such a fine if he were incarcerated and unable to work. Indeed, as discussed above and in our original submission, Mr. Spata's family, including his wife, three young children, and parents are financially dependent on him.

## **CONCLUSION**

We respectfully submit that, for the reasons discussed herein and in the original sentencing submission, a non-custodial sentence is most appropriate here, so that Mr. Spata's business does not collapse and he can continue to provide for his wife, young children and elderly parents. If the Court believes a probationary sentence insufficient, we respectfully implore Your Honor to consider imposing a sentence that includes home confinement and/or community service in order that Mr. Spata is able to continue working and caring for those who so desperately rely on him.

Dated: New York, New York
       December 16, 2013

                                      Respectfully submitted,
                                             /s/
                                      Sarita Kedia
                                      Sarita Kedia Law Offices, P.C.
                                      5 East 22nd Street, Suite 7B
                                      New York, New York 10010
                                      (212) 681-0202
                                      skedia@kedialaw.com

                                      *Attorney for Angelo Spata*